**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | | |
| | * | |
| **v.** | | **Crim. No. ELH-14-271** |
| | * | |
| **KEYON PAYLOR** | | **Civil No.  _____** |
| | * | |

\* \* \* \* \*

## MOTION TO VACATE JUDGMENT UNDER 28 U.S.C. § 2255

NOW COMES Petitioner, KEYON PAYLOR, by and through his attorneys, THE

EXONERATION PROJECT, and hereby moves to vacate his judgment under 28 U.S.C. § 2255.

In support thereof, Mr. Paylor states as follows:

## INTRODUCTION

The petitioner, Keyon Paylor, is an innocent man who pled guilty to a crime he did not

commit. He has served almost the entirety of his 60-month sentence. He pled guilty because,

generally familiar with corruption in the Baltimore City Police Department and the

persuasiveness to a jury of even false testimony coming from police officers, he recognized that

he did not have a level playing field on which to fight the false allegations against him. The

conviction of Detective Daniel Hersl, the officer who had arrested him in both the instant case

and multiple other times since he was thirteen years old, on charges of racketeering, robbery, and

extortion prove Mr. Paylor right. *See United States v. Gondo, et al.*, Crim. No. JKB-17-0106.

Indeed, following a three-week trial, on February 12, 2018, Hersl was convicted of

racketeering conspiracy (Count One), racketeering (Count Two), and Hobbs Act robbery and

extortion (Count Five). Ex. 1, Verdict, *United States v. Hersl & Taylor*, No. CCB 17-106 (D.

Md.). The Acting Baltimore Police Department Commissioner has described the behavior of

Hersl and his cohorts on the Gun Trace Task Force as some of the "most egregious and

despicable acts ever perpetrated in law enforcement"; Mayor Catherine Pugh has announced that

she is "appalled by the level of dishonesty and betrayal;" and Councilman Brandon Scott said

that having learned about the testimony at Hersl's criminal trial, "[t]he first thing I think about is

all the lives that they have ruined." "What They're Saying about the Guilty Verdict in Baltimore

Police Corruption Case," *Baltimore Sun*, at

http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-what-theyre-saying-baltimore-

corruption-20180212-story.html. Mr. Paylor's is one of the "lives that they have ruined."

Hersl, however, did not act alone—neither with respect to the GTTF nor with regard to Mr.

Paylor's false arrest and conviction.  Multiple of Mr. Paylor's prior arrests involved Hersl

working with the same officers who arrested him in the instant case, including with Detective

Romeo and Sergeant Burns.

Romeo testified on Hersl's behalf at Hersl's federal criminal trial, but Romeo's testimony

could not sanitize Hersl's bad acts, and the jury convicted Hersl on the very robbery that Romeo

testified did not occur: the robbery of Jimmie Griffin. Ex. 1, Verdict at Racketeering Act 3 (Nov.

5, 2014 Jimmie Griffin), at 4. Likewise, the jury convicted Hersl of robbing (and planting

evidence on) Herbert Tate, which Hersl did with Sergeant Burns. *Id.*, Verdict at Racketeering

Act 4 (Nov. 27, 2015) at 5.

Just as was true for Hersl's trial, no testimony or statements of any other officer can

sanitize Hersl's fraudulent acts regarding Mr. Paylor. To the contrary, Mr. Paylor's conviction is

forever, and irreparably tainted. And though Mr. Paylor has served nearly all of his time, his

wrongful conviction, unless vacated, will forever have serious, prejudicial collateral

consequences. *See Spencer v. Kemna*, 523 U.S. 1, 8–14 (1998). This Court should correct this miscarriage of justice and vacate Mr. Paylor's conviction.

## STATEMENT OF THE CASE

### I.      Procedural History

Keyon Paylor was arrested at his home in Baltimore on January 2, 2014, and was detained on state charges. He was indicted federally on June 4, 2014. He agreed to remain detained because the state had filed a petition alleging he had violated his conditions of state probation.

Mr. Paylor entered into a plea agreement pursuant to Rule 11(c)(1)(C). The agreement stipulated that he would serve a term of 60-months incarceration. This plea agreement also included a promise that the Baltimore City State's Attorney's Office would recommend that the state court impose a sentence of time served for violating his probation. On July 22, 2015, the court accepted the plea and sentenced him to serve 60 months in prison. Mr. Paylor did not appeal his conviction or sentence.

### II.      Facts

#### A.      Mr. Paylor's False Arrest

According to the statement of probable cause written by Det. Hersl, Detectives Hersl, Moore, Romeo, and Sergeant Burns saw Mr. Paylor walking down the street quickly, watching the police driving behind him in their unmarked car. Ex. 2, Statement of Probable Cause. The police allegedly saw him jump over several front porch walls, reach for his waistband, and remove what appeared to be a black handgun. The report states, "Keyon Paylor then placed same under the cushion of a chair located on the porch of 651 Bartlett Ave." *Id*. The report continues that after seeing Romeo and Moore getting out of the car, "Keyon Paylor then opened the front

door of 651 Bartlett Ave. and entered the dwelling in a very hurried manner, disregarding Detective Romeo and Moore's lawful orders to stop. Detectives Romeo and Moore, believing that Keyon Paylor just tried to hide a handgun under the chair cushion, gave pursuit into the dwelling of 651 Bartlett Avenue." *Id.*

