IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
MARYLAND NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Crim. No. ELH-14-271 |
| KEYON PAYLOR | * | Civil No. _____ |
| | * | |

* * * *
*

## DECLARATION OF KATHERINE TANG NEWBERGER
## IN SUPPORT OF KEYON PAYLOR'S PETITION UNDER 28 U.S.C. § 2255

I, Katherine Tang Newberger, make this declaration under oath. I affirm that the following is true and correct to the best of my knowledge.

1. The Office of the Federal Public Defender (D. Md.) has represented Keyon Paylor since his initial appearance in the District of Maryland in this case, which occurred on September 16, 2014. Although other lawyers in this office represented him then and through the entry of his guilty plea and sentencing, I have access to their files and have reviewed their notes.

2. I became personally involved in this case in May 2017. On May 23, 2017, I spoke with Assistant United States Attorney Derek Hines, who wanted to speak with Mr. Paylor as part of his ongoing investigation into Detective Daniel Hersl.

3. On or about June 13, 2017, after meeting with Mr. Paylor, I informed Mr. Hines that Mr. Paylor's description of the events of January 2, 2014, would

1

EXHIBIT 3

differ from the statement of facts in his plea agreement. Mr. Hines said he still wanted to meet with Mr. Paylor.

4. On June 15, 2017, Mr. Paylor and I met with AUSA Derek Hines, FBI Agent Erica Jenson, and another male FBI agent. They explained to Mr. Paylor that Erica Jenson, listening to jail calls, heard a January 4, 2014, call that Mr. Paylor made to his family in which he complained that the officers had stolen his money. They explained that this was the reason they wanted to speak to him. They played a recording of the call. During the call, Mr. Paylor asked his mother and sister to look in his room for his money. They could not find any. In the call, Mr. Paylor said that an officer was in his room and "was looking down the stairs. I knew something was funny," or words to that effect. He also said, "they didn't see me put no gun nowhere," or words to that effect. He said he knew they were coming into the house. "I'm not running; I'm not doing anything," or words to that effect.

5. Mr. Paylor told AUSA Hines that he had known Det. Hersl since he was thirteen years old. Det. Hersl used to come into the neighborhood, "shake us down" and "lock us up." Mr. Paylor explained that Det. Hersl and Sergeant Burns worked together often.

6. AUSA Hines gave Mr. Paylor limited use and derivative use immunity regarding the events of January 2, 2014, the date he was arrested in the instant case.

7. Mr. Paylor explained that he was walking down the street. A friend told him that the police were behind Mr. Paylor. Mr. Paylor said, "I don't care, I'm

not doing anything," or words to that effect.

8. Before entering his house, Mr. Paylor looked over his shoulder and saw the police. Mr. Paylor expected Det. Hersl to follow him into the house. Once in the house, he told his step-father about Det. Hersl, who had repeatedly harassed Mr. Paylor. Mr. Paylor started going toward the front of the house, when the officers came into the house and one went right upstairs to his bedroom at the top of the stairs. He said Sgt. Burns, who he had seen frequently with Det. Hersl in the past, was the person who went upstairs. Mr. Paylor said the other three officers were with him inside the house in front of the steps to the second floor.

9. Among other things, Mr. Paylor said that the officers took between $4,500.00 and $5,000.00 from his room. From where he was standing at the bottom of the stairs, he could see up into his room. He could tell Sgt. Burns was going through his things. Sgt. Burns looked down at Mr. Paylor.

10. Mr. Paylor said the other officers took Mr. Paylor outside. The officers looked around the porch, lifted a seat cushion and found a gun on a chair under the cushion. Mr. Paylor said it wasn't his, and then the officers said they saw him put it there.

11. Mr. Paylor explained to AUSA Hines that he does not know whose gun it was. He said he saw the gun on the chair when the police lifted the cushion, but he insisted it wasn't his. He pointed out that he had an appointment with his probation officer that morning and was walking home from the probation office when this all happened.

12. AUSA Hines and the FBI agents showed Mr. Paylor photographs. Mr. Paylor identified Det. Hersl and Sgt. Burns.

13. Mr. Paylor then testified in front of the grand jury. I sat outside of the grand jury room.

14. When I went to the Chesapeake Detention Facility to tell Mr. Paylor that the Government had filed a Rule 35 motion, he told me that he was too scared of the police to go through with the Rule 35 motion. He said the risk of retaliation by the police was too high to continue with a Rule 35 motion since the government would not agree to vacate the conviction, but only reduce his sentence when he had relatively little time left to serve.

_____
KATHERINE TANG NEWBEGER
Assistant Federal Public Defender