**OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**DISTRICT OF MARYLAND**
NORTHERN DIVISION
TOWER II, NINTH FLOOR
100 SOUTH CHARLES STREET
BALTIMORE, MARYLAND 21201-2705
TEL: (410) 962-3962
FAX: (410) 962-0872

JAMES WYDA                                                          BRENDAN A. HURSON
FEDERAL PUBLIC DEFENDER                                  ASSISTANT FEDERAL PUBLIC DEFENDER

April 3, 2015

*Filed Ex Parte and Under Seal*

The Honorable Ellen L. Hollander
Judge, United States District Court
United States District Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

      Re:   Request for Review of IAD Files in <u>U.S. v. Keyon Paylor</u>, ELH-14-271

Dear Judge Hollander:

   I write, *ex parte*, to delineate the reasons I subpoenaed the Baltimore City Police Department ("BPD") Internal Affairs Division ("IAD") files of the officers involved in the brief investigation and arrest of Keyon Paylor. As we discussed yesterday on the phone, the Court denied my Petition for a Rule 17(c) subpoena for the IAD files (see ECF/CM Docket # 40). Further, since the IAD files have already been provided to the Court in their entirety, the parties[1] agreed that it saved judicial resources to deny the subpoena petition and permit me the opportunity to provide to the Court with an ex parte letter explaining the basis for my request for review of all IAD files.

   Under Rule 17(c), a district court may quash or modify the subpoena if compliance would be unreasonable or oppressive. <u>See</u> Fed.R.Crim.P. 17(c)(2). To be "reasonable," a party seeking a subpoena must show that: "(1) the items sought are evidentiary and relevant; (2) they are not otherwise procurable by the exercise of due diligence; (3) he cannot properly prepare without production and inspection of the items; and (4) the application was made in good faith and is not a fishing expedition." <u>United States v. Nixon</u>, 418 U.S. 683, 699–700 (1974). In sum, "a defendant seeking a Rule 17(c) subpoena 'must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity.'" <u>United States v. Caro</u>, 597 F.3d 608, 620 (4th Cir. 2010) (citing <u>Nixon</u>, 418 U.S. at 700. Here, all three <u>Nixon/Caro</u> hurdles have been crossed.

---

   [1] Ordinarily, requests for Rule 17 subpoenas are made *ex parte* and the government is not privy to the contents of those requests. Here, the undersigned alerted the government to the request and permitted the Court to share the specific details of the request with the government.

EXHIBIT 5

April 3, 2015 *EX PARTE* Letter to Judge Hollander
U.S. v. Keyon Paylor, ELH-14-271
Page 2 of 7

First, the IAD files are relevant to Mr. Paylor's theory that Det. Hersl and his colleagues pursued him without legal basis and lied about seeing him in possession of a firearm on January 2, 2014. The IAD files will lead to admissible evidence (or permissible questions at trial) related to the officers' bias, their motive to target Mr. Paylor, their common scheme and plan to harass people like Mr. Paylor, and their credibility. Finally, the request is narrowly tailored to specific documents that have already been compiled and produced. As such, the law establishes that I should be permitted to review the files.

As the Court is likely aware, the government intends to prove its case at trial by calling four (4) police officer witnesses: Dets. Moore, Romeo, and Hersl, as well as Sgt. Burns. All four law enforcement witnesses will testify to essentially the same set of facts, namely that each witnessed Mr. Paylor pull a firearm from his waistband and place it under a cushion on a chair in front of his home on Bartlett Avenue. Mr. Paylor was unquestionably prohibited from possessing a firearm at the time of the alleged offense, and the firearm likely affected interstate commerce. Stated bluntly, the government will prove its case beyond a reasonable doubt if the jury concludes that these officers' are accurately recounting the events of January 2,, 2014.

As noted yesterday, the only sworn account of these events was authored by BPD Det. Hersl.[2] At trial, I intend to argue that the all officers did not witness the events as Det. Hersl's report claims. I will argue that each saw glimpses of Mr. Paylor's conduct, but none saw him with a weapon. Ultimately, I will contend that each agreed to join in Det. Hersl's written account of the events, including the allegation that he saw Mr. Paylor with a gun. They did so either out of loyalty to Det. Hersl (these officers are close personal friends and have worked together for years), or because so much time has passed since Mr. Paylor's arrest that they are simply relying on his written account and substituting its content for their own memory.

