## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **UNDER SEAL** |
| | ) | |
| **v.** | ) | **CRIMINAL NO. ELH-14-0271** |
| | ) | |
| **KEYON PAYLOR** | ) | **CIVIL NO. ELH-18-0745** |
| | ) | |

...o0o...

### GOVERNMENT'S RESPONSE TO PAYLOR'S MOTION TO VACATE (ECF 98)

On January 2, 2014, Keyon Paylor was arrested by four Baltimore Police officers and charged with possessing a loaded .45 caliber Heckler & Koch pistol.  On April 21, 2015, Paylor pleaded guilty in this Court to one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g).  During the Rule 11 colloquy, he admitted under oath that the gun was his and that he was pleading guilty because he was, in fact, guilty.  He made similar admissions during an interview with the probation officer who prepared the presentence report, and through his counsel at sentencing.

At the time he pleaded guilty, Paylor was aware that one of the BPD officers involved in his arrest, Daniel Hersl, had an extensive history of police misconduct.  In fact, Paylor made a pretrial discovery request in which he documented Hersl's long track record of misconduct and sought disclosure of the Internal Affairs Division files for all four arresting officers.  The government complied with Paylor's request and produced the IAD files for all four officers to the Court for *in camera* review.  The Court examined the IAD files carefully for impeachment evidence and ordered portions of five files against Hersl disclosed to Paylor.   In light of the impeachment evidence against Hersl, the government informed Paylor's counsel that it would not be calling Hersl as a witness, and would instead rely on the testimony of the three other

officers who had seen Paylor with the handgun and heard him make incriminating statements. Shortly thereafter, Paylor elected to plead guilty.

Roughly a year later, this Office began a corruption investigation into Hersl, who had by then moved into a different unit of BPD called the Gun Trace Task Force.  Hersl and seven other members of the GTTF were ultimately convicted of racketeering offenses involving robbery, extortion, and overtime fraud, among other crimes.  Only one of the racketeering acts of which Hersl was found guilty pre-dated Paylor's guilty plea, and none of the offenses were factually connected to this case.

In the wake of Hersl's conviction, Paylor asks the Court to ignore his sworn admissions and set aside his guilty plea.  He argues that his plea was involuntary because, if he had known more about Hersl's egregious conduct in other cases, he would not have pleaded guilty and would have insisted on going to trial.  He further argues that the government committed a *Brady* violation because it failed to disclose the 2016 investigation into Hersl's corruption before Paylor admitted his guilt in 2015.

Paylor's claims are baseless.  With respect to his first claim, the Supreme Court has squarely held that "the Constitution does not require the government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002).  Paylor does not point to any evidence of police misconduct in his own case—aside from a self-serving claim of innocence that is, of course, contradicted by his own sworn admissions at the Rule 11 colloquy.  In any event, the impeachment evidence Paylor alleges he was missing either *post*-dated his guilty plea, or was cumulative of impeachment evidence he did receive.  Under these circumstances, Paylor cannot establish that his guilty plea was unknowing or involuntary.

With respect to Paylor's second argument, there was no *Brady* violation in this case. Here again, Paylor's claim that the government failed to disclose impeachment information about Hersl is barred by *Ruiz*.  But in any event, the investigation into Hersl did not begin until roughly a year after Paylor entered his guilty plea.  Indeed, even the Fox news article that is the linchpin of Paylor's *Brady* claim traces the origin of the GTTF corruption investigation to summer or fall of 2015, months after Paylor pleaded guilty.

Paylor attempts to distract attention from the legal merits by citing to news stories and making accusations that are not supported by the record of this and other cases.  As discussed below, the government disputes Paylor's characterization of the facts.  Ultimately, however, the Court need not resolve these disputes to reject Paylor's arguments, none of which are based on actual innocence.  Because Paylor's claims fail as a matter of law, the Court should deny his motion without a hearing.

## I.     RELEVANT FACTUAL BACKGROUND

### a.  Paylor's Arrest and the Subsequent Federal Indictment

On January 2, 2014, at approximately 11:10 a.m., four Baltimore Police officers— Detectives Jordan Moore and Timothy Romeo, Detective-Sergeant John Burns, and former Detective Daniel Hersl—were riding in an unmarked vehicle in the 600 block of Bartlett Avenue.  As the officers traveled southbound, they observed Paylor, who was also walking southbound on the south side of the block.  The officers watched as Paylor looked over his shoulder, made eye contact with them, and immediately picked up his pace.  He then ran onto the front porch of 647 Bartlett Avenue and hopped over the walls of two adjoining porches.

As Paylor reached the front porch of 651 Bartlett Avenue—his residence—Moore and Romeo saw him reach into his waistband and remove a black metallic object, which, based on

their training and experience, they immediately suspected was a gun.  While still inside the

unmarked vehicle, Romeo told his colleagues that Paylor was carrying a gun.  Moore and Romeo

then watched as Paylor placed the object underneath the cushion of a chair on his front porch.

Moore and Romeo exited the vehicle, and Moore ordered Paylor to stop.  Paylor ignored

Moore's instruction and entered his residence through the front door.

Seconds later, Moore and Romeo followed Paylor into the residence and quickly

apprehended him in the kitchen at the rear of the first floor.  Paylor's stepfather, Stewart Harris,

was also in the kitchen at the time, along with a small child.  Romeo placed Paylor in handcuffs,

and he and Moore escorted Paylor to the front porch.  Meanwhile, Burns and Hersl, who had

gone around back to cut off a potential escape route, entered the kitchen through the rear door

and followed Romeo and Moore to the front porch.  The officers were in the residence for a

matter of minutes.

