IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**KEYON PAYLOR**,
*Petitioner*,

v.

**UNITED STATES OF AMERICA**,
*Respondent*

Criminal Case: ELH-14-271
(Related Civil Action: ELH-18-745)

## PETITIONER'S REPLY IN SUPPORT OF
## MOTION TO VACATE JUDGMENT UNDER 28 U.S.C. § 2255

"An inscription on the walls of the Department of Justice" proclaims that "[t]he United States wins its point whenever justice is done its citizens in the courts." *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (internal quotation marks omitted). Prosecutors, as powerful agents of our government, play a "special role . . . in the search for truth." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Their obligation is "not to convict, but to see that, so far as possible, truth emerges." *Giles v. Maryland*, 386 U.S. 66, 98 (1967) (Fortas, J., concurring). In short, while a federal prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).

Unfortunately, in this case foul blows have been struck. The government urges that Mr. Paylor should get no relief because he pleaded guilty and he is in fact guilty. In addition to being untrue, that position is diametrically opposed to what the government told judges in this very Court, and diametrically opposed to evidence the government presented to ordinary citizens sitting on a grand jury, asking them to return a criminal indictment.

The truth is that Mr. Paylor was framed for a crime that never happened so that corrupt Baltimore City police officers could steal from him. That the government cannot argue otherwise

without repeatedly contradicting itself is proof enough that allowing this conviction to stand would be a miscarriage of justice.

## ARGUMENT

I. **The Government flips and flops before settling on a preposterous story.**

    A. **After investigating this incident, the government vouched for Mr. Paylor's innocence.**

After his arrest, Mr. Paylor made phone calls from jail. The conversations make clear that he *did not* carry or hide a gun, and that the police barged in his home just to steal from him. The calls were Exhibit 22 to the government's brief (provided to the clerk, *see* ECF 116), so the Court can listen and decide for itself what they reveal. Here's some of what will be heard:

- Call 1, at 4:47–5:56: Mr. Paylor talks about "my money that the police took" and that he "knew something wasn't right" when a police officer was "in my room" going through dresser drawers and "looking down the steps" at Mr. Paylor. Mr. Paylor is concerned because he owes someone money but now won't be able to pay it back.

- Call 1, at 5:56–8:10: "Hersl plays a dirty game, yo." Mr. Paylor says the report that the police saw him hide a gun is false.

- Call 1, at 7:45–7:55: Mr. Paylor's reaction to the false police report was "Y'all ain't seen me put nothing nowhere, because I ain't had nothing!"

- Call 1, at 10:50–11:36: "Hersl and them took my money," "They went through my clothes and took my [expletive] money." Mr. Paylor describes having called his mother earlier, who told him that all his clothes were on the floor and his money was gone.

- Call 1, at 12:56: Mr. Paylor says, "Yo, Hersl though playing dirty games, yo," to which the person he's talking to responds, "I already know, man!"

- Call 2, at 8:30–8:52: Mr. Paylor asks witnesses to the incident to come to court for him because the police are lying and saying he put a gun ("a joint") under the seat but he didn't even have a gun. The person on the other line says "they're lying."

- Call 2, at 10:34–10:43: Mr. Paylor says the police know that they are "damn lying" with their report that they saw him hide a gun.

- Call 2, at 12:01–13:44: Mr. Paylor asks someone to contact his probation officer (who knows that Mr. Paylor did not have a weapon that morning because he had just come from a meeting at which he had to go through a metal detector).

Years later, as part of its investigation into the criminal acts of Baltimore City police officers, the FBI listened to an enormous quantity of jail calls, including ones involving Mr. Paylor. After reviewing the conversations, the FBI and federal prosecutors approached and interviewed Mr. Paylor. Ex. 1 (Newberger Declaration) ¶¶ 2–4. Mr. Paylor told the truth: that he was returning from a meeting with his probation officer, that he did not have a gun, and that upon chasing Mr. Paylor into his house Sergeant Burns immediately went upstairs and stole money. *Id*. ¶¶ 8–11; Ex. 2 (Paylor Interview).