Although, Hersl alleged that Paylor placed a handgun under the cushion of the exposed front porch, the police did not stop and seize the handgun. Instead, according to Hersl's report, these trained officers simply walked past an unattended gun on an open front porch and followed Mr. Paylor inside. The report states that they arrested Mr. Paylor inside his home and then brought him back out to the porch. *Id.* Only then did Detective Moore, who was now joined by the other officers, "recover" a gun from the chair. *Id.* Shortly after his arrest, Mr. Paylor called his family from the jail. In that call, he said, "they didn't see me put no gun nowhere."  Ex. 3, Declaration of Katherine Newberger ¶ 4. He said he knew they were following him into the house no matter what happened. *Id.*

During that same call from jail, Mr. Paylor asked his family to look for money that he had upstairs in his room. Mr. Paylor had seen the police go into his room. He told his family over that phone that "I knew something was funny." *Id.* His family was not able to find any money. No documentation from the police records reflects this, but Sgt. Burns spent time in Mr. Paylor's room on the day of the arrest. *Id.*

These four police officers were no strangers to Mr. Paylor. Det. Hersl first arrested him when he was 13 (he is now 25). A review of Mr. Paylor's prior convictions shows that both Det. Hersl and Sgt. Burns were involved in previous charges that Mr. Paylor faced in Baltimore. In one of the instances, Det. Hersl was listed as a witness only in the district court proceedings, but was removed by the time the case had been transferred to circuit court.

**B.      Mr. Paylor's Federal Prosecution**

Mr. Paylor consistently maintained his innocence, insisting that he did not possess or hide a gun. From the early stages of his federal prosecution, he informed defense counsel that Det. Hersl and others were under investigation for corruption.[1]

Assistant Federal Public Defender Brendan Hurson filed a motion to suppress the firearm and a motion challenging the warrantless entry into Mr. Paylor's home. In the course of litigating the suppression motions, as well as in preparation for trial, Mr. Hurson attempted to investigate the corruption allegations and sought ways to impeach the credibility of the arresting officers. *See* Ex. 4, Letter from Mr. Hurson to AUSA Martinez demanding Internal Affairs Division ("IAD") files. He made specific demands of the prosecutors for records of complaints and IAD investigations into the four officers. His demand was not a pro forma request, but detailed an extensive investigation that had been based on media reports and publicly available documents.

Mr. Hurson provided the Court with a lengthy explanation of the need for the information. *See* Ex. 5, Letter from Mr. Hurson to the Court, dated April 3, 2015. He described the evidence that the government would use to prove its case: the testimony of the four officers, Detectives Hersl, Moore, Romeo, and Sgt. Burns. Counsel expected that all four would testify to the same facts, although the only sworn account of the events leading up to Mr. Paylor's arrest was authored by Hersl. Each officer would adopt Hersl's version of events, although none of the officers saw Mr. Paylor with a weapon the day of his arrest. Mr. Hurson explained his theory that the officers would adopt Hersl's story "either out of loyalty to Hersl (these officers are close

---

[1]      Several lawyers in the Office of the Federal Public Defender have represented Mr. Paylor over the course of his case.  Gary Christopher represented Mr. Paylor at his initial appearance. The case was then assigned to Susan Hensler.  When she went on maternity leave, Brendan Hurson took over the case.  Most recently, Katherine Tang Newberger has represented Mr. Paylor.

personal friends and have worked together for years), or because so much time has passed since

Mr. Paylor's arrest that they are simply relying on his written account and substituting its content

for their own memory." *Id.* at 2.

Defense counsel explained that the only issue at trial would be whether Hersl lied when

he swore that he saw Mr. Paylor hide a gun under the cushion. Mr. Hurson explained that "in

order to convince the jury that reasonable doubt exists, the jury must be presented with a reason

*why* Det. Hersl would fabricate the key allegation in this matter, as well as a reason why these

officers would agree to join him in that fabrication." *Id*. Counsel articulated the Defense theory:

> Det. Hersl exhibits extreme bias toward defendants like Mr. Paylor, . . . that Det. Hersl's
> behavior in this case is in keeping with his behavior in other investigations of black
> residents of Baltimore City. I intend to show the jury that Det. Hersl, who is white, has a
> history of harassing Mr. Paylor and other young black men in Baltimore City. I also
> intend to show that Det. Hersl has a history of skirting the rules in his pursuit of suspects,
> regardless of race.

*Id*. at 2-3.

The requested IAD files would have advanced this defense.  Counsel argued, "It is my

understanding that the IAD files will reflect that Det. Hersl has a long history of pursuing

suspects at all costs without regard to their actual guilt or innocence." *Id*. at 3. The records would

show that others "have claimed that Det. Hersl doggedly pursued their arrest and detention

despite a lack of factual support to justify either. Det. Hersl has used excessive force in his

pursuits causing BPD to spend nearly $200,000 settling just three claims against him. Det. Hersl

has lied on applications for search warrants and during at least one meeting with a probation

officer in order to secure the arrest of a promising young rap artist solely to prevent that artist's

performance at a huge concert. Det. Hersl has planted evidence on at least one suspect to secure

a conviction." *Id*.; *see also id*. at 5 (citing newspaper articles with allegations against Hersl).