At its core, my argument centers on the claim that Det. Hersl inaccurately stated that he saw Mr. Paylor with a firearm. Thus, in order to convince the jury that reasonable doubt exists, the jury must be presented with a reason *why* Det. Hersl would fabricate the key allegation in this matter, as well as a reason why these officers would agree to join him in that fabrication. As to the second point, I will show that these officers have patrolled together on countless occasions and are friends "outside of the office." While the IAD files may be probative of this fact, I do not rest my request for their disclosure on this point.

Instead, disclosure is warranted as it will lead to the discovery of relevant and admissible evidence related to the key defense contention that Det. Hersl exhibits extreme bias toward defendants like Mr. Paylor and in showing the jury that Det. Hersl's behavior in this case is in

---

[2] Recently, the government "updated" this account by adding additional facts that were not included in Det. Hersl's sworn statement and, arguably, were at odds with his prior sworn account. All "additional" facts were, perhaps not surprisingly, favorable the government's case.

keeping with his behavior in other investigations of black residents of Baltimore City. I intend to show the jury that Det. Hersl, who is white, has a history of harassing Mr. Paylor and other young black men in Baltimore City. I also intend to show that Det. Hersl has a history of skirting the rules in his pursuit of suspects, regardless of race. To that end, I intend to show the jury that Det. Hersl has previously arrested Mr. Paylor and, after that arrest did not result in criminal charges, continually harassed him by stopping him on the street without cause.

Defense witness███████will testify that he encountered Mr. Paylor just seconds before his arrest on January 2, 2014. ████████ saw that Mr. Paylor was being followed by an unmarked vehicle with men inside, and he will testify that he warned Mr. Paylor of the car's approach. Mr. Paylor responded that he was aware of the car. He then told ████████ that the car was driven by "Hersl," further noting that Hersl is "always harassing [Mr. Paylor]" and that Mr. Paylor wasn't worried because he "wasn't do anything wrong." I intend to prove that the arrest on January 2 was in keeping with prior harassment of Paylor and, more importantly, that it was consistent with Det. Hersl's behavior in his prior interactions with (mostly black) residents of Baltimore City.

It is my understanding that the IAD files will reflect that Det. Hersl has a long history of pursuing suspects at all costs without regard to their actual guilt or innocence. As the attached letter to my request for the subpoena compelling the disclosure of the IAD records details, other men (again, mostly black) have claimed that Det. Hersl doggedly pursued their arrest and detention despite a lack of factual support to justify either. Det. Hersl has used excessive force in his pursuits, causing the BPD to spend nearly $200,000 settling just three claims against him. Det. Hersl has lied on applications for search warrants and during at least one meeting with a Probation Officer in order to secure the arrest of a promising young rap artist solely to prevent that artist's performance at a huge concert.[3] Det. Hersl has planted evidence on at least one suspect to secure a conviction. I believe the IAD files will provide information related to these events and provide proof of Det. Hersl's bias.

Extrinsic evidence of bias is always relevant and always admissible. See United States v. Abel, 469 U.S. 45, 56, 105 (1984). Similarly, evidence of a common plan to target particular persons without cause and without regard to the law is relevant and admissible as so-called "reverse 404(b) evidence." See United States v. Myers, 589 F.3d 117, 124 (4th Cir. 2009) ("Rule 404(b) authorizes the admission of evidence of a witness's other wrongs, acts, or crimes 'for defensive purposes if it tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him.'") (quoting United States v. Montelongo, 420 F.3d 1169, 1174 (10th Cir.2005)). The IAD files contain allegations of behavior showing Det. Hersl's bias, his systematic disregard for the law, and evidence that his treatment of Mr. Paylor is in keeping with his general "modus operandi" of disregarding the law in his pursuit of his chosen "suspects." Thus, the

---

[3] It is believed this conduct, the pursuit of rapper "Young Moose," is the basis of at least one of the "open" IAD complaints.

**April 3, 2015 *EX PARTE* Letter to Judge Hollander**
**U.S. v. Keyon Paylor, ELH-14-271**
**Page 4 of 7**

subpoena clears the first two Nixon/Caro hurdles of admissibility and relevance as the IAD files contain, or will lead directly to, relevant and admissible evidence related to these defense arguments.

As for the final hurdle of "specificity," there is little question that the subpoena targets a discrete and specific set of documents. I seek only the allegations themselves, not the department's decisions on the validity of these allegations, nor do I seek Det. Hersl's (or the other officers) personnel files. The BPD obviously has no issue complying with this production as it has already provided the requested documents to the Court. All three Nixon/Caro factors are satisfied.

It should be noted that the focus of yesterday's conversation was on the question of "credibility" and the relevance of the files to that key trial issue. Though I have noted an alternative basis for seeking review of all IAD files, I believe review is appropriate to search for questions related to credibility as well.