Once the officers had Paylor detained on the front porch, Moore and Romeo immediately

focused on the seat cushion, underneath of which they had seen Paylor place the black metallic

object moments earlier.  Both officers saw what appeared to be a marijuana cigarette on top of

the cushion.  Without being questioned or prompted by the officers, Paylor said something to the

effect of, "the weed's mine, but I don't know anything about the gun."  Moore then lifted up the

seat cushion and recovered a .45 caliber Heckler and Koch pistol, bearing serial number

25090291.  The gun was loaded with nine rounds, one of which was in the chamber.  Romeo

searched Paylor incident to arrest and recovered $94 from his person.

Based on these events, the State of Maryland charged Paylor with unlawful possession of

a firearm and other offenses.  The State also charged him with violating his probation with

respect to his October 2010 convictions for illegal possession of firearms (Baltimore City Circuit

4

Case No. 110299018) and possession with intent to distribute controlled dangerous substances (Baltimore City Circuit Case No. 110299019).  On June 4, 2014, a federal grand jury indicted Paylor on one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). ECF 1.

### b.   Discovery Litigation/IAD Disclosures

Paylor made his initial appearance before Magistrate Judge Timothy Sullivan on September 16, 2014.  ECF 6.  During a conference call on January 7, 2015, Paylor's counsel, Susan Hensler, indicated that Paylor was prepared to plead guilty to Count One.  Following the conference call, the Court scheduled a guilty plea hearing for March 10, 2015.  ECF 24.  Six days before the hearing, Paylor's new counsel, Brendan Hurson, requested that the hearing be postponed.  The Court granted Hurson's request and issued a scheduling order setting deadlines for pretrial motions.  ECF 26, 28.

On March 13, 2015, Hurson filed two motions on Paylor's behalf: a motion to suppress the handgun recovered from Paylor's porch on the ground that Paylor was unlawfully arrested without a warrant, ECF 30; and a motion to suppress the statement Paylor made to Moore and Romeo on the porch ("the weed's mine, but I don't know anything about the gun"), on the ground that the statement was involuntary and had not been preceded by *Miranda* warnings, ECF 31.  Hurson further argued that the statement was the fruit of an unlawful arrest.  *Id*. at 3.

On March 20, 2015, Hurson sent a letter to the government, in which he requested any and all complaints, including complaints to the BPD's Internal Affairs Division, against the four officers involved in Paylor's arrest.  Ex. 1 at 1.  Hurson requested that the government produce the complaints to him, *or*, *in the alternative*, that the government provide notice of "the existence of the material" so that he could "request *in camera* review by the Court."  *Id*. at 1.  In his letter,

Hurson summarized a large body of publicly available material indicating that Hersl had engaged in a pattern of harassment, false statements, and other misconduct relating to earlier investigations.  Hurson wrote as follows:

> "My investigation has revealed a startling number of allegations of impropriety on the part of Officer Hersl, including the filing of numerous IAD complaints against him and the fact that at least three police brutality/false arrest lawsuits against him have recently settled for substantial amounts.  Additional media coverage indicates that Officer Hersl recently provided misleading statements to a judge in a search warrant affidavit.  Hersl later repeated these statements to a probation officer in a successful effort to guarantee the arrest of a young rap artist whom Hersl was apparently seeking to prevent from performing at a concert at the Baltimore Arena."[1]

*Id*. at 2.

In response to Hurson's request, and consistent with its standard practice when such a request is made, the government collected IAD files for all four officers involved in Paylor's arrest and submitted the files to the Court for *in camera* review.[2]  Ex. 2.  After carefully reviewing the files, the Court ordered the government to produce four IAD files and part of a fifth.  Ex. 3.  All five files pertained to Hersl.  The government produced the files to Paylor's counsel on April 13, 2015.  Ex. 4.

As a result of the government's disclosure, Paylor and his counsel received the following IAD files pertaining to Hersl:

---

[1]     Hurson provided detailed information regarding each of these allegations in the body of his letter.  *See id*. at 3 (addressing lawsuits against Hersl and settlement amounts); *id*. at 3 n.3 (addressing IAD complaints against Hersl); *id*. at 3–5 (addressing misconduct allegations in connection with Hersl's role in the investigation and arrest of a rap artist named Kevron Evans, a/k/a "Young Moose").

[2]     It is therefore inaccurate to say, as Paylor does in his brief, that the government "opposed" Hurson's request.  ECF 98, at 7.  To the contrary, the government complied with the request, which was framed as a request for production *or* review by the Court *in camera*.



- *IAD File 2003-0216*. Ex. 5.

- *IAD File 2003-1156*. Ex. 6.

- *IAD File 2006-0080*. Ex. 7.

- *IAD File 2011-143*. Ex. 8.

- *IAD File 2014-637*. Ex. 9.

As discussed below,          later testified that Hersl took additional money from his residence and person, but failed to submit the money to evidence control or report having seized the money in the statement of probable cause.

In April 2015, the government informed Hurson that in light of the multiple findings of police misconduct against Hersl, it would not be calling Hersl as a witness at trial. Instead, the government explained that it intended to rely on the testimony of the three other officers who participated in Paylor's arrest—Romeo, Moore, and Burns. Shortly before the scheduled motions hearing (which had been set for April 21, 2015), Hurson informed the government that Paylor had opted to plead guilty rather than proceeding with his motions to suppress. Shortly thereafter, Paylor executed a plea agreement, which called for an agreed-upon sentence of 60 months' imprisonment, pursuant to Fed. R. Crim. P. 11(c)(1)(C). ECF 76.