Assistant United States Attorney Derek Hines then presented Mr. Paylor's testimony to the grand jury. Mr. Paylor was given limited-use and derivative-use immunity and was told he could be prosecuted for perjury if he lied. Ex. 3 (Grand Jury Testimony) at 3:4–4:6. Again he told the truth, telling the grand jurors exactly what he told the FBI and prosecutors, which is exactly what he said on the recorded jail calls when he thought nobody but family and friends was listening. *Id*. The only time Mr. Paylor has ever told a different story is when confronted with the fact that the same police officers who planted evidence on him and stole from him would come to court, lie on the stand, and subject him to 15 years of incarceration. AUSA Hines specifically highlighted this for the grand jurors. *Id*. at 19:8–20:1:

> AUSA Hines: So was it your understanding, Mr. Paylor, that if you went to trial in this case, had a trial, Danny Hersl, Sgt. Burns, and others may testify, and that if you were convicted you could get somewhere close to 15 years of prison time?
>
> Mr. Paylor: Yes.
>
> AUSA Hines: And as a result of that, did you -- is that why you pled guilty to this case?
>
> Mr. Paylor: I pled guilty to this case [to] take the 5 years, so I won't have

3

to do the whole 15 years of my back-up probation time.

> AUSA Hines: So you felt it was a risk worth taking, even though your testimony indicates today that that gun was not yours, is that right?
>
> Mr. Paylor: Yes.
>
> AUSA Hines: But to be clear, the testimony you've given today to the grand jurors is truthful and complete and accurate testimony?
>
> Mr. Paylor: Yes.

When a grand juror didn't understand the sentencing benefit to pleading guilty, AUSA Hines made sure it was clear. *Id*. at 22:16–23:9:

> AUSA Hines: So you had a prior state conviction from a Danny Hersl arrest, right?
>
> Mr. Paylor: Yes.
>
> AUSA Hines: And as a result of that state conviction and that arrest, you were on probation, right?
>
> Mr. Paylor: Yes.
>
> AUSA Hines: And if you got charged, which you in fact did, you could back up time on the state side and have to serve an additional 15 years because you were on probation, is that right?
>
> Mr. Paylor: Yes.
>
> AUSA Hines: And this plea was a global resolution of both the state case and your federal case, right?
>
> Mr. Paylor: Yes.
>
> AUSA Hines: And you believed that 60 months was a deal that you felt you had to take for various reasons, because you were looking at 15 years or more if you were convicted at a trial, is that right?
>
> Mr. Paylor: Yes.

In short, AUSA Hines led Mr. Paylor through questioning that explained that Mr. Paylor was innocent but pleaded guilty because he felt a jury would credit a police officer's word over his, and because he was facing substantial time.

4

The government's endorsement did not stop there. After his testimony and pursuant to Federal Rule of Criminal Procedure 35, the government told this Court that Mr. Paylor had "substantially assisted the United States in an ongoing investigation," and asked the Court to reduce his sentence to time-served. Ex. 4 (Rule 35 Motion) at 2.[1]

### B. But now the government says Mr. Paylor is guilty.

Now that Mr. Paylor is the target, instead of Hersl, the government has changed its position. Starting on page 3, the government blandly lays out what it (now) says happened on January 2, 2014: the government (now) alleges that Mr. Paylor illegally possessed a gun and tried to hide it. Remarkably, the government recites its factual allegations as if they were truth, even though they come primarily from the report authored by Hersl, someone the government says was robbing civilians and falsifying police documents for years.[2] *Compare* Gov. Br. at 3–4 *with* Ex. 10 (Incident Report) at 2. The government specifically told Judge Bredar that Hersl repeatedly "engaged in obstruction of justice in order to conceal the evidence of the robberies and extortions in which [h]e participated." Ex. 6 (Bail Hearing) at 4:24–5:1. The government said that Hersl filed "false incident reports with the Baltimore Police Department that were relied on by city state's attorneys and judges and other actors in the criminal justice system. Those became, in some cases, statements of probable cause and charging documents that determinations were made about charging individual defendants." *Id*. at 5:2–7. And prosecutors

---

[1] Section § 5K1.1 of the Sentencing Guidelines is a useful comparison. It shows that sentence-reduction considerations include the "truthfulness, completeness, and reliability of any information or testimony provided by the defendant." U.S.S.G. § 5K1.1(a)(2).

[2] Hersl admitted to stealing throughout his 17-year career. Ex. 5 (Opening Statement) at 4:24–5:7; 10:1–7. And the government repeatedly said that Hersl had been robbing civilians since before ever joining the GTTF. Ex. 6 (Bail Hearing) at 11:10–12 (telling Judge Bredar Hersl "was also robbing civilians in the previous unit he served with."); Ex. 7 (Closing Argument) at 4:14–17 (telling jury that Hersl's "choice" to start robbing people "occurred sometime prior to 2014"); *id*. at 41:9–19 (similar); Ex. 8 (Rebuttal Argument) at 28:6–9 (similar); Ex. 9 (Sentencing) at 23:12–13 (similar); *id*. at 42:18–20 (similar).

told Judge Blake that they had "seen in the course of this case so many statements of probable cause that bear little to no resemblance to what really went on in these episodes[.]" Ex. 9 (Sentencing) at 21:16–18.