The prosecutor opposed this request, but obtained numerous files and reviewed them. The Baltimore Police Department Internal Affairs files contained departmental investigations against each of the four officers involved in this case.  The prosecutor provided the Court with the files for an in camera review. *See* Group Ex. 6, Letters from AUSA Martinez to the Court dated April 1, 2015, and April 3, 2015.

The Court conducted an in camera review of the files. Of the 30 files/complaints against Det. Hersl, the Court disclosed only four files and part of a fifth. *See* Ex. 7, Letter from the Court to counsel, dated April 9, 2015. The Court did not disclose any files relating to the other three officers.

According to trial counsel's files, one of these files involved allegations similar to the issues here—that Det. Hersl and others stole money from the accused without documenting the total amount seized from the accused. A search of records on the Maryland Judiciary Case Search website reveals that other officers involved in that case and misconduct included Burns and Romeo.

Nevertheless, while probative, the disclosed information from the Internal Affairs citizen complaints was insufficient to allow defense counsel to adequately challenge the credibility of the officers—the key issue at a potential trial—particularly when the stakes of the federal prosecution were so high. Without sufficient information to challenge the credibility of the police officers, counsel believed the chances of success at trial to be negligible and advised Mr. Paylor to plead guilty. Ex. 8, Declaration Brendan Hurson ¶ 5.

Mr. Paylor ultimately decided to enter a guilty plea to illegally possessing a firearm on April 21, 2015. The fact that this charge also constituted a violation of his state probation, but that the plea agreement would favorably resolve that violation, heavily influenced his decision.

*See* Ex. 9, Plea Agreement. Mr. Paylor faced a sentence of 14 years, 6 months, and 27 days on

the state VOP. With the plea agreement calling for an agreed term of 60 months for the federal

charge and an agreement that the Baltimore City State's Attorney's Office would recommend

that the state court impose a sentence of time served for his VOP, this combined resolution was

an offer too good for Mr. Paylor to refuse, despite knowing that the police had planted evidence

against him.[2]

### C.    Mr. Paylor Assists The Government

In March 2017, a grand jury indicted Hersl and six other officers, charging racketeering,

armed robbery, and various acts of corruption. *See United States v. Gondo*, Criminal No. JKB-

17-0106. As part of the investigation into this matter, FBI agents listened to the phone call that

Mr. Paylor placed to his family from the jail shortly after his arrest. Ex. 3, Newberger Dec. ¶ 4.

Since that call indicated that the corrupt police officers had engaged in the same conduct against

Mr. Paylor for which they were indicted, the U.S. Attorney's Office contacted the Federal

Defender's Office and indicated an interest in debriefing Mr. Paylor. *Id.* ¶¶ 2-4.

Mr. Hurson was no longer in the Maryland Office of the Federal Public Defender, so

Assistant Federal Public Defender Katherine Tang Newberger took over Mr. Paylor's case. After

talking with Mr. Paylor, Ms. Newberger informed the government that Mr. Paylor's version of

events given at the debriefing would conflict with the statement of facts in the plea agreement.

The government attorney indicated they still wanted to meet with Mr. Paylor anyway. *Id.* ¶ 3.

On June 15, 2017, Mr. Paylor and Ms. Newberger met with Assistant United States

Attorney Derek Hines and two FBI agents. *Id.* ¶ 4. The government offered Mr. Paylor limited

---

[2]     As it happened, Mr. Paylor's violation of probation was ultimately dismissed. This means
that the whole time he had spent detained pretrial was credited to his federal sentence. His
current estimated release date from the BOP is May 12, 2018.

use and derivative use immunity for information relating to his interactions with Hersl, particularly with respect to his arrest in 2014. *Id*. ¶ 6.

Mr. Paylor explained that he had been to visit his probation officer the morning he was arrested, meaning that prior to when the police saw him walking down his block (Hersl's report sets the time as 11:10 a.m.), he had gone through a metal detector at the state probation office. *Id*. ¶ 11. He proffered that when he was returning home, the police officers got out of their vehicle and followed him into the house, with Burns going straight upstairs to his room. *Id*. ¶¶ 7-9. He said that Burns had stolen between $4,500 and $5,000 from his room. *Id*. Mr. Paylor also described the officers bringing him out to the front porch while Burns was upstairs, and only then "finding" the gun under the cushion. *Id*. ¶¶ 10-11. Mr. Paylor was able to identify both Burns and Hersl in photographs. *Id.*¶ 12.  The AUSA was able to independently corroborate a fact related to Mr. Paylor's proof that he did not have a gun when he was arrested: records showed that he had in fact seen his state probation officer earlier that same morning. Immediately after Mr. Paylor met with Mr. Hines and the FBI agents, he testified before the federal grand jury. *Id*. ¶ 13.

Mr. Hines then filed a motion pursuant to Fed. R. Crim. P. 35 on Mr. Paylor's behalf requesting that the Court reduce Mr. Paylor's sentence to time-served. Ex. 10, Rule 35 Motion. The government argued in its motion that Mr. Paylor "provided information to the United States that has substantially assisted the United States in an ongoing investigation." *Id*. at 2.