As the Court is aware, Fed. R. of Evid. 608 (b) governs the admissibility of evidence related to a witnesses' "character for truthfulness." Often called the "extrinsic evidence rule," the rule provides that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608 (b). However, "the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness." Id. Thus, though a witness can be asked about prior "bad acts" that are probative of character for truthfulness, the questioner is essentially "stuck" with the witnesses' answer. United States v. Ling, 581 F.2d 1118, 1120-21 (4th Cir. 1978) ("However, when a defendant is cross-examined for the purpose of impeaching his credibility by proof of specific acts of past misconduct not the subject of a conviction, the examiner must be content with the witness' answer.").

Though no "extrinsic evidence" can be offered to prove the untruthful conduct, the "bar" for inquiring into that conduct is quite low. All the law requires to probe character for truthfulness is that the questioner "proffer[] a good faith factual basis" for questions related to untruthfulness. See United States v. Williams, 986 F.2d 86, 89 (4th Cir. 1993). It is my contention that the complaints of misconduct against the officers in this case, whether sustained or not,[4] constitute a "good faith factual basis" to question the officers about the alleged misconduct.

---

[4] It should be noted that the government provided no information about IAD's process of investigating complaints or what standard of proof governs their findings. Much like the court's wise observations related to the number of complaints, resting on a finding of "sustained" lacks context without knowledge of the process. Yielding the question of the propriety of disclosure to whether the BPD finds a complaint to be "sustained" improperly cedes the Giglio, Brady, and Rule 17 process to an outside party.

April 3, 2015 *EX PARTE* Letter to Judge Hollander
U.S. v. Keyon Paylor, ELH-14-271
Page 5 of 7

Of what I know of the process, making an IAD complaint requires the complainant to represent that particular facts are true. Complainants are often required to give their name, contact information, and more. Calls to IAD are recorded. Applied to the familiar criminal law, allegations of this kind frequently give rise to "reasonable suspicion" to stop and detain a person, even if made anonymously. See Navarette v. California, 134 S. Ct. 1683, 1688, 188 L. Ed. 2d 680 (2014) ("Even assuming for present purposes that the 911 call was anonymous, . . . we conclude that the call bore adequate indicia of reliability for the officer to credit the caller's account."). Considering that a "good faith basis" to question is a considerably lower bar than "reasonable suspicion," IAD complaints – sustained or not – should provide support for questions related to credibility.

During yesterday's call, the Court noted that the sheer number of complaints against Det. Hersl is not probative of any fact of consequence as that number is meaningless without context. I agree. To that end, I should have noted that the government's proffer that Det. Hersl has "dozens"of IAD complaints is, in my experience, abnormal. Det. Hersl started on the Baltimore City Police force in September of 1999. By 2006, the late Judge Prevas of the Baltimore City Circuit Court noted that he had already amassed "dozens" of complaints. By contrast, Sgt. Burns started on the force less than two years after Det. Hersl (in 2001). He has no complaints to IAD.

For what it's worth, in eight years of practice in federal court, I have never encountered a federal case involving BPD officers where any of those officers has anywhere close to the number of complaints filed against Det. Hersl. As the Baltimore Sun and City Paper have both chronicled, Det. Hersl is among a select group of BPD officers who have been plagued by an extreme number of allegations of misconduct.[5]

I should address the claim that "privilege" prevents disclosure of the files for review. The BPD typically opposes review of sustained and unsustained IAD complaints on the ground that the files are privileged under the Maryland Public Information Act ("MPIA"). The Court raised this

---

[5] Numerous newspaper articles have chronicled Det. Hersl's alleged misconduct. See, e.g., Mark Puente, Some Baltimore Police Officers Face Repeated Misconduct Lawsuits, BALTIMORE SUN, October 4, 2014, pages 10-17; Yvonne Wenger and Mark Puente, Nearly $50,000 police settlement approved, BALTIMORE SUN, September 24, 2014; Mark Reutter, Man Convicted of Drug Possession Paid $49,000 to Settle Police Brutality Case, BALTIMORE BREW, September 23, 2014; Mark Reutter, City to pay $150,000 to settle police shooting, BALTIMORE BREW, February 10, 2015; Baynard Woods and Brandon Soderberg, The Detective and the Rapper: The long strange relationship between Detective Hersl and Young Moose, CITY PAPER, October 14, 2014; D. Watkins, Out the Mud: The use of Young Moose's videos as probable cause makes me wonder if poor black artists can ever escape their pasts, CITY PAPER, October 14, 2014; Unreturned Warrants Indicate a Bigger Issue, BALTIMORE SUN, April 15, 2006; Julie Bykowicz, Drug Case Falls Apart Complaints About Officers Allowed, BALTIMORE SUN, March 27, 2006.