### c. Paylor's Admissions During Rule 11 Colloquy, Presentence Investigation, and at Sentencing

On April 21, 2015, Paylor pleaded guilty during a rearraignment hearing before this Court. During the hearing, Paylor stated, under oath, that he understood the charges against him and had fully discussed the case and his rights with his counsel, Hurson. Ex. 10 at 6. He also affirmed his statement, in the written plea agreement between the parties, that he had "reviewed the factual and advisory guidelines stipulation with [his] attorney and [did] not with to change any part of it." *Id*. at 8. That stipulation, which the government read into the record at the conclusion of the hearing, read, in pertinent part:

> "On January 2 2014, four Baltimore Police officers encountered the Defendant, Keyon Paylor, while driving in an unmarked vehicle on the 600 block of Bartlett Avenue in Baltimore City. Upon seeing the officers, Paylor ran up the stairs of 647 Bartlett Avenue. He then hopped the walls of two adjoining porches. When he reached the porch of 651 Bartlett Avenue—his residence—Paylor withdrew from his waistband a Heckler & Koch .45 caliber pistol, bearing serial number 2509021. The pistol was loaded with nine rounds, one of which was in the chamber. After withdrawing the pistol from his waistband, Paylor placed it underneath a seat cushion on his porch, where it was later recovered by law enforcement."

ECF 76, at 4 (written agreement); Ex. 10 at 34.

After the government read this stipulation into the record, the Court and Paylor had the

following exchange:

| | |
|---|---|
| THE COURT: | Mr. Paylor, is that an accurate summary of the facts of this case? |
| PAYLOR: | Yes, ma'am. |
| THE COURT: | Did you, in fact, commit the crime as summarized by the government? |
| PAYLOR: | Yes, ma'am. |
| THE COURT: | Do you still wish to plead guilty? |
| PAYLOR: | Yes, ma'am. |
| THE COURT: | Are you pleading guilty freely and voluntarily? |
| PAYLOR: | Yes, ma'am. |
| THE COURT: | Are you pleading guilty because you are guilty as charged? |
| PAYLOR: | Yes, ma'am. |

Ex. 10 at 35–36.

Paylor also confirmed that he was waiving any and all defenses to the charges against

him, including his right to pursue motions filed on his behalf or to otherwise make a "challenge

to some aspect of the case." *Id*. at 30–31.  He specifically acknowledged that by entering a

guilty plea to Count One, he was waiving any "argument that something illegal happened in this

case in terms of the investigation or prosecution." *Id*. at 32.

Following the Rule 11 colloquy, the Court accepted Paylor's guilty plea, adjudged him

guilty of Count One, and ordered the preparation of a presentence report.  *Id*. at 36.  The Court

explained to Paylor that he would be asked to provide information to the probation officer

responsible for preparing the report.  *Id*.  Paylor and his counsel subsequently participated in a

presentence interview with U.S. Probation Officer Tracy Schrum.  ECF 80 at 1, 5.  During that interview, Paylor told Schrum that he agreed with the statement of facts in his plea agreement and "demonstrated an acceptance of personal responsibility for his criminal conduct."  *Id*. at 5.

The Court held a sentencing hearing on July 22, 2015.  Prior to the hearing, Paylor filed a letter in which he again accepted responsibility for his conduct in this case.  ECF 81.  In the letter, Paylor's counsel, Hurson, wrote as follows:

> "Mr. Paylor's offense is undoubtedly serious as the possession of firearms poses inherent risks.  However, this case is unremarkable in that it contains no report that Mr. Paylor used, or threatened to use, *the firearm he possessed*.  Mr. Paylor's was an entirely random arrest.  He was walking down a city street when four (4) officers randomly came upon him.  Residing in a city awash with illegal firearms, it would easily have been thousands of other young men arrested by officers that morning.

*Id*. at 2 (emphasis added).

Hurson made similar comments to the Court during the sentencing hearing itself:

> "You know, the nature and circumstances of the offense are obviously serious here.  Firearms are—this town's awash in firearms.  And people like Mr. Paylor are not supposed to possess them.  It's illegal for them to possess them and, frankly, there's no reason for him to possess them.
>
> But as I pointed out in [my sentencing] letter, he wasn't the target of an investigation.  This wasn't a long-running thing.  It was unfortunately a random encounter at 11 a.m. in the morning that resulted in Mr. Paylor's arrest.
>
> You know, obviously, *he shouldn't have had a gun*.  But I think it's important that it wasn't as though he was getting a phone call, that he was menacing anyone or using the firearm or anything like that, because often times that is the case.  In some sense, I think that mitigates slightly, making this one of the arguably less serious felon in possession cases, but serious nonetheless."

Ex. 11 at 14 (emphasis added).

### d.   The GTTF Investigation—Timing, Charges, and Trial

In October 2015, while pursuing an unrelated drug investigation, DEA investigators executed a search warrant on a vehicle belonging to a suspected drug trafficker named Aaron Anderson, a/k/a "Black."  Ex. 12 at 11-12.  While executing the warrant, the investigators discovered a GPS tracking device that the FBI subsequently determined (pursuant to a grand jury subpoena) had been purchased a member of the Gun Trace Task Force, with his personal credit card.  *Id.* at 12.   The FBI suspected that at some point prior to the search of Anderson's vehicle, members of the GTTF had installed the tracking device on Anderson's vehicle "in order to monitor his whereabouts unrelated to their official duties."  *Id.* at 26.

With assistance from the DEA, the FBI continued investigating potential criminal activity by members of the GTTF.  On March 31, 2016, investigators intercepted a telephone call between a drug dealer named Antonio Shropshire, a/k/a "Brill," and former BPD Detective Momodou Gondo, during which Shropshire told Gondo that he had discovered a GPS tracking device on his vehicle, and Gondo recommended that Shropshire remove it.  *Id.* at 29–30.  Based on that phone call and a wealth of other evidence, the FBI obtained a wiretap on Gondo's telephone in April 2016.  *Id.* at 47.

The FBI's investigation ultimately led to Hersl—but not until May 2016, over a year after Paylor's guilty plea.  On May 11, 2016, while monitoring the wiretap on Gondo's telephone, investigators determined that Gondo, Hersl and two other officers had participated in a traffic stop that led to the seizure of a handgun and currency from a defendant named Nicholas Deforge. Ex. 13 at 22–30.  Based on intercepted phone calls and surveillance footage, the FBI determined that the statement of probable case for Deforge's arrest, which had been authored by Gondo and documented the seizure of a handgun by Hersl, misrepresented how and when the handgun was

11

seized.  *Id*. at 30.  Investigators further determined that Gondo, Hersl, and their colleagues had taken money from Deforge but failed to report the seizure in their arrest paperwork.  *Id*.  This was the first occasion that the FBI uncovered evidence that Hersl had participated in criminal activity as a member of the BPD.