The government does not squarely address the problem that it gets its facts from Hersl, but it does silently make several changes Hersl's report, designed to minimize his involvement. For example, Hersl's report says "these detectives" saw Paylor with what looked like a gun, Ex. 10 (Incident Report) at 2, but the government replaced "these detectives" with "Moore and Romeo," Gov. Br. at 2, 3. Similarly, Hersl reported that he, Moore, and Romeo were all on the porch when Mr. Paylor allegedly made an incriminating statement, and Hersl's report does not say who among the three of them allegedly heard this remark. Ex. 10 (Incident Report) at 2. But the government's brief drops Hersl completely, calling this "the statement Paylor made to Moore and Romeo on the porch." Gov. Br. at 5.

### C.   The government's current story is preposterous.

Regardless of where it came from and how much it has been scrubbed, the government's current story is simply preposterous. First, the government asks this Court to believe that four trained officers knew that a gun was hidden in a public place where anyone could grab it, but not one of those officers stopped to secure the gun—instead, all four for some reason had to chase the now-unarmed man into his house. That story is so unbelievable that AUSA Hines highlighted it for the grand jurors. Ex. 3 (Grand Jury Testimony) at 14:12–19.

Moreover, the government's brief simply ignored the inconvenient fact that Mr. Paylor could not have had a gun on him because he had just come from meeting his probation officer and had to pass through metal detectors—a fact that Mr. Paylor told the FBI, Ex. 1 (Newberger Declaration) ¶ 11, and a fact that Mr. Paylor made clear even years earlier, on a call with friends

6

and family: he asked them to get in contact with his probation officer to help prove his innocence. (This is at 12:01–13:44 of Call 2 on Exhibit 22 to the government's response.)

But most egregious of all is the government's handling—or more accurately, it's ignoring—of the recorded jail calls. The government urges this Court to find Mr. Paylor's story unbelievable because he was only interviewed by the FBI and prosecutors "roughly three months after Hersl and his colleagues were indicted." Gov. Br. at 13. But Mr. Paylor could not, upon learning of the indictment, go back years in time to when he was first arrested and insert false allegations into conversations with his friends and family. Again, the Court has the full recordings so it can listen to the calls and decide for itself. The comments about being framed and robbed are completely intermixed with irrelevant personal conversation—complaints about the food and temperature at the jail, questions about his friends' activities, and banter with a romantic partner. By standing behind this conviction, the government asks this Court to conclude that Mr. Paylor invented a false story and cleverly intermixed it with personal conversation, all in the untethered hope that one day federal agents would listen to his words, fortuitously have no proof that they were false, conveniently find them consistent with a corrupt officer's pattern and practice, and mistakenly ask for Mr. Paylor's assistance in the investigation of that officer. That scenario is so preposterous that AUSA Hines highlighted it for the grand jury. Ex. 3 (Grand Jury Testimony) at 15:14–16:2:

> AUSA Hines: I'm going to play what's been marked as Grand Jury Exhibit No. 4. But before I do that, Mr. Paylor, after you were arrested, were you taken to Central Booking?
>
> Mr. Paylor: Yes.
>
> AUSA Hines: And while at Central Booking, you made some – any jail phone calls?
>
> Mr. Paylor: Yes.

> AUSA Hines: And at the time you made those phone calls, were you even aware that they were being recorded?
>
> Mr. Paylor: No.
>
> AUSA Hines: Did you think at any point in time that later on, years down the road, that someone would be listening to those jail call?
>
> Mr. Paylor: No.

That's not all. Mr. Paylor was not the only victim who the FBI discovered through recorded jail calls. And the government told Judge Bredar and then the jury that the jail calls should be believed because they were made contemporaneously and in conversations that the prisoners had no reason to think would ever be listened to, much less used as evidence. Ex. 6 (Bail Hearing) at 10:12–11:3 (describing "the weight of the evidence" and relying on "contemporaneous jail call recordings, where at the time of the arrest, where the robberies occurred, in what the victims thought were private conversations"); Ex. 7 (Closing Argument) at 19:14–19 ("Mr. Santiful's testimony is corroborated by the jail call, the jail call he made the night of his arrest at a moment in time when he did not believe anyone would ever listen to it.").[3] Now, the government's brief says nothing about the jail calls, because there is nothing to say that is consistent with its desire to maintain this illegitimate conviction. In that sense, the government's position is disingenuous.