Ms. Newberger visited Mr. Paylor to tell him that the government had filed the Rule 35 motion. After her visit with Mr. Paylor, she informed AUSA Hines that Mr. Paylor was too scared of retaliation from the corrupt police officers to proceed with the Rule 35 motion. Ex. 3, Newberger Dec. ¶ 14. Both he and his family were scared of being identified as "snitches." He

and his family were concerned about the significant possibility that corrupt officers would plant evidence against him again, or even physically harm them to punish him for providing evidence about the corruption. *Id.*

Mr. Paylor's concern was not unfounded. Indeed, AUSA Derek Hines argued to Judge Bredar, regarding Hersl specifically, but also about all the corrupt officers in general, "Witnesses in this case are terrified of these defendants. They're terrified they will be retaliated against because they've come forward and brought information against police officers. They're fearful not only of these defendants, but of other police officers that they fear may be associated with them or working with them or have sympathy for the position they're in." *See* Ex. 11, *United States v. Hersl*, ECF No. 104, Transcript at 12, filed 3/30/17. AUSA Hines further said of witnesses' fears of retaliation: "It's not unfounded. Members of the conspiracy . . . have threatened witnesses, including threatened to have a witness killed if the witness said anything. And this was [sic] confidential informant that in an intercepted communication members of the conspiracy said they would let it be known that this person was a snitch on the street and he would wind up dead if he, quote, 'said anything.'" *Id.*

AUSA Hines asked Ms. Newberger if there was anything he could do to change Mr. Paylor's mind about proceeding with the Rule 35 motion. Counsel told him that the government could agree to vacate the conviction. If Mr. Paylor was going to continue to labor under a federal conviction and all its attendant collateral consequences, he would prefer to finish out the 11 months of his sentence without any looming danger of retaliation from the police department. At that time, the government was not prepared to agree to vacate the convictions. Both parties called the Court to cancel the scheduled Rule 35 hearing.

The parties explained this development to the Court. The Court asked the government to withdraw the motion so the motion would not remain on the docket without a ruling. The government stated in its motion to withdraw the previous motion that "Mr. Paylor has decided that he does not want to pursue a sentence reduction pursuant to Rule 35 at this time." Ex. 12, Notice of Withdrawal of Rule 35 Motion.

The government never decided that Mr. Paylor's proffer or grand jury testimony was unhelpful or unreliable. Instead, the withdrawal of the motion was at Mr. Paylor's request to protect himself and his family.

### D.       Hersl's Federal Prosecution and Conviction

On January 23, 2018, the U.S. Attorney's Office began a three week trial, exposing the corruption of Hersl and the GTTF. During that trial, the government presented evidence that Hersl and others were "willing to do whatever it took to lie, cheat and steal" from civilians under their arrest. "Baltimore Police Officers Found Guilty of Racketeering, Robbery in Gun Trace Task Force Corruption Case," *at* http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-gttf-verdict-20180208-story.html (quoting Assistant U.S. Attorney Leo Wise). Hersl and his colleagues planted evidence, extorted and robbed civilians, and then lied about it to cover up their wrongdoing. Their bad acts included but were not limited to:

- Keeping BB guns in their cars in case they shot someone "so we could plant them."

- In one case, the police went into a home without a warrant, cracked open a safe and stole $100,000 from it (leaving an additional $100,000 behind). They then closed the safe back up, and filmed themselves pretending to open it for the first time. After that man was arrested, the police listened to the man's calls made from jail talking about the officers taking his money. The man was talking to his wife about her hiring a good attorney. The police wrote a false note and delivered it to the wife, purporting to be from another woman and claiming the arrested man had gotten this woman pregnant. The purpose was to upset the man's wife so she would not hire a good attorney.

- The police were talking about robbing someone and Sergeant Jenkins pulled out a large black bag full of ski masks, black clothing and shoes; another bag had a crow bar, battering ram and rope. The prosecutor displayed all of these "tools" in the courtroom during the trial.

"Notable Testimony from the Baltimore Police Gun Trace Task Force Corruption Trial," *Baltimore Sun*, *available at* http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-gun-trace-task-force-gttf-testimony-highlights-20180126-story.html.[3]

Particularly relevant to Mr. Paylor's case was testimony from Jimmie Griffin and from Herbert Tate. Mr. Griffin testified that on or about November 5, 2014 (just months after Mr. Paylor's false arrest), Hersl and Romeo, among others, stole thousands of dollars from him during an arrest. Specifically, Jimmie Griffin testified that Hersl took $6,000 out of Griffin's pocket but documented taking only $900. Ex. 13, *United States v. Hersl & Taylor*, No. CCB 17-106 (D. Md.) (Griffin Testimony 2/1/2018) at 14, 20. Romeo, who was present for the robbery of Griffin, testified to back up Hersl's false version, saying that the wad of money taken out of Griffin's pocket was not large, did not look "anything close" to $6,000, and was in fact only $900. Ex. 14, *United States v. Hersl & Taylor*, No. CCB 17-106 (D. Md.) (Romeo Testimony 2/6/2018) at 12. There was also a dispute about how much money the police took from Griffin's home: Griffin said it was $6,000 but Romeo said it was just $4,003. Ex. 13 *United States v. Hersl & Taylor*, No. CCB 17-106 (D. Md.) (Griffin Testimony 2/1/2018) at 8–10; Ex. 14, *United States v. Hersl & Taylor*, No. CCB 17-106 (D. Md.) (Romeo Testimony 2/6/2018) at 14. The jury resolved these disputes, crediting Griffin and not Romeo, and specifically found that Griffin