April 3, 2015 *EX PARTE* Letter to Judge Hollander
U.S. v. Keyon Paylor, ELH-14-271
Page 6 of 7

issue on yesterday's call, drawing a comparison to limits on the disclosure of privileged mental health records. I should note that any MPIA "privilege" claimed by the BPD does not rise to the level of an evidentiary privilege recognized under the law. See Mezu v. Morgan State Univ., 269 F.R.D. 565, 576 (D. Md. 2010) (J. Grimm) ("[T]here is no legal justification for claiming that the MPIA is a privilege that would warrant refusal to produce documents pursuant to Fed.R.Civ.P. 26(b)(1)."). Thus, even assuming IAD records are personnel files, confidential personnel records may be discoverable in a criminal trial. See Robinson v. State, 354 Md. 287, 309 (Md.1999); Baltimore City Police Dep't v. State, 158 Md. App. 274, 284 (Md.Ct.Spec.App.2004).

In Shriner v. Annapolis Police Dep't,, your Honor made the same observation that IAD records were "not immune from disclosure to the defendant in a criminal trial." ELH–11–2633, 2012 WL 959380 (D. Md. March 19, 2012) (quoting Baltimore City Police Department v. State, 158 Md.App. 274, 857 A.2d 148 (2004)). Indeed, even the privilege not to disclose psychotherapy notes of the kind referenced in yesterday's call can yield to a defendant's right of compulsory process. See Goldsmith v. State, 337 Md. 112, 130, 651 A.2d 866, 875 (1995) ("Therefore, although we hold that the psychotherapist-patient privilege protects a doctor from having to furnish information for pre-trial discovery review, the privilege may not always protect a doctor from furnishing exculpatory evidence at trial pursuant to a trial subpoena or subpoena duces tecum . . .").

The relevant Maryland law governing protection of personnel records only denies inspection of said records to the public unless disclosure is "otherwise provided by law." Fields v. State, 432 Md. 650, 678 (2013) (McDonald, J., concurring). Here, federal law and the right to compulsory process would represent another law requiring inspection. Also, as to the BPD's frequent claim that state law governs the protection of the documents, the Supremacy Clause of the United States Constitution orders that federal law ". . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. Art. VI, Clause 2.   Finally, to the extent the Court has concerns about the dissemination[6] or misuse of the information in the IAD files, the undersigned would be happy to draft a protective order addressing the Court's concerns. Review of the files is not foreclosed by privilege.

---

[6] For preservation of argument purposes, I reiterate that the selective disclosure of IAD files represents a waiver of any claimed "privilege." It is hornbook law that just as a privilege may be invoked, it can also be waived. Producing the files to the government serves as a waiver of any alleged "privilege." Moreover, BPD routinely permits disclosure of the requested files for *in camera* review in cases in this District. See, e.g. United States v. Kevin Lewis Lucas, RDB-09-0560; United States v. Paul Stanley Henley, CCB-07-485. The BPD's practice of selectively waiving that privilege as it provides the files to some while crying "privilege" when requested by others should not be countenanced.

April 3, 2015 *EX PARTE* Letter to Judge Hollander
U.S. v. Keyon Paylor, ELH-14-271
Page 7 of 7

I close by noting that if more of the apparently large number of complainants in the Hersl IAD files had the resources to file civil lawsuits, the allegations would be publicly available and there would be no need for me to seek disclosure of the IAD files to support Mr. Paylor's defense. But lawsuits require counsel, filing fees, and funds largely unavailable to most Baltimore City residents. As a result, indigent citizens of Baltimore victimized by police misconduct are constrained to simply complain to the BPD itself. Just because complainants don't have the funds to pursue a public lawsuit, courts should not treat IAD complaints as deposits in a "lock box" shielding future (largely poor) defendants from information critical to their defense. Poverty should not be a bar to justice.

For these reasons, I believe that I should be permitted to review the IAD files of all officers, particularly Det. Hersl. I note that the AUSA assigned to the case has already reviewed the files. Thus, my request does little more than put me on equal footing with my opposition. Further, mere review of the files does not mean that the material reviewed will be admissible at trial. Instead, it is merely an acknowledgment that, in these specific circumstances, review of all IAD files (subject to an applicable protective order), is not unreasonable or oppressive and is necessary and essential to Mr Paylor's defense at trial.

Respectfully submitted,

/s/

Brendan A. Hurson, #28179
Assistant Federal Public Defender