Ultimately, the FBI's investigation resulted in criminal charges against Hersl and six other officers.  Ex. 14, 15.  In February 2018, at the conclusion of a three-week jury trial, Hersl was convicted of racketeering conspiracy, racketeering, Hobbs Act robbery, and extortion.  Ex. 16.  On June 22, 2018, Judge Blake sentenced Hersl to 18 years in the custody of the Bureau of Prisons.  Ex. 17.

In his motion to vacate, Paylor summarizes testimony by two government witnesses, Jimmie Griffin and Herbert Tate, both of whom testified at Hersl's trial that Hersl had robbed them of money in the course of arresting them.  ECF 98 at 12–13.  Tate further testified that Hersl had planted evidence (drugs) on his person.  *Id*. at 13.  Paylor's summaries are misleading, insofar as they claim that "Hersl *and Romeo*" stole money from Griffin, and that "Hersl *and Burns*" stole money from Tate and planted evidence to cover up their misconduct.  *Id*. at 12–13 (emphasis added).  Although Hersl was convicted of racketeering acts involving the robberies of Griffin and Tate, neither Griffin nor Tate directly implicated Romeo or Burns in those crimes, and the jury made no findings with respect to Romeo or Burns.

Griffin testified that Hersl, and Hersl alone, took $6,000 from his person in connection with Griffin's arrest.  Although Griffin explained that another officer was present at the scene, he testified that the other officer (whom he never identified by name) did not conduct the search. Ex. 17 at 15.  Romeo testified that he witnessed Hersl taking money from Griffin's person, and that the stack of money did not appear large enough to total $6,000, but that Hersl did not count

the money in front of him and he did not know how much money it was.  Ex. 19 at 12, 16.  There

was no dispute that Romeo was not present when approximately $5,000 (only $4,003 of which

was submitted to evidence control) was taken out of a safe in Griffin's home.  Romeo was

merely the submitting officer.  Ex. 19 at 14.  Taken as a whole, this body of testimony undercuts

Paylor's allegation that "Hersl *and Romeo*" robbed Griffin together.  ECF 98, at 12 (emphasis

added).

Tate testified that Burns was one of the officers who participated in his arrest in

November 2015, when, according to Tate, Hersl stole money from him and planted drugs on

him.  Tate did not, however, directly accuse Burns of any wrongdoing, nor did the jury make any

findings with respect to Burns.  Ex. 20 at 15–17, 23–24.  Here again, Paylor's accusation that

"Hersl *and Burns*" stole money and planted drugs is not supported by the transcript.  ECF 98, at

13 (emphasis added).  In any event, as noted above, the Tate incident post-dated the entry of

Paylor's guilty plea by nearly seven months.

### e.  Paylor's 2017 Interview and Grand Jury Testimony

In June 2017, roughly three months after Hersl and his colleagues were indicted, FBI

investigators and an Assistant United States Attorney interviewed Paylor regarding his arrest in

this case.  During the interview, Paylor alleged that Burns had stolen $4,500 to $5,000 from his

room.  He also denied possessing the handgun that Moore had recovered from underneath the

seat cushion on his porch.  Paylor testified before a grand jury later the same day.

On July 5, 2017, the government filed a motion to reduce Paylor's sentence pursuant to

Fed. R. Crim. P. 35.  ECF 86.  At the time of the motion, neither the FBI nor anyone associated

with the GTTF investigation had spoken to the officers involved in Paylor's arrest.  They also

had not interviewed Paylor's stepfather, Stewart Harris, who lived at 651 Bartlett Avenue and witnessed the arrest himself.

On July 11, 2017, the government withdrew its Rule 35 motion at Paylor's request.  ECF 89.  After the motion was withdrawn, Paylor, through his counsel, requested that the government vacate his conviction.  The government declined that request.

### f. The Government's Disclosures Regarding Detective Romeo in *United States v. Johnson et al.*

On December 28, 2017, the government disclosed information pertaining to Detective Romeo's involvement in Paylor's arrest to counsel for three defendants in *United States v. Gerald Johnson et al.*, JKB-16-363.  Ex. 21.  The government made this disclosure because it intended to, and ultimately did, call Detective Romeo as a witness during its case-in-chief.

With respect to this case, the disclosure in *Johnson* included the following materials:



---

3





### g.   The 2018 Interview of Stewart Harris

As noted above, Paylor's stepfather, Stewart Harris, was inside the residence at 651 Bartlett Avenue when Paylor was arrested.  Investigators interviewed Harris, with Paylor's counsel present, on March 14, 2018.  During the interview, Harris told investigators that Paylor's arrest was "quick" and "didn't take long."  He estimated that the arrest occurred in five to ten minutes or less.  Harris recognized Hersl because he had seen Hersl frisk Paylor and his friends on a prior occasion.  He did not recognize the other officers.  He did not recall speaking with any of the officers when Paylor was arrested, but he remembered them acting respectfully.

Harris explained that although he could not see the front stairway from where he was standing in the kitchen, he believed that all four officers went directly to the front porch with Paylor after he was taken into custody.  Harris did not see anyone go upstairs or hear any activity on the second floor of the house.  He explained that Paylor's room was directly above the kitchen, and that he would have heard noises if anyone had been rummaging around in Paylor's room.  He added that he did not notice anything missing or out of place in the house after the detectives left.

Harris also recalled an earlier incident in October 2010 when the BPD executed a search warrant at 651 Bartlett Avenue.  Paylor was the target of that search warrant, although he was

not at home when it was executed.  Harris recalled that the police recovered two firearms from

Paylor's room.  He stated that Paylor told him afterward that he was holding the guns for a

friend.