---

[3] Mr. Paylor's counsel does not have the full trial transcript, so there may be other instances in which the government vouched for the jail calls because of the unlikelihood of them being false.

The government didn't call Mr. Paylor at Hersl's criminal. Perversely, that is likely because its own prosecution of him for a fake crime would have given Hersl's defense attorney the opportunity to argue that Paylor was testifying only to get a reduced sentence. The government chose witnesses who fortuitously did not have that issue. Ex. 8 (Rebuttal Argument) at 35:8–13 (government stressing the credibility of the victim-witnesses: "And you heard them and you listened to them and you know they had no reason to come in here and lie. All they got was a day off at work to be subjected to questioning in a Federal Courthouse. *They didn't have charges they were trying to beat or sentences they were trying to reduce*.") (emphasis added).

It is disingenuous in other ways too.[4] The government says there is "no evidence" of misconduct in this case. Gov. Br. at 2 ("Paylor does not point to any evidence of police misconduct in his own case"); *id.* at 22 ("he cannot point to evidence that there was any misconduct in this case"); *id.* at 25 ("Paylor's claims are based solely on his own self-serving accusations"). Those assertions are plainly false. In addition to the fact that no officer stopped to secure the allegedly hidden gun, the metal detector at the probation office, and the contemporaneous jail calls, the government's own exhibits reveal even more evidence: we now know that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**D.    The government's reasons for its about-face don't hold water.**

The government explains its new, unlikely position, by asserting—though without providing evidence—that when it put Mr. Paylor in front a grand jury and asked this Court to

---

[4] It was disingenuous for the government to mention that Stewart Harris, Mr. Paylor's stepfather, said that "he did not notice anything missing or out of place in the house after the detectives left." Gov. Br. at 16. Because Mr. Paylor's counsel was present, we know that Mr. Harris said that he personally did not see anything out of place because it was his wife, not he, who went into Mr. Paylor's room—the only room that Sergeant Burns stole from. And Mr. Harris couldn't see whether anyone went upstairs. The weight of Mr. Harris's interview is that, while his stepson was being arrested by several officers, Mr. Harris did not recognize any rummaging-like *sounds* coming from Mr. Paylor's bedroom, through the floor, and into the kitchen.

[5] The government attempts to score points by noting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ then Hersl admitted to some wrongdoing, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Gov. Br. at 14 & n.3. Not surprisingly, the government previously rejected out of hand any inference that Hersl's denials must be true simply because he didn't deny every instance of wrongdoing. *E.g.*, Ex. 12 (Suppression Hearing) at 49:9–14 (though Hersl admitted *one* statement of probable cause was false, the government would present evidence that several were).

9

reduce his sentence, no one had yet "spoken to the officers involved in Paylor's arrest" or to Mr. Paylor's stepfather. Gov. Br. at 13–14. That explanation, thin as it is, cannot withstand scrutiny.

Mr. Paylor's stepfather has little relevant knowledge, as discussed in footnote 4. That leaves the "officers involved in Paylor's arrest." There's Hersl, who—aside from the obvious criminal conviction for framing and robbing citizens— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Then there's Burns, but the government admits he didn't see Mr. Paylor with a gun. Gov. Br. at 23 n.7. And nowhere does the government even hint at what, if anything, Officer Jordan Moore would claim to have seen.

So that leaves Romeo. The government says it "inquired again" of Romeo and his description of events matches Hersl's report. Gov. Br. at 15. But the official report of that interview demonstrates the opposite: Romeo's story *does not* match Hersl's report. Hersl said Mr. Paylor was walking quickly, saw the officers, picked up his pace, ran up onto a porch, hopped over several porch walls, *and then* pulled out what appeared to be a gun. Ex. 10 (Incident Report) at 2. Romeo, on the other hand, tells the incredible-on-its-face story that he was driving along and just saw Mr. Paylor on the street with a gun, and upon seeing the officers Mr. Paylor ran away but was caught (and unharmed) by Romeo and Moore. Ex. 13 (Romeo Interview) ¶ 2.[6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Romeo says he doesn't remember that, and he would remember it if it had happened, Ex. 13 (Romeo Interview) ¶ 2.

---

[6] The government papers over the difference between Romeo's account and Hersl's report, stating that someone other than Hersl would have been available to testify not that Mr. Paylor attempted to run away and then pulled out a gun and hid it, but that Mr. Paylor was seen "with a gun on the date of his arrest." Gov. Br. at 23.