---

[3]     Mr. Paylor has ordered some of the testimony from Hersl's federal prosecution. Because of the timing of this Section 2255 motion, however, he does not yet have all of the relevant transcripts.

had been robbed of his money. Ex. 1, Verdict at Racketeering Act 3 (Nov. 5, 2014 Jimmie Griffin), at 4.

In addition, Herbert Tate testified that Hersl and Burns stole hundreds of dollars from him and then planted drugs to cover up their misconduct. In particular, according to Tate, on November 27, 2015, Hersl and Burns "grabbed him on the street." Ex. 15, *United States v. Hersl & Taylor,* No. CCB 17-106 (D. Md.) (Tate Testimony 1/30/18) at 8. Hersl told another police officer to steal $530 that the officers found in Tate's pocket (and then falsely report only $216 as being seized from Tate). *Id.* at 16, 23-25, 69-70. Hersl and Burns then planted "blue and whites" (heroin) on Tate. *Id.* at 21. Tate testified that Hersl and Burns falsely reported seeing Tate go back and forth to a hole in a retaining wall where Hersl "found" drugs. *Id.* at 22, 64. That report was completely fabricated. *Id.* at 19, 64-65. Tate was charged with possession of the drugs, but the bogus charges were eventually dropped. *Id.* at 25-26, 68, 71. Notwithstanding Hersl's denials of wrongdoing, the jury convicted Hersl on Racketeering Act 4—the robbery of Herbert Tate. Ex. 1, Verdict Form at Racketeering Act 4, at 5.

Indeed, the jury convicted Hersl of racketeering conspiracy (Count 1), racketeering (Count 2) and Hobbs Act robbery and extortion (Count 5). He faces decades in prison.

## ARGUMENT

Mr. Paylor's guilty plea and resulting conviction are the direct result of egregious police misconduct. His guilty plea was involuntary in violation of his Fifth Amendment due process rights. Although he knew at the time that he pled guilty that the police had planted evidence against him and lied, he also knew that he had no viable way to fight against those lies in front of a jury. The misconduct therefore induced him to plead guilty. Moreover, his conviction is also

the result of suppressed exculpatory information—a violation of *Brady v. Maryland*. For both of these reasons, this Court should vacate his conviction under 28 U.S.C. § 2255.[4]

## I.     Mr. Paylor's Guilty Plea is Involuntary Because it was Predicated on Impermissible Government Conduct that was Material to his Decision to Plead Guilty.

Mr. Paylor's conviction must be vacated pursuant to 28 U.S.C. § 2255(a) because it was entered "in violation of the Constitution or laws of the United States." Specifically, Mr. Paylor's guilty plea was involuntary in violation of his Fifth Amendment due process rights because it was induced by gross police misconduct.

"[A] guilty plea is a grave and solemn act to be accepted only with care and discernment[.]." *Brady v. United States*, 397 U.S. 742, 748 (1970). As such, in order to be constitutionally valid, a guilty plea must be "the voluntary expression of [an accused's] own choice." *Id*. However, even when "a defendant is fully aware of the direct consequences of the plea," it is involuntary when induced by police misconduct. *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013).

As the Fourth Circuit held in Fisher, an otherwise knowing and intelligent plea must be set aside as involuntary when (1) "some egregiously impermissible conduct" by a government agent predated the entry of the guilty plea, and (2) the misconduct was "material" to that decision to plead guilty. 711 F.3d at 465. Under this two-part test, a petitioner need not establish that the prosecutor knew of the misconduct at the time of the guilty plea, since "[n]either the timing, nor the prosecution's good faith" are relevant to the inquiry. *Id*. at 467. And though in the case at bar,

---

[4]      There is no dispute about the timeliness of this petition. Under 28 U.S.C. § 2255(f)(4), a motion attacking a conviction is timely if the petitioner files it within one year of newly discovered evidence and acted with due diligence in discovering that evidence. In this case, the newly discovered evidence is the federal indictment against and conviction of Baltimore City police officer Daniel Hersl and his BPD colleagues. Indeed, the government has agreed that any filing by Mr. Paylor is timely. *See* Ex. 16, Agreed Waiver.

Mr. Paylor is actually innocent, that is not the issue and need not be proved: a petitioner's "factual innocence" of the crime is not a "prerequisite to finding a plea invalid." *Id*. at 467.

Applying this two-part standard, the Fourth Circuit held in *Fisher* that the petitioner's plea was involuntary. To begin, the court found that a police officer's "deliberate lie" in a search warrant affidavit that led to discovery of evidence against the petitioner was impermissible government conduct that went "to the heart of the prosecution's case" and "[struck] at the integrity of the prosecution as a whole." *Id*. at 466 (citation omitted).