## II.   ARGUMENT

Paylor asks the Court to set aside his guilty plea, which he entered following a thorough

Rule 11 colloquy in April 2015.  During that colloquy, Paylor admitted, under oath, that he

unlawfully possessed a firearm on the date of his arrest.  He now asks the Court to believe that he

lied during his guilty plea hearing, and that the gun was, in fact, planted by the police.

Paylor fails to acknowledge two important principles: first, "allegations in a § 2255

motion that directly contradict the petitioner's sworn statements made during a properly

conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'"

*United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005); *see also id*. (a defendant's "solemn

declarations in open court affirming a [plea] agreement … carry a strong presumption of

veracity").  Thus, absent extraordinary circumstances, "the truth of sworn statements made

during a Rule 11 colloquy is conclusively established, and a district court should, without

holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations

that contradict the sworn statements."  *Id*.

Second, Paylor fails to acknowledge that "when a defendant pleads guilty, he waives all

nonjurisdictional defects in the proceedings conducted prior to the entry of the plea."  *United

States v. Moussaoui*, 591 F.3d 263, 279 (4th Cir. 2010) (quoting *United States v. Bundy*, 392

F.3d 641, 644 (4th Cir. 2004)).  The Supreme Court has recognized that a "guilty plea represents

a break in the chain of events which has preceded it in the criminal process."  *Tollett v.

Henderson*, 411 U.S. 258, 267 (1973).  Thus, a defendant who enters a guilty plea "has no non-

jurisdictional ground upon which to attack the judgment except the inadequacy of the plea,

*Bundy*, 392 F.3d at 644–45, or the government's "power to bring any indictment at all." *United*

*States v. Broce*, 488 U.S. 563, 575 (1989); *see also United States v. Bluso*, 519 F.2d 473, 474

(4th Cir. 1975) ("A guilty plea is normally understood as a lid on the box, whatever is in it, not a

platform from which to explore further possibilities."); *Blackledge v. Perry*, 417 U.S. 21, 29–30

(1974) ("[W]hen a criminal defendant enters a guilty plea, he may not thereafter raise

independent claims relating to the deprivation of constitutional rights that occurred prior to the

entry of the guilty plea.").

Paylor seeks to evade these principles in two ways.  First, he attacks the voluntariness of

his guilty plea by arguing that it was induced by egregiously impermissible police misconduct.

Second, he claims that the government committed a *Brady* violation by failing to disclose that

Hersl and others were under investigation prior to Paylor's guilty plea in April 2015.  For the

reasons discussed below, the Court should reject these arguments, which fail as a matter of law,

and dismiss the pending motion without a hearing.

### a.  Paylor's Guilty Plea Was Knowing and Voluntary.

"In order for a guilty plea to be valid, the Constitution imposes 'the minimum

requirement that [the] plea be the voluntary expression of [the defendant's] own choice."

*Moussaoui*, 591 F.3d at 278 (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)

(alterations in original)).  Because it operates as a waiver of important constitutional rights, the

plea must also be entered knowingly and intelligently, 'with sufficient awareness of the relevant

circumstances and likely consequences.'"  *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005)

(quoting *Brady*, 397 U.S. at 748).  It must reflect "a voluntary and intelligent choice among the

alternative courses of action open to the defendant."  *North Carolina v. Alford*, 400 U.S. 25, 31

(1970).  In evaluating the constitutional validity of a guilty plea, "courts look to the totality of the circumstances surrounding [it], granting the defendant's solemn declaration of guilt a presumption of truthfulness."  *Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir. 2003) (internal citation omitted).

As discussed above, during his guilty plea hearing in April 2015, Paylor admitted that the factual stipulation in his plea agreement was accurate; that he was pleading guilty freely and voluntarily; and that he was pleading guilty because he was, in fact, guilty as charged.  Ex. 10 at 35–36.  He further acknowledged that was waiving any and all defenses to the charges against him, as well as his right to proceed to a motions hearing and raise "[a] challenge to some aspect of the case."  *Id*. at 31.

Despite these sworn admissions, Paylor now argues that his guilty plea was unknowing and involuntary because he was not aware, at the time of his guilty plea hearing, that "since at least 2014," Hersl had engaged in an extensive pattern of criminal conduct.  ECF 98, at 16–17.  Paylor argues that, had he known of Hersl's pattern of criminal conduct, he would have challenged Hersl's credibility and attempted to persuade a jury that Hersl (and his colleagues) had fabricated the evidence against him in this case.  *See id*. at 16–18.  In short, Paylor asks the Court to vacate his conviction because he was not provided with impeachment material before he pleaded guilty in this case.

But the Supreme Court has rejected this very argument.  In *United States v. Ruiz*, 536 U.S. 622 (2002), the Court held that "the Constitution does not require the government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."  *Id*. at 633.  The Court explained that exculpatory impeachment information "is special in relation to *the fairness of a trial*, not in respect to whether a plea is *voluntary*."  *Id*. at

629 (emphasis in original).  The Fourth Circuit has followed this reasoning in similar contexts.

*See*, *e.g.*, *Moussaoui*, 591 F.3d at 285–87 ("The *Brady* [*v. Maryland*] right … is a trial right …

[it] exists to … minimize the chance that an innocent person would be found guilty … when a

defendant pleads guilty, those concerns are almost completely eliminated because his guilt is

admitted."); *Jones v. Cooper*, 311 F.3d 306, 315 n.5 (4th Cir. 2002) (applying *Ruiz*, and rejecting

the defendant's argument that he would not have pleaded guilty had he been provided certain

death penalty mitigation evidence prior to entry of plea); *United States v. Richards*, 314 Fed.

Appx. 522, 524-25 (4th Cir. 2008) (prosecution's withholding of certain recordings, even if the

recordings were exculpatory, was not reversible error because "the failure to disclose *Brady*

evidence prior to a guilty plea does not establish a constitutional violation").