Aside from its facial implausibility and its conflict with Hersl's report, another point is in order concerning Romeo's unsworn statement. The interview took place in December 2017, before Hersl went to trial. And as the government told Judge Bredar in March of 2017, there were legitimate concerns that police officers would not only lie for each other, but would also retaliate against citizens who testified. Ex. 6 (Bail Hearing) at 12:4–14 (it was "not unfounded" for witnesses to be "fearful not only of these defendants, but of other police officers that they fear may be associated with them or working with them or have sympathy for the position they're in"). The government alluded to those concerns again in December 2017, Ex. 12 (Suppression Hearing) at 22:20–23:14, and Judge Blake called them "valid." *Id.* at 24:9. And there is reason to think that Romeo in particular would lie for Hersl: in the same December 2017 interview, Romeo told his version of the Jimmie Griffin arrest, Ex. 13 (Romeo Interview) ¶ 3, which is the same version he told in Hersl's criminal defense but the jury rejected.[7]

That the government now would abandon the position on Mr. Paylor's conviction that it presented to a grand jury and this Court, and adopt a position that flies in the face of the only credible evidence, all because one officer (whose credibility a jury rejected) gave an unsworn statement that contradicts the official report and tells a facially incredible story but at least still says Mr. Paylor had a gun, is beyond troubling and does not accord with the prosecutor's "special role" in our system of justice. *Strickler*, 527 U.S. at 281.

---

[7] In short, Hersl took money from Griffin, in Romeo's presence. Griffin said it was $6,000, but Hersl reported only $900. Ex. 14 (Griffin Testimony) at 14:12–18, 20:2–24. Romeo testified in Hersl's defense, saying the wad of money taken was not large, did not look "anything close" to $6,000, and was in fact only $900. Ex. 15 (Romeo Testimony) at 12:2–24, 14:3–5. The jury believed Griffin and convicted Hersl of robbing him. Ex. 16 (Verdict) at 4.

### E. The government attempts a "foul blow," demonstrating how the deck was stacked against Mr. Paylor.

The government gratuitously notes that in an unrelated incident, guns were found in Mr. Paylor's room when he was not there. Gov. Br. at 16–17. That allegation was tied to absolutely nothing—it was a naked attempt to prejudice Mr. Paylor in exactly the way that the government previously warned about:

- AUSA Leo Wise to the jury: Hersl and his co-defendants "preyed" on "people like Mr. Hamilton, who, because of a record that will follow him for the rest of his life, the defendants counted on no one believing." Ex. 8 (Rebuttal Argument) at 40:8–15.

- AUSA Wise to Judge Blake: "This witness testified under oath and he was asked questions. He looks like a lot of people in this city, which is someone with a criminal record who's on the margins, and that's who these people -- that's who this defendant and his co-defendants targeted." Ex. 9 (Sentencing) at 26:11–15.

- AUSA Wise to Judge Blake: "Hersl, as we heard over and over again during this trial, devalued people like Jimmie Griffin and he thought the law didn't protect them and he abused his power to prey on them. That's what he did." *Id*. at 36:8–11.

- AUSA Wise to Judge Blake: Hersl "didn't value people like Herbert Tate and because he abused his power to prey on them." *Id*. at 37:13–14.

- AUSA Hines to the jury: "The victims of the defendants' crimes in this case thought no one would ever listen to them. They thought, 'It's my word against theirs.'" Ex. 7 (Closing Argument) at 47:6–8

Of course the government's tactic will not work here. But that it even *attempted* the tactic shows why Mr. Paylor believed he stood no chance if a jury was asked to choose between his testimony and a presentation from powerful government actors.

### II. The case for granting relief here is even stronger than in *Fisher*.

In *Fisher*, the Fourth Circuit held that even where "a defendant is fully aware of the direct consequences" of a guilty plea, that plea must be set aside as involuntary when (1) "some egregiously impermissible conduct" by a government agent predated the entry of the plea, and (2) the misconduct was "material" to the decision to plead guilty. *United States v. Fisher*, 711

F.3d 460, 465 (4th Cir. 2013); (quoting *Ferrara v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)). *Fisher* governs this case and a comparison of the facts shows that Mr. Paylor's case involves far more egregious government misconduct; allowing his conviction to stand would be an injustice far more intolerable than would have been the case for Mr. Fisher.