Next, the court found that the misconduct was material to the petitioner's decision to plead guilty because had he been armed with the evidence of the police officer's misrepresentation, his "entire approach to the case would have been different." *Id*. at 467 (citation omitted). In reaching this conclusion, the court relied on the affidavit of the lawyer who represented Fisher in the underlying criminal proceeding. Fisher's lawyer declared that if he had the information of the police officer's lies at the time of the plea, he would have sought a range of options, "including outright dismissal, to a dismissal in lieu of state prosecution, to a plea in federal court to a significantly lower sentence. Were negotiations with [the prosecution not successful], he would have sought to suppress the evidence against [Fisher], including filing a motion to suppress and seeking a *Franks* hearing." *Id*. at 468 (citation omitted). Even more, the lawyer declared that "[w]ere [he] to lose at such a hearing, [he] would have advised [Fisher] that a key consideration in deciding whether to enter a guilty plea or proceed to trial was the role that [the lying officer's] credibility would play at trial." *Id*. (citation omitted). Accepting these statements, the Fourth Circuit concluded that "even if Defendant's suppression efforts were not successful, there is a reasonable probability that knowledge of [the lying officer's] misconduct would have changed Defendant's decision to plead guilty." *Id*. at 469.

In sum, the *Fisher* court held: "Given the totality of the circumstances of this case—a law enforcement officer intentionally lying in an affidavit that formed the sole basis for searching the defendant's home where evidence forming the basis of the charge to which he pled guilty was found—Defendant's plea was involuntary and violated his due process rights." *Id*. at 469 (emphasis added). *See also United States v. Andrews*, 2015 WL 12830499, at *1 (E.D. Va. April 1, 2015) (relying on *Fisher* to conclude that plea was involuntary when "critical information contained in the search warrant affidavit [was] false" and "material to finding probable cause.").

The same result obtains here. There is now reliable evidence that since at least 2014—before Mr. Paylor pled guilty—Hersl had been committing crimes against and violating the constitutional rights of some of the most vulnerable and marginalized members of our society, all while acting in his capacity as an officer of the law. The crimes of which Hersl has been convicted—robbery, extortion, and racketeering—constitute impermissible government conduct. Certainly such misconduct "strikes at the integrity of the prosecution as a whole." *Fisher*, 711 F.3d at 466 (citations omitted).

Indeed, this case easily satisfies both aspects of the *Fisher* test. First, there is no shortage of egregious, impermissible police misconduct here. As reflected in the testimony at Hersl's federal trial and the jury's verdict, since at least 2014, Hersl has been involved in a steady spree of fraudulent behavior, including, but not limited to, lying in search warrant affidavits, charging documents, and arrest reports; planting evidence against suspects; robbing individuals Hersl then (falsely) charged with other crimes; extortion; and fraud.

Evidence of this vast array of criminal conduct gives life to Mr. Paylor's claim that Hersl also fabricated the events that led to the only incriminating evidence against Mr. Paylor. The impermissible conduct undermines the entire case against Mr. Paylor. Hersl had ample motive to

plant the firearm and lie under oath in the statement of probable cause because he had given his friend and colleague a chance to illegally rummage through Mr. Paylor's property and steal close to $5,000. Hersl needed to plant the evidence and lie about it to ensure that his victim was silenced, discredited, and shipped to a prison far away from Baltimore—just as he did in the many counts for which he was federally convicted.[5] Indeed, the facts relating to Hersl's racketeering conviction for robbing and planting evidence against Tate are eerily similar to Hersl's bad acts in Mr. Paylor's case.

Second, Hersl's misconduct was material to Mr. Paylor's decision to plead guilty.  Mr. Paylor knew that Hersl's version of events was full of lies, but he had no way of proving this fraud. In the balancing test of credibility, criminal defendants typically lose out to police officers, even when those officers are lying under oath and committing crimes themselves. In a "he said – she said" contest, a convicted felon charged with possessing a firearm could not compete with a police officer when Mr. Paylor knew that juries respect police officers and find them credible as a matter of course. To be sure, the type of misconduct in which Hersl engaged inherently coerces guilty pleas because it tends to discourage defendants like Mr. Paylor from insisting upon their innocence and demanding a trial.

Had Mr. Paylor known about Hersl's extensive criminal conduct—and the government's imputed awareness of it—he would have had an entirely different view of the government's case against him. He would have insisted on going to trial. To win at trial, Mr. Paylor would have had to convince the jury that Hersl lied under oath and that other officers were willing to do the

---

[5]       Indeed, the misconduct here bears a striking resemblance to what Hersl and Burns did to Herbert Tate. As Tate testified, Hersl and Burns planted evidence—in Tate's case, drugs—arrested Tate, took his money, and documented having taken less than they really did. Ex. 15, *United States v. Hersl & Taylor*, No. CCB 17-106 (D. Md.) (Tate Testimony 1/30/2018) at 20–21, 24–25; Ex. 1, Verdict at Racketeering Act 4 (Nov. 27, 2015 Herbert Tate), at 5.

same. This was an insurmountable burden without the concrete evidence of corruption that now

is available. Mr. Paylor knew that, in situations like his, cops always win. His only chance would

have been to present the real evidence about Hersl.