Curiously, Paylor fails to bring *Ruiz* to the Court's attention, perhaps because it disposes

of his argument.  Here, as in *Ruiz*, the government was under no obligation to disclose

impeachment material prior to Paylor's guilty plea.  Further, and in any event, the government

disclosed to the Court *in camera* all available IAD materials pertaining to Hersl and his

colleagues.  After carefully reviewing the files, the Court determined that only five of them

constituted impeachment material and ordered those files disclosed.  Paylor received the files

weeks in advance of his guilty plea.  The files included not only a sustained IAD complaint

against Hersl for making a false statement, but also a then-pending complaint relating to the

incident involving Jimmie Griffin, which Paylor cites repeatedly in his brief.  *See* ECF 98 at 12–

13.  As discussed below, the robbery of Griffin, which occurred in November 2014, is the only

incident of corrupt behavior by Hersl that Paylor alleges pre-dated his guilty plea.  The IAD

complaint, which was brought by George Lee, alleged that Hersl had subjected Lee to false arrest

and malicious prosecution by "falsely charging" him, and included a statement of probable cause

that summarized the execution of a search warrant at Griffin's residence and Griffin's eventual arrest. Ex. 9 at 3. Thus, even though the government was under no obligation to provide Paylor with impeachment material prior to the entry of his guilty plea, Paylor nonetheless received information pertaining to the very episode that he now contends would have altered his calculus as to whether or not to plead guilty. Under these circumstances, and pursuant to the Supreme Court's holding in *Ruiz*, Paylor cannot establish that his guilty plea was unknowing or involuntary.

Instead of confronting *Ruiz*, Paylor invokes the Fourth Circuit's decision in *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), in support of his argument that his plea was unknowing and involuntary. But the holding in *Fisher* is irrelevant to Paylor's claim, which is governed instead by *Ruiz*. Paylor comes nowhere close to meeting *Fisher*'s requirements on the basis of the record in this case.

In *Fisher*, the Fourth Circuit allowed the defendant to withdraw his guilty plea where the police officer responsible for his arrest subsequently entered a guilty plea in which he admitted to lying in the search warrant affidavit that formed the sole basis for searching the defendant's residence, and led to the sole evidence against him. *Id*. at 466, 469. Both the government and the defendant were unaware of the police officer's misconduct—*i.e.*, the lies in the search warrant affidavit—at the time the defendant pleaded guilty. *Id*. at 467. In its opinion, the Fourth Circuit noted that the case involved "highly uncommon circumstances in which gross police misconduct [went] to the heart of the prosecution's case," and not merely a situation where the defendant's "calculus misapprehended the quality of the state's case" based on the reliability of its witnesses. *Id*. at 466. Because the officer's lies, had they been disclosed, "may well have" led to a successful motion to suppress the sole evidence of the defendant's guilt, the Court found

a "reasonable probability" that the defendant would not have entered a guilty plea had he known the true facts of the case.  *Id*. at 468–69.

   *Fisher* established a two-part standard for determining whether a guilty plea is involuntary.  To meet that standard, a defendant must show that (i) there was "some egregiously impermissible conduct" that "antedated the defendant's entry of his plea," such as "an officer's deliberate misrepresentation that underpinned the entire case against him," and (ii) the misconduct was "material" to the defendant's decision to plead guilty, that is, there is a "reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial."  *Id*. at 465–67.[5]

   Paylor cannot satisfy either prong of the *Fisher* test.  With respect to the first prong, he cannot point to evidence that there was any misconduct in this case.  Instead, Paylor points to evidence that one of the four officers involved in his arrest—Hersl—had engaged in criminal conduct in *other* cases, such as those involving Jimmie Griffin and Herbert Tate.  ECF 98 at 2, 12-13, 16-17.   As discussed above, however, the incident involving Tate post-dated Paylor's guilty plea, and is therefore irrelevant to the *Fisher* analysis.  *See Fisher*, 711 F.3d at 465; *see also Richardson v. United States*, 2015 WL 4366198 at * 4 (E.D.N.C. Jul. 16, 2015).  With respect to the incident involving Griffin, Hersl was convicted of robbery on the basis of

---

[5]      *Fisher* was decided over a strong dissent, 711 F.3d at 470–78 (Agee, J.), and a number of courts from outside the Fourth Circuit have expressly disagreed with its reasoning.  *See, e.g.*, *Hasbajrami v. United States*, 2014 WL 4954596 at * 3 (E.D.N.Y. Oct. 2, 2014) ("I am not convinced that *Ferrara*, and especially *Fisher*, were correctly decided …"); *United States v. Rains*, 2015 WL 4647292 at * 7 (N.D. Fla. Aug. 5, 2015) ("noting that "the persuasiveness of *Fisher* is questionable in that … no other circuit court as adopted [its] expansive holding").  Further, as far as the government is aware, there is only one case from within the Fourth Circuit that has relied on *Fisher* to allow a defendant to withdraw his guilty plea, and in that case, the government joined in the defendant's motion.  *See United States v. Andrews*, 2015 WL 12830449 at * 1 (E.D. Va. Apr. 1, 2015).

testimony that he took money from Griffin and falsely reported the amount of money he took in the arrest paperwork.[6]  Paylor does not claim, nor can he, that the Griffin incident is in any way connected to his specific case, or that it has any bearing on his actual guilt or innocence.  The incident is, instead, a classic example of impeachment material that could have been used to attack Hersl's credibility at trial.  As discussed above, however, the Supreme Court has squarely held that the government's failure to turn over impeachment material such as this does not render a guilty plea involuntary.  *Ruiz*, 536 U.S. at 625, 636.