In *Fisher*, a corrupt police officer learned that Cortez Fisher was dealing drugs out of his home. *Fisher*, 711 F.3d at 463. The officer learned this information from a particular confidential source, but in his affidavit in support of a search warrant he misattributed the information to a different person (because that second person had agreed to split reward money with the officer). *Id*. When the home was searched, drugs and a loaded gun were found. *Id*. Mr. Fisher argued that he could have had the evidence suppressed had he known about the officer's lie, but he did not deny his criminal conduct. *Id*.; *see also id*. at 467. On these facts, the Fourth Circuit held that "the officer's deliberate misrepresentation underpins the entire case against [Mr. Fisher] and induced his guilty plea, thereby rendering his plea involuntary." *Id*. at 465. Importantly, the "case present[ed] highly uncommon circumstances in which gross police misconduct goes to the heart of the prosecution's case." *Id*. at 466.

Such is the case here too; indeed, the misconduct here is far more egregious. Unlike Mr. Fisher, Mr. Paylor is actually innocent.[8] The police misconduct is not merely misattributing who led the police to the defendant; instead, the police invented this crime out of whole cloth to steal

---

[8] Though *Fisher* held that innocence is not a prerequisite to relief, it also held that innocence can be "an important factor." 711 F.3d at 467 (citing *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000); *United States v. Garcia*, 401 F.3d 1008, 1013 (9th Cir. 2005)). Indeed, had Mr. Fisher's guilt heavily influenced the dissenting judge, who wrote that "Fisher does not contend that he is innocent of the offense to which he pled guilty. Nor is there record evidence representing affirmative proof of his innocence. *In these circumstances*, I am in agreement with the district court that 'a failure to allow Fisher to withdraw his guilty plea would not result in a miscarriage of justice.'" 711 F.3d at 477 (brackets omitted; emphasis added).

Mr. Paylor's money.[9] The police then covered it all up with a single false report, authored and signed by only two of the four officers (Hersl and Burns).[10] That report conveniently omits the fact that Burns had gone upstairs during the arrest—███████████████.

The government spends most of its brief avoiding *Fisher*. When it finally gets to that case, it musters only feeble half-arguments. It goes without saying that *Fisher* binds this Court, notwithstanding the fact that it was decided over what the government calls "a strong dissent." Gov. Br. at 22 n.5. And since *Fisher* by its own terms deals with "extraordinary case[s]," 711 F.3d at 462, involving "highly uncommon circumstances," *id.* at 466, it is of no moment that the government finds only one case in this circuit directly applying *Fisher*. *See* Gov. Br. at 22 n.5.

The sharpest distinction the government draws between this case and *Fisher* is that the officer in that case admitted his wrongdoing, while in this case ███████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████.[11] Gov. Br. at 25. But we

---

[9] The dissenting judge in *Fisher* put weight on the fact that in that case, unlike here, the misconduct *did not* go directly to guilt or innocence. 711 F.3d at 476. Because the misconduct here was fabricating the entire crime, Mr. Paylor has of course satisfied *Fisher*'s second prong— that the misconduct was material to his decision to plead guilty.

[10] Even if prosecutors were in the dark about Hersl's criminal enterprise, it is hornbook law that misconduct by *police* suffices. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Fisher*, 711 F.3d at 467 (noting that "[t]he government and the dissent point out that neither the prosecution nor defense counsel knew about Lunsford's lies at the time Defendant entered his plea" but finding that argument unavailing). As the *Fisher* court noted, "[i]f a defendant cannot challenge the validity of a plea based on subsequently discovered police misconduct, officers may be more likely to engage in such conduct, as well as more likely to conceal it to help elicit guilty pleas." 711 F.3d at 467. Notably the government cites no support its implied proposition that facts known to the police count only if they were known to police "leadership." *See* Gov. Br. at 29.

[11] We say "apparently" because we only have the ████████████████ ███████ we do not have ████████████████████████ Furthermore, ████████████████████ is nearly entirely redacted. Ex. 17 ███████████████ And that report shows that ██████ *id.* at 19, 20, 21, 22 (headers on each page), but we have no report ████.


don't need Hersl's admission. The credible evidence all demonstrates that Mr. Paylor is innocent. That's why he was put before a grand jury and offered a sentence reduction to time-served.

Other than that, the government sidesteps *Fisher* by pretending the facts in this case are something other than what they are, asserting that Mr. Paylor complains only about misconduct committed against other citizens but not himself. That's why the government cites cases like *Richardson v. United States*, No. 4:11-CR-110-FL, 2015 WL 4366198 (E.D.N.C. July 16, 2015) and *Lewis v. United States*, No. 4:12-CR-00068-FL-2, 2015 WL 2401514, at *8 (E.D.N.C. May 20, 2015), both of which distinguished *Fisher* on the ground that the police misconduct had no connection to the petitioner's particular case. Those cases are inapposite because Mr. Paylor complains—and indeed has *shown* based on the only credible evidence—that police officers framed and robbed him and then covered it up with a false police report that omitted the real facts (including that Burns went upstairs), and they were prepared to testify to their fake story and subject Mr. Paylor to up to 15 years in prison.[12] So this case is nothing like *Richardson* or

---

[12] Of course Hersl also suppressed that what he did to Mr. Paylor was in keeping with his *modus operandi* and long history of stealing from citizens, including framing them for crimes in order to steal. That evidence undermines the entire investigation and is exculpatory, not merely impeaching. *See, e.g., United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) (information which might "have raised opportunities to attack . . . the thoroughness and even good faith of the investigation" constitutes exculpatory, material evidence).