Because there was no way to establish that Hersl and the officers with whom he was

working had invented the evidence against Mr. Paylor, defense counsel, in the underlying

criminal case, Brendan Hurson, viewed the government's case as relatively strong and advised

Mr. Paylor to accept the guilty plea offer that ultimately gave him 60 months in prison. However,

if Mr. Hurson had this new evidence against Hersl—evidence that he tried but was unsuccessful

in securing—his entire approach to the case would have been different. He would have

advocated strongly for a different outcome in the case. Specifically, he would have fought hard

for an outright dismissal of the case. If that did not work, he would have litigated the motion to

suppress the evidence in the case. And if he were to lose the suppression motion, he would have

advised Mr. Paylor that a key consideration in deciding whether to plead guilty or go to trial

would have been the role that Hersl's credibility played. Ex. 8, Hurson Dec. ¶ 6.

Indeed, if evidence of Hersl's extensive criminal conduct existed at time of his guilty

plea, Mr. Paylor would have had an entirely different view of the government's case and insisted

on proceeding with a motion to suppress rather than pleading guilty. Under these terms, at the

very least, a reasonable probability exists that evidence of Hersl's misconduct would have altered

Mr. Paylor's decision to plead guilty to a crime for which he was absolutely innocent. Thus, the

misconduct was material to Mr. Paylor's decision to plead guilty.

It is worth noting that the government's conduct since June 2017 is indicative of the

veracity of Mr. Paylor's claims regarding his wrongful arrest, prosecution and conviction. The

U.S. Attorney's Office, on its own accord, reached out to Mr. Paylor after reviewing

contemporaneous evidence that suggested that Hersl and others had victimized Mr. Paylor in the same way that is reflected in the indictment and subsequent conviction against Hersl. Ex. 3, Newberger Dec. ¶¶ 2-4. After hearing Mr. Paylor's version of events, AUSA Hines credited Mr. Paylor's version of events enough to put him before the grand jury. *Id*. ¶ 13. The government was satisfied with the information Mr. Paylor provided such that it informed the Court that Mr. Paylor had substantially assisted the government with an ongoing investigation by providing useful information meriting, in its view, a sentence reduction to time-served. Ex. 10, Rule 35 Motion at 1-3.

While Mr. Paylor appreciates the sentiment behind an offer of a sentence reduced to time-served, he is an innocent man and a sentence reduction would not eliminate the prejudicial collateral consequences stemming from his wrongful conviction. *See Spencer*, 523 U.S. at 8–14. Knowing the power that the police have to plant evidence and obtain convictions against even the innocent, Mr. Paylor believes that the miscarriage of justice in this case can only be redressed by vacating his wrongful conviction.

In sum, Mr. Paylor's constitutional due process rights were violated when he was induced to plead guilty based on the lies of a police officer that led to the only evidence against him. This Court should vacate Mr. Paylor's involuntary plea not only because his individual case has been infected by a lying police officer, but also because courts have an important role to play in "deterring police misconduct." *Fisher*, 711 F.3d at 469. As the Fourth Circuit explained in *Fisher*, "[i]f a defendant cannot challenge the validity of a plea based on subsequently discovered police misconduct, officers may be more likely to engage in such conduct, as well as more likely to conceal it to help elicit guilty pleas." *Id*.

"Whether to prosecute, issue a warrant, indict and convict are serious matters that are decided in large measure based on what a police officer relates. So when an officer does not tell the whole truth, public confidence in the fair administration of criminal justice inevitably is eroded." *Id.* (citation omitted). Mr. Paylor's conviction is just the sort that erodes confidence in the fair administration of justice.

## II.     The Government Committed a *Brady* Violation by Failing to Disclose the Investigation Into Hersl's Corruption Before Mr. Paylor Pleaded Guilty.

In the alternative, Mr. Paylor's guilty plea should be vacated because the government violated Mr. Paylor's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose the investigation—both its existence and the evidence it revealed—into Hersl's (and the other officers') widespread fraudulent actions before Mr. Paylor pled guilty on April 21, 2015.

"There are three components of a true *Brady* violation": the disputed information must be (1) "favorable to the accused," (2) "suppressed" by the government, "either willfully or inadvertently," and (3) "material." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To be clear, to satisfy the second element, Mr. Paylor need not show that the prosecutor in his case or the U.S. Attorney's Office willfully or inadvertently suppressed evidence. The actions and knowledge of the Baltimore City Police Department suffice. Each of the three criteria is met here.

First, it goes without saying that information relating to Hersl's pattern and practice of falsifying documents (including search evidence receipts, warrant affidavits, police reports, charging documents, and time/attendance records), robbing and extorting people, and stealing money from them is "favorable" to Mr. Paylor. In fact, the scale of Hersl's corruption was so large that it goes well beyond impeachment or Fed. R. Evid. 404(b) evidence. Evidence of

Hersl's fraud in parallel situations would have undermined the validity of his entire statement of probable cause and the legitimacy of all evidence "seized" in the instant case. *See Kyles v. Whitley*, 514 U.S. 419, 445-46 (1995) (evidence relating to coercive interrogation of a witness could have been used to impeach witness' and detectives testimony at trial and "attack . . . the thoroughness and even the good faith of the investigation"); *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) (explaining that *Kyles* instructs that information which might "have raised opportunities to attack . . . the thoroughness and even good faith of the investigation" constitutes exculpatory, material evidence); *Bowen v. Maynard,* 799 F.2d 593, 613 (10th Cir.1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant and we may consider such evidence in assessing a possible *Brady* violation.").