Paylor also fails to demonstrate that Hersl's pattern of criminal behavior went "to the heart of the prosecution's case," or that it "underpinned the entire case against him."  *Fisher*, 711 F.3d at 465–66.  Indeed, prior to Paylor's guilty plea, and following the litigation over Hersl's IAD file, the government informed defense counsel that *it did not intend to call Hersl as a witness*.  The government did not need Hersl as a witness because other officers would have testified that they saw Paylor with a gun on the date of his arrest.[7]  Accordingly, impeachment information relating to Hersl's prior conduct is radically different in character than the information at issue in *Fisher*, which, as discussed above, related to an officer who lied in a search warrant affidavit *for the defendant's residence*, which led to the discovery of the *only evidence against the defendant in the case*.  *Id*. at 466, 69.  Numerous courts in this Circuit have held that *Fisher* does not apply where, as here, the information allegedly withheld from the defendant is impeachment evidence with little or no connection to the defendant's own case.  *See, e.g., United States v. Coats*, 2018 WL 1570241 at *5–6 (D. Md. Mar. 30, 2018) (Bennett, J.)

---

[6]     Griffin, who also pleaded guilty to gun and drug offenses, never alleged that evidence was planted or sought to withdraw his plea.

[7]     The third officer, Detective Burns, did not see Paylor take the firearm out of his waistband, but did hear another officer shout "gun," or something to that effect.

(refusing to apply *Fisher* in a case involving the same corrupt officer, TFO Lunsford, even though there was evidence Lunsford had stolen a watch from the defendant, because "[m]ultiple officers were involved in the observations and investigations that led to [the defendant's] conviction"); *Carmon v. United States*, 2015 WL 5838634 at *3 (E.D.N.C. Oct. 7, 2015) (distinguishing *Fisher*, and holding that "[w]hile criminal conduct by [Agent] Edmonds is undisputed … petitioner makes no allegation as to any connection between such criminal conduct and the prosecution in this case"); *Richardson v. United States*, 2015 WL 4366198 at *3–4 (holding *Fisher* inapplicable where "petitioner ha[d] not alleged that the alleged criminal conduct by [the officer] related specifically to the police investigation that underpinned the government's evidence in this case"); *Lewis v. United States*, 2015 WL 2401514 at *8–9 (E.D.N.C. May 20, 2015) (distinguishing *Fisher* where criminal charges brought against an officer involved in the defendant's arrest "d[id] not permit an inference of connection to this case" and therefore constituted mere impeachment evidence that, pursuant to *Ruiz*, the government was not required to disclose prior to a guilty plea); *see generally United States v. Cohen*, 2015 WL 5331697 at *6–8 (D. Md. Sept. 10, 2015) (Quarles, J.) ("*Fisher* … involved misconduct relating to the evidence underlying the charges to which the defendant pled guilty.").

With respect to *Fisher*'s second prong, Paylor cannot demonstrate that information about Hersl's prior misconduct was material to his decision to plead guilty.  As we have explained, the information did not go "to the heart of the prosecution's case," *id*. at 465, because Hersl was not a necessary witness.  Moreover, the sum and substance of the information regarding Hersl was known to Paylor when he decided to plead guilty.  By the time he entered his guilty plea, Paylor had received a wealth IAD materials regarding Hersl's prior track record of police misconduct.  As discussed above, among those materials was an IAD complaint for the case involving Jimmie

Griffin—the only instance of misconduct by Hersl that Paylor alleges pre-dated his guilty plea—which put Paylor on notice that there were open claims of false imprisonment and false arrest related to that very case.  The only change between then and now, of course, is that a jury in fact subsequently found Hersl guilty of that misconduct.  In short, we deal here with impeachment information pertaining to a non-essential government witness, which was included (at least in part) in the materials the government produced, despite being under no legal obligation to do so.[8] It would be a gross expansion of *Fisher* to characterize such information as "material" to Paylor's decision to plead guilty in this case.

To be sure, Paylor does claim—now—that there was egregious police misconduct in this case.  Years after pleading guilty, he alleges that Hersl and his colleagues planted the gun (which he previously admitted under oath to possessing) and that they stole his money and lied.  But unlike in *Fisher*, where the police officer *admitted* his misconduct in the case, Paylor's claims are based solely on his own self-serving accusations.  Those accusations are inconsistent with the accounts of three other officers; as well as with the account of Paylor's stepfather, a disinterested witness with no incentive to lie, who did not recall seeing or hearing anyone rummaging around in Paylor's bedroom at the time of his arrest.  More importantly, Paylor's accusations are contradicted by his own sworn admissions at the Rule 11 colloquy, during the presentence investigation, and at sentencing.  This was not a plea of *nolo contendere*.  To the contrary, Paylor

---

[8]     Police misconduct allegations can take many months or even years to resolve.  They are, more often than not, determined to be unfounded or not sustained.  An expansion of *Fisher* requiring pre-plea disclosure of not only the nature of unrelated accusations against an officer but also the *resolution* of those unrelated accusations would upend guilty pleas in an untold number of cases, including many cases in which officers are ultimately cleared or exonerated of any wrongdoing.

confessed his guilt repeatedly, to the Court, the probation office, and through his counsel.  There

is no reason, legal or otherwise, to ignore those confessions now.

Whatever the Court makes of Paylor's allegations, he certainly does not present any new

evidence of police misconduct in this case.  In fact, he contends that "he knew at the time he pled

guilty that the police had planted evidence against him and lied."  ECF 98, at 13.  This admission

is fatal, for to the extent that Paylor's unsupported allegations are credited, which they should not

be, the alleged misconduct could not have been material to Paylor's decision to plead guilty

when, by his own admission, he knew about the misconduct at the time.  For this reason as well,

Paylor has failed to satisfy *Fisher*'s second prong.

### b.  There Was No *Brady* Violation in This Case.

Paylor also argues that his guilty plea should be vacated because the government violated

his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose the

investigation into Hersl's corruption (and the evidence it revealed) before Paylor pleaded guilty

on April 21, 2015.  In support of this claim, Paylor points to a public statement made by former

Baltimore Police Commissioner Kevin Davis in March 2017, when he said he had been aware of

the corruption investigation since it was initiated "in 2015."  Def. Br. at 22.  Paylor infers from

Davis's statement that the government—either the U.S. Attorney's Office or BPD—had

additional information about Hersl's pattern of misconduct, above and beyond what was in the

IAD files, before Paylor pleaded guilty.  This claim lacks merit.