The majority of the Circuits to consider the question have held or suggested that exculpatory evidence must be turned over even when a defendant pleads guilty. *See, e.g., United States v. Ohiri*, 133 Fed. App'x 555, 562 (10th Cir. 2005); *McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003); *United States v. Persico*, 164 F.3d 796, 804–05 (2d Cir. 1999); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995); *White v. United States*, 858 F.2d 416, 422 (8th Cir. 1988); *Campbell v. Marshall*, 769 F.2d 314, 322–24 (6th Cir. 1985). That result properly accounts for the importance and prevalence of pleas in our system of justice. *See, e.g., Missouri v. Frye*, 566 U.S. 134, 143–44 (2012) (plea bargains are "central to the administration of the criminal justice system" because ours "is for the most part a system of pleas, not a system of trials" and plea bargaining "is not some adjunct to the criminal justice system; it *is* the criminal justice system"); *Lafler v. Cooper*, 566 U.S. 156, 169–70 (2012) ("[C]riminal justice today is for the most part a system of pleas, not a system of trials."); *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) (acknowledging that pleas account for 95% of all criminal convictions).

*Lewis*, and much more like *United States v. Andrews*, 2015 WL 12830449, at *1 (E.D. Va. April 1, 2015) (relying on *Fisher* to conclude that plea was involuntary when "critical information contained in the search warrant affidavit [was] false" and "material to finding probable cause."). Notably, in *Andrews*, the government never asked the court to dismiss the petition, instead first asking for a hearing and later agreeing that the petition should be granted without a hearing. Ex. 18 (Andrews Doc. No. 38); Ex. 19 (Andrews Doc. No 47); Ex. 20 (Andrews Doc. No. 50).

A comparison between Mr. Paylor's case and that of another Hersl victim, Herbert Tate, demonstrates the patent injustice of maintaining Mr. Paylor's conviction. Just like Mr. Paylor, Tate was sought out by the FBI after the FBI listened to recorded jail calls. Ex. 21 (Tate Testimony) at 7:5–23. Just like Mr. Paylor, federal prosecutors interviewed Tate and then presented his testimony to the grand jury. *Id*. at 31:21–33:16. And just like Mr. Paylor, Tate was framed and robbed by both Hersl *and Burns*: Burns was the one who ordered Tate to be stopped and searched, *id*. at 17:18–18:6, and it was Burns who told Tate he was being arrested for drug possession even though Tate had no drugs on him, *id*. at 20:15–21:16; *see also id*. at 33:17–23. And just like Mr. Paylor, evidence was fabricated to make Tate's alleged wrongdoing seem more plausible. *Id*. at 65:12–23 (though Tate was not carrying any one-dollar bills, a wad of cash containing one-dollar bills was submitted to make it look like Tate was a low-level drug dealer); *id*. at 45:24–46:23 (same). *But unlike Mr. Paylor*, Mr. Tate was framed for a state crime, not a federal one, and the fabricated charges were dropped. *Id*. at 6:7–7:3. Mr. Paylor's fate should not turn on the fortuity of whether he was prosecuted by a state government (as Tate was), or by the federal office in Virginia (as in the *Andrews* case) instead of Maryland.

### III. Mr. Paylor's conviction must be vacated to deter police misconduct and restore public trust.

The *Fisher* court's "decision to vacate [Cortez Fisher's] plea is supported by the important interest of deterring police misconduct" and avoiding "undermin[ing] public confidence in our judicial system." *Id*. at 469–70. The government acknowledges that Hersl's misconduct has the "strong collateral consequence of undermining public trust in the law, in the enforcement of the law in the department." Ex. 9 (Sentencing) at 49:11–13. And in seeking a lengthy prison sentence, the government argued that one of the harms Hersl caused, for which he should be punished, is that convictions would have to be vacated even when the government could not confirm that the person was actually innocent. *Id*. at 49:13–50:12. The government's position on Hersl's misconduct was a forceful statement of the importance of public trust in the justice system—it had none of the hand-wringing and hoop-jumping that we see now.