This, in turn, would have likely led to the dismissal of all charges against Mr. Paylor after a pre-trial hearing. Failure to disclose such information—that is, information material to a Fourth Amendment suppression issue—constitutes a *Brady* violation. *See United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992) ("objections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing[.]"); *Biles v. United States*, 101 A.3d 1012, 1020 (D.C. 2014) ("We agree that the suppression of material information can violate due process under *Brady* if it affects the success of a defendant's pretrial suppression motion").

Second, the government suppressed evidence of the investigation into Hersl. And certainly Hersl suppressed the truth of what really happened the day he arrested Mr. Paylor. In discovery, the government never disclosed evidence of Hersl's or other officers' corruption. When ordered to, the government provided a partial disclosure of IAD files, but this was not even the tip of the iceberg of information available to the government regarding the racketeering conspiracy and fraudulent behavior. This partial disclosure did not satisfy *Brady*.

While Mr. Paylor does not precisely know when investigators first learned of Hersl's misconduct, it appears that knowledge can, at the very least, be traced back to 2015, according to a public statement by Baltimore City Police Commissioner Kevin Davis, who said he had been aware of the investigation since it was initiated in 2015. *See* Christine Boyton, Police Commissioner: Indictments of '7 dirty cops' result of rock solid investigation, FOX 45 NEWS, Baltimore, Friday, March 3, 2017, *available at* http://foxbaltimore.com/news/local/police-commissioner-indictments-of-7-dirty-cops-result-of-rock-solid-investigation.

On this score, Mr. Paylor is not contending that the U.S. Attorney's Office knew of Hersl's corruption before Mr. Paylor pleaded guilty; rather, *Brady* applies equally to evidence "known only to police investigators and not the prosecutor." *Kyles*, 514 U.S. at 419.[6] Therefore, in order to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Id*. at 437. Because it appears that at least BPD leadership was aware of Hersl's misconduct before Mr. Paylor's guilty plea, the BPD should have disclosed that to the U.S.

---

[6]    Notably, due process also requires the disclosure of exculpatory information even after Mr. Paylor's conviction. *Burgess v. Baltimore Police Department*, No. 15-0834, 2017 WL 4947004, at *19 (D. Md. Oct. 31, 2017). As such, even if the BPD or the U.S. Attorney's Office did not know of Hersl's corruption prior to Mr. Paylor's plea, both were required to disclose the same once they discovered such information. *Id*. at *19-*20.

Attorney's office; and the U.S. Attorney's Office, in turn, should have turned it over to Mr.

Paylor. Because that did not occur, the second *Brady* criteria is met.[7]

Third, the government's failure to disclose evidence of Hersl's corruption was material.

Favorable evidence is "material" if "there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different." *United States v.*

*Bagley*, 473 U.S. 667, 682 (1985). However, "a showing of materiality does not require

demonstration by a preponderance that disclosure of the suppressed evidence would have

resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. Rather "the touchstone

of materiality is a 'reasonable probability' of a different result." *Id*. This standard is satisfied

when the government's failure to disclose evidence "undermines confidence in the outcome" of

the case. *Id*. Here, a disclosure of Hersl's corrupt practices would have undoubtedly undermined

confidence in the validity of the arrest and seizure of evidence, and in turn, shattered the

government's only vehicle for securing a conviction against Mr. Paylor. *See Kyles*, 514 U.S. at

445-46; *Howell*, 231 F.3d at 625; *Maynard*, 799 F.2d at 613.

Therefore, a Brady violation occurred in Mr. Paylor's case, and as a result, this Court

should vacate his conviction.

## CONCLUSION

Mr. Paylor's Fifth Amendment due process rights were violated in two ways. First, his

guilty plea was involuntarily induced by gross government misconduct. Second, the government

---

[7]     Moreover, the United States Attorney's Office was on notice of the need for this
information in Mr. Paylor's particular case since at least March 20, 2015. The defense made a
demand for *Brady* information relating to Hersl's corruption, as well as misconduct by the other
officers involved in Mr. Paylor's arrest. The detailed pleadings surrounding the defense request
for subpoenas to the police department regarding the officers' misconduct and the litigation
about the IAD files notified the government about potential exculpatory information relating to
the officers' corruption.

failed to timely disclose this misconduct, as required by *Brady*. Now that the widespread corruption of the Baltimore Police Department and of Daniel Hersl, in particular, has been exposed, this Court should correct this grave miscarriage of justice and vacate Mr. Paylor's conviction.

Dated: March 12, 2018                    Respectfully Submitted,

                                         /a/ Gayle Horn

                                         Jon Loevy
                                         Gayle Horn
                                         Anthony Balkissoon
                                         THE EXONERATION PROJECT
                                         311 N Aberdeen, 3rd Floor
                                         Chicago, IL 60607
                                         Telephone: 213-285-4409
                                         *Counsel for Petitioner Keyon Paylor*