In *Brady v. Maryland,* the Supreme Court held that the prosecution's failure to disclose

favorable evidence to an accused "violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at

87.  In order to establish that the government's failure to turn over evidence constitutes a *Brady*

violation, the defendant must demonstrate (1) that the undisclosed evidence was favorable, either because it was exculpatory or impeaching; (2) that the prosecution had the materials and failed to disclose them, either willfully or inadvertently; and (3) that the evidence was material to the defense. *See Strickler v. Greene*, 527 U.S. 263, 280–81 (1999); *Moore v. Illinois,* 408 U.S. 786, 794–95 (1972).  Evidence is "material" for purposes of the *Brady* inquiry "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id.*

Here, no *Brady* evidence—whether characterized as exculpatory or impeachment evidence—was withheld by the government in this case.  The government's investigation into Hersl's corruption did not begin until May 2016, over a year after Paylor pleaded guilty and months after his sentencing.  Ex. 13 at 22-30.  Even the broader investigation into the GTTF as a whole did not begin until November 2015, roughly seven months after Paylor pleaded guilty. Ex. 12, at 11-12.[9]  Thus, contrary to Paylor's claim, the Hersl IAD files were not "the tip of the iceberg," ECF 98 at 22; they were the *sole* evidence of officer misconduct known to the government at the time Paylor pleaded guilty.  As discussed above, prior to Paylor's guilty plea, the government provided every IAD file for every officer involved in Paylor's arrest to the Court

---

[9]     The news article cited in Paylor's brief reported that the BPD corruption investigation "was initiated in 2015, shortly after [Davis] was named Commissioner."  Police Commissioner: Indictments of '7 dirty cops' result of rock solid investigation, FOX 45 NEWS, Baltimore, Mar. 3, 2017, *available at* http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-kevin-davis-vote-20151019-story.html.  Davis was was confirmed as BPD Commissioner by the Baltimore City Council on October 19, 2015, after having been named interim commissioner in July 2015.  *See* City Council confirms Kevin Davis as police chief, The Baltimore Sun, Oct. 19, 2015, *available at* http://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-kevin-davis-vote-20151019-story.html.  The article is therefore consistent with wiretap affidavits documenting that the corruption investigation began in November 2015, several months after Paylor's guilty plea and sentencing in this case.

for *in camera* review.  The Court made a careful, reasoned determination that certain files constituted impeachment evidence that should be disclosed to the defendant pursuant to *Brady* and its progeny, and the remainder did not.  Accordingly, Paylor had the entire universe of impeachment evidence pertaining to the arresting officers when he entered his plea.  Clearly, there was no *Brady* violation under these circumstances.  *Cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 59–60 (1987) (holding that a defendant's right to *Brady* evidence in protected child abuse files could be "protected fully by requiring that the … files be submitted only to the trial court for *in camera* review"); *Love v. Johnson*, 57 F.3d 1305, 1313–15 (4th Cir. 1995) (extending *Ritchie*'s *in camera* review protocol to other files the government deems privileged or confidential where a defendant makes a "plausible showing" that the files contain *Brady* material); *United States v. Trevino*, 89 F.3d 187, 190 (4th Cir. 1996) (holding that "[t]he trial court's ultimate conclusion as to whether the information is subject to disclosure—whether the evidence is both material and favorable—may be disturbed on appeal only if it is clearly erroneous").

In any event, the information that Paylor alleges the government withheld is nothing more than impeachment evidence that *Ruiz* squarely holds does not need to be disclosed to a defendant prior to pleading guilty.  536 U.S. at 633.  Paylor alleges that the government withheld "information relating to Hersl's pattern and practice of falsifying documents . . ., robbing and extorting people, and stealing money from them."  ECF 98 at 20.  Certainly, evidence of such a pattern and practice would seriously undermine Hersl's credibility and thereby weaken the government's case against Paylor to the extent it relied on Hersl's testimony.  But it would not be "exculpatory" because it would not directly bear on whether, as a factual matter, Paylor

possessed the .45 caliber firearm recovered from his front porch on January 2, 2014.[10]  Thus,

even assuming, *arguendo*, that BPD's leadership had additional information about Hersl's prior

misconduct when Paylor pleaded guilty—and Paylor points to no evidence that it did—the

failure to disclose such impeachment evidence would not be a reason to invalidate Paylor's

guilty plea.

## III.    CONCLUSION

For the foregoing reasons, the Court should reject Paylor's arguments as a matter of law

and deny the pending motion without a hearing.

Respectfully submitted,

ROBERT K. HUR
United States Attorney

By:    /s/
       Peter J. Martinez
       Christina A. Hoffman
       Assistant United States Attorneys
       36 South Charles Street
       Fourth Floor
       Baltimore, Maryland  21201
       (410) 209-4984

---

[10]      Paylor's argument that "the scale of Hersl's corruption was so large that it goes well beyond impeachment," *id.*, finds no support in logic or case law.  Impeachment evidence does not become exculpatory simply because it is very impeaching; the two categories of evidence are different in kind, not degree.  *See Ruiz*, 536 U.S. at 631 (differentiating between impeachment information that undermines the credibility of witnesses, and exculpatory information that "establish[es] the factual innocence of the defendant"); *Moussaoui*, 591 F.3d at 286 (declining to decide "the question of whether the *Brady* right to *exculpatory* information, in contrast to *impeachment* information, might be extended to the guilty plea context").

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of July, 2018, I caused a copy of the foregoing

Response to be served on defense counsel through the electronic case filing system.


      /s/
Peter J. Martinez
Assistant United States Attorney