The court accepted the government's position: "As has been referenced, the conduct of Mr. Hersl and others has resulted, it would appear, in the dismissal of probably hundreds -- or will result in the dismissal of probably hundreds of other criminal cases, some perhaps involving people wrongly convicted, some people who had, in fact, committed crimes, but those must be dismissed because the credibility of the officers on which the convictions rested has been destroyed." *Id*. at 80:17–24. And courts around the country do just that—vacate convictions—when government misconduct is so widespread that fundamentally shocks public trust in the justice system, even if it cannot be conclusively determined to have affected an individual case. *See, e.g.*, *Com. v. Scott*, 5 N.E.3d 530, 544–45 (Mass. 2014) ("[I]n the wake of government misconduct that has cast a shadow over the entire criminal justice system, it is most appropriate that the benefit of our remedy inure to defendants.").

At every step, the government urged that Mr. Paylor was a victim of Hersl's crimes—listening to Mr. Paylor's calls, interviewing him, putting him before the grand jury, and then offering him Rule 35 relief. The government also urged that convictions like Mr. Paylor's should and would be vacated. Urging those true and principled views, the government successfully prosecuted Hersl and had him sentenced to nearly two decades in prison. Its current about-face is completely unjustified and runs afoul of principles of judicial estoppel. See *Penn. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 117 (4th Cir. 2012) (noting that "the judicial process is not some kind of game" and that a litigant cannot change positions "simply because his interests have changed") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982) ("Judicial estoppel is invoked in these circumstances to prevent the party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process.") (internal quotation marks omitted).[13]

## CONCLUSION

The judge who sentenced Detective Hersl rightly noted that "it strikes at the foundation of our entire criminal justice system if judges and juries can't rely on the word of sworn law enforcement officers because they're covering up their own crimes, whatever those crimes may be." Ex. 9 (Sentencing) at 81:7–11. That lack of reliability is present in this case, in spades.

The government asks for something drastic and unjustified. In the face of all of its flip flops and contradictions, the government asks this Court to deny Mr. Paylor's petition without ever ordering discovery or holding a hearing. To be sure, the Court needs no discovery or

---

[13] This Court listed the elements of judicial estoppel in *Topline Sols., Inc. v. Sandler Sys.*, Inc., No. CV ELH-09-3102, 2017 WL 1862445, at *27 (D. Md. May 8, 2017). Those elements are met: the government's positions are inconsistent, its earlier position was adopted by the grand jury and sentencing court, and its positions have been intentionally taken. The only caveat is that it is the government's *current* position, not its prior one, that is false and misleading.

18

hearing to *grant* this petition, because the question is only whether Mr. Paylor would have pleaded guilty in the absence of the egregious government misconduct, and it is abundantly clear that he would not have.

But if the Court endeavors to dig beyond what Mr. Paylor would have done, and determine guilt or innocence, it cannot merely accept at face value the government's latest assertions (supported sometimes by no evidence, and sometimes by new evidence like misleading snippets of what Mr. Paylor's stepfather said in an interview). Instead, the Court should order a hearing with live testimony—from at least Mr. Paylor, Hersl, Burns, Moore, and Romeo, all under oath—so the Court can judge the witnesses' credibility.[14] See *United States v. O'Quinn*, 166 Fed. App'x 697, 698 (4th Cir. 2006) (factual disputes require an evidentiary hearing); *id.* ("[W]here the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted.") (quoting *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004)).

\* \* \*

Mr. Paylor is no longer incarcerated, but he remains on supervised release. And extant criminal convictions have long-lasting collateral consequences. *See Spencer v. Kemna*, 523 U.S. 1, 8–14 (1998). Unfortunately it is too late to give Mr. Paylor back the five years that he spent wrongfully incarcerated for a crime that never happened. But it is not too late to prevent this illegitimate conviction from having significant consequences for the rest of Mr. Paylor's life. Mr. Paylor respectfully asks the Court to vacate his conviction.

---

[14] If the Court declines to grant Mr. Paylor's petition on the papers and instead schedules a hearing, Mr. Paylor will seek leave to issue discovery requests under Rule 6 of the rules governing § 2255 proceedings.

Dated: August 24, 2018				Respectfully Submitted,

						s/ Anthony Balkissoon

						Gayle Horn
						Anthony Balkissoon
						THE EXONERATION PROJECT
						311 N Aberdeen, 3rd Floor
						Chicago, IL 60607
						Telephone: 213-285-4409
						*Counsel for Petitioner Keyon Paylor*