IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEYON PAYLOR

    *Petitioner*,

    v.

UNITED STATES OF AMERICA,

    *Respondent*.

**UNDER SEAL**
Criminal No.: ELH-14-271
(Related Civil No. ELH-18-0745)

## MEMORANDUM OPINION

This Memorandum Opinion addresses the post-conviction petition filed by Keyon Paylor, through counsel, pursuant to 28 U.S.C. § 2255, challenging Paylor's 2015 conviction for unlawful possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g). ECF 98 (the "Petition"). The Petition, which is supported by numerous exhibits, is rooted in the events of January 2, 2014, when Paylor was arrested at his home by four members of the Baltimore City Police Department ("BPD"). One of those officers was then Detective Daniel Hersl, a corrupt police officer who has since been convicted in this District of several felony offenses.

On June 4, 2014, in connection with the events of January 2, 2014, a federal grand jury indicted Paylor on one count of possession of a firearm and ammunition by a felon. ECF 1 (Indictment). Paylor entered a plea of guilty to the charge on April 21, 2015, pursuant to Fed. R. Crim. P. 11(c)(1)(C). ECF 75; ECF 76 ("Plea Agreement"). On July 23, 2015, in accordance with the terms of the C plea, the Court sentenced Paylor to a term of 60 months' imprisonment, along with a three-year term of supervised release. ECF 82 (Judgment).[1] As discussed, *infra*, the plea

---

[1] Paylor is no longer incarcerated, but he remains on supervised release. ECF 125 at 19. "A prisoner on supervised release is considered to be 'in custody' for purposes of a § 2255 motion." *United States v. Pregent*, 190 F.3d 279, 283 (4th Cir. 1999); *see United States v. Haymond*, ___, U.S. ___, 139 S. Ct. 2369, 2379-80 (2019) (plurality opinion) (recognizing that "an accused's final sentence includes any supervised release sentence he may receive"); *see also United States v.*

also addressed a substantial sentence that Paylor faced in the Circuit Court for Baltimore City for violation of probation in two cases. Petitioner did not note an appeal to the Fourth Circuit. *See* Docket.

Of import here, several years after Paylor's arrest, Hersl and other police officers were convicted in federal court of multiple offenses, largely in connection with their illegal activities as members of the BPD's now disgraced Gun Trace Task Force ("GTTF"). The offenses included racketeering, racketeering conspiracy, Hobbs Act robbery, and extortion. *See, e.g.*, CCB-17-106; CCB-17-452; CCB-17-0638; CCB-19-431.[2] Almost all of the police officers who were charged pleaded guilty. However, Hersl and a fellow police officer, Marcus Taylor, proceeded to trial in February 2018. *See* CCB-17-106. Their convictions were recently affirmed by the Fourth Circuit. *See United States v. Taylor and Hersl*, ___ F.3d ___, 2019 WL 5700359 (4th Cir. Nov. 5, 2019).

At the time of Paylor's plea of guilty, Hersl was not yet under federal investigation. However, rumors of his misconduct had been circulating among the defense bar. Indeed, as discussed, *infra*, Paylor's defense attorney was aware of the allegations of misconduct by Hersl and others and sought to pursue a claim of fabrication of evidence as to Paylor. *See* ECF 98-6 at 2; ECF 114-1 at 2.

In his Petition (ECF 98), Paylor maintains that he is innocent of the charges and "pled guilty to a crime he did not commit." ECF 98 at 1; *see also id.* at 18. Moreover, he contends that his plea was involuntary, in violation of his Fifth Amendment right to due process. *Id.* at 14.

_____

*Venable*, ___ F.3d ___, 2019 WL 6139674, at *5 (4th Cir. Nov. 20, 2019) (recognizing supervised release and revocation as components of a unified sentence); *United States v. Ketter*, 908 F.3d 61, 65 (4th Cir. 2018) (same); *United States v. Evans*, 159 F.3d 908, 913 (4th Cir. 1998). Therefore, the case is not moot.

[2] The investigation is ongoing, as reflected in the recent charge lodged against former BPD Detective Carmine Vignola for lying to a grand jury. *See* CCB-19-431.

Paylor explains that he pleaded guilty because "he did not have a level playing field on which to fight the false allegations him." *Id.* at 1. He insists that he had no way to prove the lies; he thought no one would have believed his claim that the weapon in issue was planted and used as a pretext to enter his home to steal money from him, but instead would have believed the lies of the police officers. *Id.* at 17. Paylor adds that "cops always win." *Id.* at 18. And, he argues that he could not take the risk of going to trial because the conviction would have resulted in violation of two State probations, where he faced back up time of almost 15 years. *Id.* at 8.[3]

According to Paylor, he was "framed for a crime that never happened so that corrupt [BPD] officers could steal from him." ECF 125 at 1. Further, he contends that his guilty plea was induced by the criminal misconduct of "corrupt police officers [who] robbed him and planted false evidence on him to cover up their misconduct." ECF 130 at 1.

Alternatively, Paylor argues that his conviction should be vacated pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). ECF 98 at 20. He contends that, had he known of Hersl's extensive criminal conduct, "he would have had an entirely different view of the government's case against him. He would have insisted on going to trial." ECF 98 at 17. But, in order to persuade the jury of the lies of the BPD officers, he needed "concrete evidence of corruption . . . ." *Id.* at 18. He adds that "evidence of Hersl's misconduct would have altered" his decision to plead guilty to a crime for which he was absolutely innocent." *Id.*

According to Paylor, even if the prosecution was unaware of Hersl's conduct at the time of Paylor's prosecution, BPD leadership knew of the misconduct of Hersl and others prior to Paylor's

---

[3] The violations of probation were ultimately dismissed. Paylor received credit on his federal sentence for the time he was held by the State. ECF 98 at 8 n.2.

plea of guilty on April 21, 2015, which is imputed to the government. *Id*. at 17, 20-23. In his

view, knowledge on the part of the BPD leadership "can be traced back to 2015[.]" *Id.* at 22.

The government vigorously opposes the Petition, ECF 114 (the "Opposition),[4] and has

submitted numerous exhibits. Paylor has replied (ECF 125, the "Reply"), and has submitted

additional exhibits.[5]

The Court heard the argument of counsel on March 7, 2019. *See* ECF 128; ECF 136

(Transcript).[6]

In my review of the mountain of submissions provided by the parties, I was mindful of the

"fundamental value determination of our society that it is far worse to convict an innocent man

than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372 (1970 ) (Harlan, J., concurring).

But, I also recognize that "a guilty plea is a grave and solemn act . . . ." *Brady v. United States*,

397 U.S. 742, 748 (1970). And, I cannot ignore the sanctity of an oath to tell the truth.

---

[4] The Opposition was filed under seal. A redacted version of the Opposition is docketed at ECF 119.

[5] The Reply was filed under seal. A redacted version of the Reply is docketed at ECF 127.

[6] The parties submitted copious exhibits. In a letter filed March 4, 2019 (ECF 130), Paylor requested the opportunity to conduct discovery and to present witnesses at a hearing. The list of proposed witnesses is referenced at ECF 130 at 4-7. The request was supplemented a few days later. ECF 133. The list of proposed witnesses largely consists of prosecutors, defense attorneys, victims of the GTTF in unrelated cases, law enforcement special agents, and the officers involved in the underlying criminal case. The government opposes the request for testimony and discovery. ECF 154.

For the reasons advanced by the government in ECF 154, I agree that the proposed witness testimony and the requested discovery are neither necessary nor warranted. Therefore, I shall deny ECF 130 and ECF 133.

Hersl's betrayal of trust is obviously disturbing. Nonetheless, after careful consideration, I am compelled to conclude that the conduct of Hersl and his corrupt colleagues does not entitle Paylor to the relief in the Petition.

## I. Factual and Procedural Background[7]

### A. Paylor's Arrest

On January 2, 2014, BPD Detectives Daniel Hersl, Jordan Moore, Timothy Romeo, and Detective Sergeant John Burns were driving in an unmarked vehicle in the 600 block of Bartlett Avenue in Baltimore City when they observed Paylor walking southbound. ECF 76 at 4. Upon seeing the officers, Paylor ran onto the front porch of 647 Bartlett Avenue. *Id.* He then allegedly hopped the walls of two adjoining porches before reaching the porch of his residence at 651 Bartlett Avenue. *Id.* Moore and Romeo claimed to have seen Paylor remove a gun from his waistband and then place it underneath a seat cushion on the porch, where it was allegedly recovered by the police officers. *Id.* The weapon was identified as a Heckler & Koch .45 caliber pistol, loaded with nine rounds. *Id.*

Hersl authored the Statement of Probable Cause. ECF 98-4. He claimed that Paylor "turned around and observed" that Romeo and Moore were exiting the unmarked vehicle and "beginning to approach him." *Id.* Although Moore directed Paylor to stop, Paylor "opened the front door" of his residence and "entered the dwelling in a very hurried manner . . . ." *Id.* Romeo and Moore, "believing" that Paylor "just tried to hide a handgun under the chair cushion," pursued him into his residence and apprehended him. *Id.* Burns and Hersl entered the kitchen from the rear, where they had allegedly gone to preclude a potential escape from the house. Moore, Romeo,

---

[7] The facts concerning the arrest of Paylor are derived from the factual summary in the Plea Agreement, to which Paylor stipulated, under oath, at the time of his guilty plea.

Hersl, and Paylor "then responded out onto the front porch" where Detective Moore "recovered 1 brown cigar wrapper containing green plant material (suspected marijuana)" on top of the seat cushion. *Id*. Before Moore lifted the chair cushion, where he found the gun and ammunition, "Paylor stated the weeds [sic] mine[, but] I don't know anything about the gun." *Id*.

The State of Maryland charged Paylor with drug and firearm-related offenses in Case No. 114021081 in the Circuit Court for Baltimore City. ECF 80 (Presentence Report or "PSR"), at 12, ¶ 36. Those charges were nol prossed on June 20, 2014, soon after the indictment was lodged in this case. *Id.* at 1, 12. In addition, the State charged Paylor with the violation of his probation in two cases in the Circuit Court for Baltimore City: Case No. 110299018, a 2011 conviction for possession with intent to distribute CDS, and Case No. 110299019, a 2011 conviction for possession of a firearm and ammunition. *See* ECF 80, ¶¶ 28, 29. Both offenses occurred in October 2010, when Paylor was 18 years of age; he pleaded guilty to both charges on March 11, 2011. *Id.* And, in both cases, Paylor was sentenced to 15 years incarceration, of which 14 years, 6 months, and 27 days were suspended, in favor of three years of probation. *Id.*

Paylor was initially detained by the State on the underlying charges and in connection with the violations of probation ("VOP"). *See* ECF 80 at 1, 12, ¶¶ 36, 37. Shortly after Paylor's arrest, he made several telephone calls from jail. The calls were recorded (ECF 114-22), although Paylor claims he was unaware of the recordings at the time. ECF 127-3 (Paylor grand jury testimony, 6/15/17) at 15. During those conversations, Paylor stated that he did not have or hide a gun on the date in question. *See* ECF 114-22; *see also* ECF 98-5 (AFPD Newberger Declaration), ¶ 4.[8] Moreover, Paylor claimed that the BPD Officers illegally entered his residence on January 2, 2014,

---

[8] The government notes that Hersl has never admitted that money was stolen from Paylor at the time of his arrest. *See*, *e.g.*, ECF 136 (Transcript of 3/7/19) at 55-56.

and, at that time, Sgt. Burns went up the stairs and stole about $4,500 to $5,000 of Paylor's money. ECF 95, ¶¶ 8, 9.

## B. Paylor's Federal Prosecution and Conviction

### 1. Internal Affairs Division Disclosures

As noted, a federal grand jury indicted Paylor on June 4, 2014. ECF 1. He was charged in one count with being a felon in possession of a firearm and ammunition on January 2, 2014, in violation of 18 U.S.C. § 922(g)(1). *Id.*[9]

At the request of defense counsel, a guilty plea hearing was scheduled for March 10, 2015. ECF 24. However, in the days leading up to the hearing, Paylor's lawyer, AFPD Brendan Hurson, requested a postponement. The Court granted that request (ECF 26) and issued a scheduling order setting new deadlines for pretrial motions. ECF 28.

Thereafter, defense counsel filed two motions to suppress on behalf of Paylor. First, Hurson moved to suppress the firearm recovered from the porch, challenging the warrantless arrest of Paylor and the warrantless entry into Paylor's residence. ECF 30. Second, Hurson moved to suppress Paylor's statement to Detectives Moore and Romeo ("[T]he weeds [sic] mine[, but] I don't know anything about the gun.") ECF 31. Hurson contended that Paylor's statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and was the fruit of Paylor's unlawful arrest. *Id.*

---

[9] During the course of this case, several lawyers in the Office of the Federal Public Defender have ably represented Paylor. AFPD Gary Christopher represented Paylor at his initial appearance. ECF 6; ECF 7. The case was then assigned to AFPD Susan Hensler (ECF 14), and subsequently to AFPD Brendan Hurson. ECF 25. Thereafter, the case was assigned to AFPD Katherine Newberger. *See* Docket. He is now ably represented by attorneys associated with The Exoneration Project at the University of Chicago Law School.

In connection with litigation of the suppression motions, Hurson sought to investigate corruption allegations involving Hersl, Romeo, Moore, and Burns. In a letter to the government of March 20, 2015,[10] (ECF 98-6; ECF 114-1, "Request for Internal Affairs Records/Complaints"), Hurson sought the disclosure of misconduct complaints lodged against the officers with the BPD's Internal Affairs Division ("IAD"). He wrote, in pertinent part, *id.* (italics in original):

> . . . I ask that you review any and all Baltimore City Police Department/Justice Department/U.S. Attorney's Office files/records for all of the officers involved in the investigation and arrest of Keyon Paylor in search of any complaint of misconduct, civilian or departmental. I ask that you disclose to me the substance of these complaints regardless of the nature of the complaint and regardless of whether it resulted in a sustained finding of wrongdoing or misconduct. In reviewing these files, I request that you pay particular attention to any *allegation* of or involving official misconduct, excessive use of force, false statements, misrepresentations, stealing, misappropriation, or any dishonest act that could, at minimum, affect a fact-finder's evaluation of the credibility of the officer. . . .

Further, Hurson advised that, based on publicly available information, he was aware of several incidents of misconduct on the part of Hersl. ECF 98-6 at 2; ECF 114-1 at 2. He stated, *id.*:

> My investigation has revealed a startling number of allegations of impropriety on the part of Officer Hersl, including the filing of numerous IAD complaints against him and the fact that at least three police brutality / false arrest lawsuits against him have recently settled for substantial amounts. Additional media coverage indicates that Officer Hersl recently provided misleading statements to a judge in a search warrant affidavit. Hersl later repeated these statements to a probation officer in a successful effort to guarantee the arrest of a young rap artist whom Hersl was apparently seeking to prevent from performing at a concert at the Baltimore Arena. . . .

Hurson also indicated that, as to Moore, his investigation revealed that Moore had been involved in at "least two police shootings, one of them fatal." ECF 98-6 at 5; ECF 114-1 at 5. Although Hurson had "no specific information regarding allegations of misconduct" with respect

---

[10] The letter is erroneously dated "March 20, 201**4**." *See* ECF 98-6 at 1; ECF 114-1 at 1.

to Burns and Romeo, he asked the government to "inquire into whether any exist, particularly because each of these officers ha[d] a long history of working with Det. Hersl." *Id.*

Thereafter, defense counsel submitted ex parte petitions to the Court for the issuance of subpoenas, pursuant to Fed. R. Civ. P. 17(c). *See* ECF 33; ECF 34; ECF 37; ECF 40; ECF 56; ECF 61. In one such request, Paylor sought a subpoena to compel the BPD to disclose the IAD records of Hersl, Burns, Romeo, and Moore. *See* ECF 56. The Court approved the requests. *See* ECF 35; ECF 36; ECF 38; ECF 59; ECF 64.[11]

On April 1, 2015, the government provided the Court with the IAD records of Moore, Romeo, Hersl, and Burns for *in camera* review by the Court.[12] *See* ECF 42. The Court held a telephone status conference with counsel on April 2, 2015. *See* Docket. Additional submissions from the government followed on April 3, 2015 (ECF 48) and April 8, 2015. ECF 58.[13]

In an ex parte letter to the Court on April 3, 2015, Hurson addressed the reasons for his subpoena of the IAD files of the officers. ECF 54. He explained, *id*. at 2-3:

> [D]isclosure is warranted as it will lead to the discovery of relevant and admissible evidence related to the key defense contention that Det. Hersl exhibits extreme bias toward defendants like Mr. Paylor and in showing the jury that Det. Hersl's behavior in this case is in keeping with his behavior in other investigations of black residents of Baltimore City. I intend to show the jury that Det. Hersl, who is white, has a history of harassing Mr. Paylor and other young black men in Baltimore City. I also intend to show that Det. Hersl has a history of skirting the rules in his pursuit

---

[11] The Court denied ECF 40, submitted on April 2, 2015, as moot. *See* ECF 46 (Marginal Order of 4/2/15).

[12] In his Petition, Paylor contends that the government "opposed" his request to subpoena the IAD records of the four officers. ECF 98 at 7. However, as the government points out, it complied with Paylor's request. Hurson asked the government to produce all materials related to allegations of misconduct, or alternatively, turn over all materials for an *in camera* review by the Court. ECF 98-6 at 1; ECF 114-1 at 1. The government chose the latter approach. *See* ECF 42.

[13] The government initially represented that it had no records for Burns. ECF 42. However, the government later submitted a letter (ECF 58) as well as a disc containing IAD files for Burns. And, the government submitted an additional IAD file as to Moore. *Id*.

of suspects, regardless of race. To that end, I intend to show the jury that Det. Hersl has previously arrested Mr. Paylor and, after that arrest did not result in criminal charges, continually harassed him by stopping him on the street without cause.

Thereafter, as set forth in my Order of April 9, 2015 (ECF 63), I personally conducted an *in camera* review of the IAD files. Over the course of three days, I spent several hours reviewing the files to determine whether any of the materials fell within the ambit of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). ECF 63 at 1.

In connection with my review of the materials, I considered the arguments advanced by the defense in its *ex parte* submission of April 3, 2015. *See* ECF 54. However, I was unaware of the rumors and suspicions concerning Hersl's history of misconduct. Therefore, I focused my review on substantiated findings of misconduct and dereliction of duty, rather than mere allegations.

With respect to Hersl, I reviewed 30 files/complaints. ECF 63 at 2. Of the 30 files, I ordered the government to disclose four files, in their entirety, as well as part of a fifth file. *Id.* I did not disclose any files relating to the other three officers. *Id.* at 1-2. Notably, I did not order disclosure of any records where the allegations of wrongdoing or misconduct were not sustained, or where the matter was administratively closed, without an adverse finding of misconduct. *Id.* at 2.

Hurson concluded, understandably, that the disclosed information was insufficient "to mount a successful challenge to the officers' accounts of Mr. Paylor's arrest." ECF 98-10 ("Hurson Declaration") at 2. Although a motions hearing had been set for April 21, 2015 (*see* Docket, 4/6/15), defense counsel advised Paylor to plead guilty. ECF 98-10 at 2.

Shortly before the scheduled motions hearing, Hurson informed the government that Paylor had opted to plead guilty, in lieu of proceeding with his suppression motions. ECF 119 at 8.

## 2. Guilty Plea

On April 21, 2015, Paylor entered a plea of guilty to the charge of felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). ECF 75. The plea was tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 60 months' incarceration. *See* ECF 76 (Plea Agreement), ¶ 13.

As indicated, Paylor faced considerable "back up" time in State court for his violations of probation in two cases. As noted, Paylor was on probation in the State for two felony offenses for which he received sentences of 15 years' incarceration, of which 14 years 6 months, and 27 days had been suspended. *See* ECF 80, ¶¶ 28, 29. Therefore, he faced the prospect of a sentence of almost 15 years in each case.

Significantly, the plea in federal court was contingent on sentences of "time served" in regard to the VOPs pending in State court. ECF 76, ¶¶ 15, 16. Indeed, the Plea Agreement stated, *id.* ¶ 17: "It is the explicit understanding of all parties and the [Baltimore City State's Attorney's Office] that [Paylor] will receive a total combined sentence of time served for all state probation violations starting on January 2, 2014."[14]

The Plea Agreement also contained a stipulated statement of facts. ECF 76, ¶ 9. That stipulation provided, in pertinent part, *id.*:

> On January 2, 2014, four Baltimore Police officers encountered the Defendant, Keyon Paylor, while driving in an unmarked vehicle on the 600 block of Bartlett Avenue in Baltimore City. Upon seeing the officers, Paylor ran up the stairs of 647 Bartlett Avenue. He then hopped the walls of two adjoining porches. When he reached the porch of 651 Bartlett Avenue—his residence—Paylor withdrew from his waistband a Heckler & Koch .45 caliber pistol, bearing serial number 2509021. The pistol was loaded with nine rounds, one of which was in the chamber. After withdrawing the pistol from his waistband, Paylor placed it underneath a seat cushion on his porch, where it was later recovered by law enforcement.

---

[14] The favorable disposition of the two VOP charges was undoubtedly a critical consideration for Paylor, given his exposure to a lengthy period of incarceration in those matters.

Paragraph 22 of the Plea Agreement is also relevant. *Id.* at 6. There, Paylor expressly waived his right to appeal his conviction. *Id.* But, he reserved the right to appeal a sentence if it exceeded 60 months of imprisonment. *Id.*

On April 21, 2015, the Court conducted proceedings pursuant to Fed. R. Crim. P. 11, at which Paylor was sworn. ECF 91 ("Rearraignment Transcript") at 2; *see also id.*, ECF 114-10.[15] Paylor stated that he had read the Plea Agreement and voluntarily agreed to it. ECF 91 at 8. The following colloquy is relevant, *id.* at 7:

> THE COURT: Let me also be sure you realize that you just took an oath to tell the truth. So this obligates you to answer my questions truthfully. And if you were to fail to do so, it's possible you would subject yourself to further charges on matters such as perjury or false statement. Do you understand?
>
> PAYLOR: Yes, ma'am.

As mentioned, Paylor also confirmed, under oath, that he had read and understood his Plea Agreement. The following exchange is pertinent, ECF 71 at 7:

> THE COURT: Okay. First of all, have you actually read this plea agreement?
>
> PAYLOR: Yes, ma'am.
>
> THE COURT: Did you understand what you were reading?
>
> PAYLOR: Yes.
>
> THE COURT: Did you fully discuss it with your lawyer?
>
> PAYLOR: Yes.
>
> * * *
>
> THE COURT: Let me ask you to turn to Page 8. Is that your signature next to the date of April 17, 2015?

---

[15] The government submitted a transcript of the Rule 11 proceeding as an exhibit, docketed at ECF 114-10. The same transcript is also docketed at ECF 91.

PAYLOR: Yes, ma'am.

THE COURT: Right above your signature, sir, it says in part: "I have read this agreement and I have carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the factual and advisory guidelines stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney." Is that a true and accurate statement?

PAYLOR: Yes, ma'am.

The Court reminded Paylor that a motions hearing had been set for April 21, 2015, but it would not be held because of his decision to plead guilty. *Id.* at 31. Paylor was also advised that, by pleading guilty, he waived his right to appeal his conviction. ECF 114-10 at 20, 30. Further, he was told that by pleading guilty he "waive[d] any and all defenses to the charges," *id.* at 30, and that "[a] defense could be legal, factual or both." *Id.* Further, Paylor was advised that the waiver included a waiver of his right to pursue motions filed on his behalf or to otherwise make a challenge to any aspect of the case. *Id*. at 30-32. And, of particular relevance here, Paylor specifically acknowledged that by pleading guilty he waived "any argument that something illegal happened in this case in terms of the investigation or prosecution . . . ." *Id*. at 32.

The government also presented the stipulated statement of facts. *Id*. at 35; *see* ECF 76, ¶ 9. In response to the Court's inquiry, Paylor expressly agreed that it was "an accurate summary of the facts of this case" and that he "commit[ed] the crime as summarized by the government." ECF 114-20 at 35.

At the conclusion of the hearing, Paylor confirmed that he was "pleading guilty freely and voluntarily" and that he was "pleading guilty" because he is "guilty as charged." *Id*. at 35-36. Accordingly, the Court found that Paylor's "plea of guilty, on the advice of competent counsel," was "a knowing intelligent, and voluntary plea supported by an independent basis in fact sustaining each of the essential elements of the offense." *Id*. at 36.

Subsequently, Paylor and his counsel participated in a presentence interview with U.S. Probation Officer Tracy Schrum, who prepared the Presentence Report. ECF 80. She indicated in the PSR that Paylor agreed with the statement of facts in the Plea Agreement and "demonstrated an acceptance of personal responsibility for his criminal conduct." *Id*. at 5.

In anticipation of Paylor's sentencing hearing, defense counsel submitted a "Sentencing Memorandum" (ECF 81), in which he represented that Paylor accepted responsibility for his conduct. Hurson wrote, in pertinent part, *id*. at 2:

> Mr. Paylor's offense is undoubtedly serious as the possession of firearms poses inherent risks. However, this case is unremarkable in that it contains no report that Mr. Paylor used, or threatened to use, the firearm he possessed. Mr. Paylor's was an entirely random arrest. He was walking down a city street when four (4) officers randomly came upon him. Residing in a city awash in illegal firearms, it could have easily been thousands of other young men arrested by officers that morning. . . .

Sentencing was held on July 22, 2015. ECF 82. Paylor was then 23 years old. ECF 80 at 2. At the sentencing hearing, Hurson stated, ECF 114-11 ("Sentencing Transcript") at 14; ECF 93 at 14 (Sentencing Transcript):

> You know, the nature and circumstances of the offense are obviously serious here. Firearms are – this town's awash in firearms. And people like Mr. Paylor are not supposed to possess them. It's illegal for them to possess them and, frankly, there's no reason for him to possess them.
>
> But as I pointed out in the [Sentencing Memorandum], he wasn't the target of an investigation. This wasn't a long-running thing. It was unfortunately a random encounter at 11 a.m. in the morning that resulted in Mr. Paylor's arrest.
>
> You know, obviously, he shouldn't have had a gun. But I think it's important that it wasn't as though he was getting a phone call, that he was menacing anyone or using the firearm or anything, because often times that is the case. In some sense, I think that mitigates slightly, making this one of the arguably less serious felon in possession cases, but serious nonetheless. . . .

After two deductions under U.S.S.G. § 3E1.1(a) for acceptance of responsibility, the Court determined that Paylor had a final offense level of 22, and a criminal history category of IV. ECF

114-11 at 4-5, 8.  This yielded an advisory sentencing guidelines range of 63 to 78 months'
imprisonment.  ECF 114-11 at 9; ECF 84 ("Statement of Reasons"); ECF 80, ¶ 58.  In accordance
with the C plea, however, the Court sentenced defendant to the agreed upon term of 60 months'
incarceration.  ECF 83.

### C.    The BPD Investigation

On February 27, 2017, a federal grand jury indicted Hersl and six other BPD officers on
charges of racketeering, RICO conspiracy, armed robbery, and various acts of corruption.  *See
United States v. Gondo, et al.*, CCB-17-106, ECF 1.[16]  The defendants in that case were Officer
Wayne Jenkins and detectives Momodu Gondo, Daniel Hersl, Evodio Hendrix, Jemell Rayan,
Marcus Taylor, and Maurice Ward.  *See* CCB-17-106, ECF 1 (Indictment); ECF 137 (Superseding
Indictment).[17]  The RICO conspiracy count (Count One) in the Superseding Indictment (ECF 137)
included as overt acts several instances of theft of money from individuals subjected to unlawful
arrests, warrantless entries into residences for the purpose of stealing money, and the filing of false
affidavits.  However, the detailed Superseding Indictment did not reference the incident involving
Mr. Paylor on January 2, 2014.

According to the Superseding Indictment, filed June 22, 2017, Hersl joined the BPD in
1999, and he was assigned to the GTTF "not later than April 28, 2016."  ECF 137, ¶ 8.  The GTTF
was described as "a specialized unit" within the BPD.  *Id.* ¶ 4.  Its "primary mission" was to track

---

[16] Other police officers have since been indicted in other cases.  Thomas Allers was charged
with RICO offenses in Case CCB-17-452.  And, on November 30, 3017, in Case CCB-17-638, a
grand jury returned an indictment against Wayne Jenkins in connection with his execution of a
false statement of probable cause.  And, as indicated, Carmine Vignola was recently charged with
lying to a federal grand jury.  *See* CCB-19-431.

[17] The Superseding Indictment named only Hersl, Jenkins, and Taylor.  At the time it was
filed on June 22, 2017, the other defendants had already pleaded guilty.

and recover firearms in Baltimore City. *Id.* According to ECF 137, Hersl "robbed arrestees and detainees, and shared the proceeds with others . . . ." *Id.* ¶ 13(c); *see also*, *e.g.*, *id.* ¶ 40.

During the investigation of the BPD, FBI agents listened to telephone calls from Paylor to his family, which took place shortly after Paylor's arrest in January 2014. At the time, Paylor was detained and the calls were recorded. As noted earlier, in those calls Paylor denied that he had a gun on January 2, 2014, and he complained that the officers entered his house and stole his money. ECF 98-5 ("Newberger Declaration"), ¶¶ 4, 8, 9. The U.S. Attorney's Office contacted the Office of the Federal Public Defender and indicated an interest in debriefing Paylor. *Id.* ¶ 2. AFPD Newberger represented Paylor at that time. *Id.* ¶ 1.

On or about June 13, 2017, Newberger informed the government that Paylor's description of the events of January 2, 2014, would differ from the statement of facts in his Plea Agreement. *Id.* ¶ 3. The government indicated that it still wanted to meet with Paylor. *Id.* Shortly thereafter, Paylor and his lawyer met with Assistant United States Attorney ("AUSA") Derek Hines, FBI Special Agent Erica Jenson, and a second FBI agent. *Id.* ¶ 4. The government offered Paylor use immunity for information relating to his interactions with Hersl, specifically with respect to the occurrence on January 2, 2014. *Id.* ¶ 6.

During the meeting, Paylor recounted that he had known Detective Hersl since he (Paylor) was 13 years old. *Id.* ¶ 5. He recalled that Hersl "used to come into the neighborhood, 'shake us down' and 'lock us up.'" *Id.* And, he indicated that Hersl often worked with Sergeant Burns. *Id.*

Paylor recounted that on the morning of Paylor's arrest on January 2, 2014, he had visited his State probation officer. *Id.* ¶ 11. He related that, as he was walking home from that appointment, the officers spotted him, got out of their vehicle, and followed him into his house. *Id.* ¶¶ 7-9. Hersl, Moore, and Romeo apprehended him and took him outside to the front porch,

where they claimed to have found the firearm under the seat cushion. *Id*. ¶¶ 8, 10. Paylor denied the gun was his, but the officers claimed they saw him put it there. *Id*. ¶¶ 10, 11. Meanwhile, according to Paylor, Burns went upstairs to Paylor's bedroom and stole between $4,500 and $5,000 from him. *Id*. ¶¶ 8, 9. Paylor also identified photographs of Hersl and Burns. *Id*. ¶ 12.

On June 15, 2017, before the Superseding Indictment was filed in case CCB-17-106, Paylor was called by the government to appear before the grand jury. *Id*. ¶ 13; ECF 127-3 (Grand Jury Transcript). Paylor testified that Hersl and two other officers detained him on the date in question, while Burns went into the house, proceeded upstairs, searched Paylor's room, "ripping [his] room apart," *id*. at 11, and stole about $4,500 to $5,000 from his dresser. *Id*. at 10-12. Paylor claimed he saw Burns "from the bottom of the steps . . . ." *Id*. at 11. He maintained that Burns "went straight to [his] room," *id*. at 13, and he estimated that Burns "was probably in the house probably for, like, 10 minutes." *Id*.[18] He also stated, *id*. at 13:

> Well, they [*i.e.*, the police officers] sat me on the porch and they asked why I was staring at them so hard, because I told them I – trying to put – like they did before. So they like, Man, don't say nothing. Then they went to the chair and lift up the chair cushion and – he going to say. So first, I told him like, Man, that's not my gun, and then he going to say, Yeah, we just seen you put this right here.

> So I'm like, I ain't put nothing right there. The next thing you know, they put the rubber gloves on. He start unloading the gun on the porch, and then took his gun off his hip and put it together and put his gun back. He going to say this – and then they call for the paddy wagon. They put me in the paddy wagon.

AUSA Hines asked Paylor why, in view of his assertions, he pleaded guilty to possession of the loaded handgun on January 2, 2014, and why he admitted to the facts as alleged in the Plea Agreement. *Id*. at 18-19. The following colloquy is pertinent, *id*.at 18-20, 22-23:

---

[18] According to the government, Paylor's stepfather, Stewart Harris, was at the residence when Paylor was arrested on January 2, 2014. ECF 114 at 16. He was interviewed on March 14, 2018, and, according to the government, he disputed Paylor's claim that a detective went upstairs. *Id*. Nor did Harris know of anything missing from the house. *Id*.

| [HINES]: | And you pled guilty to this case in federal court, and in your plea you admitted that – a number of facts, including that when you reached your porch you withdrew from your waistband a .45 caliber pistol which was loaded with 9 rounds, and after withdrawing the pistol you placed it underneath the seat cushion where it was later recovered by law enforcement. |
|---|---|
| | Is it correct that you admitted to that in your plea agreement? |
| [PAYLOR]: | Yes. |
| [HINES]: | Why did you admit to that? |
| [PAYLOR]: | Because they said it might take 60 months, or 15 years to go away, for my probation violation. |
| [HINES]: | So was it your understanding, Mr. Paylor, that if you went to trial in this case, had a trial, Danny Hersl, Sgt. Burns, and others may testify, and that if you were convicted you could get somewhere close to 15 years of prison time? |
| [PAYLOR]: | Yes. |
| [HINES]: | And as a result of that, did you -- is that why you pled guilty to this case? |
| [PAYLOR]: | I pled guilty to this case take the 5 years, so I won't have to do the whole 15 years of my back-up probation time. |
| [HINES]: | So you felt it was a risk worth taking, even though your testimony indicates today that that gun was not yours, is that right? |
| [PAYLOR]: | Yes. |
| [HINES]: | But to be clear, the testimony you've given today to the grand jurors is truthful and complete and accurate testimony? |
| [PAYLOR]: | Yes. |

*       *       *

| [HINES]: | Let me just interrupt you, Mr. Paylor. One thing we don't want to do is ask about any privileged communications between you and your lawyer, but we do want to understand how -- you know, what you believed and why you took the plea bargain. |
|---|---|

| | |
|---|---|
| [PAYLOR]: | I believed if I took 5 years, the 15 years would've been unexistent [sic]. |
| [HINES]: | So you had a prior state conviction from a Danny Hersl arrest, right? |
| [PAYLOR]: | Yes. |
| [HINES]: | And as a result of that state conviction and that arrest, you were on probation, right? |
| [PAYLOR]: | Yes. |
| [HINES]: | And if you got charged, which you in fact did, you could back up time on the state side and have to serve an additional 15 years because you were on probation, is that right? |
| [PAYLOR]: | Yes. |
| [HINES]: | And this plea was a global resolution of both the state case and your federal case, right? |
| [PAYLOR]: | Yes. |
| [HINES]: | And you believed that 60 months was a deal that you felt you had to take for various reasons, because you were looking at 15 years or more if you were convicted at a trial, is that right? |
| [PAYLOR]: | Yes. |

On July 5, 2017, the government filed a "Motion to Reduce Sentence Pursuant to Rule 35" (ECF 86), asking the Court to reduce Paylor's federal sentence to time served. The government asserted, *id*. at 3:

> Reducing the defendant's sentence at this time is appropriate because the defendant provided information to the United States that has substantially assisted the United States in an ongoing investigation. The usefulness of this information could not have [sic] reasonably anticipated by the defendant until more than one year after his sentencing and was promptly provided to the United States by the defendant.

Despite Paylor's opportunity for early release, Paylor declined, claiming he was fearful of police retaliation. ECF 98-5, ¶ 14. Newberger told AUSA Hines that Paylor preferred to complete what remained of his sentence. *Id.*; *see also* ECF 98 at 10. However, Paylor asked the government

to vacate his conviction.  The government declined to do so.  ECF 114 at 14.  On July 11, 2017,

the government withdrew its Rule 35 motion (ECF 89), stating that "Paylor has decided that he

does not want to pursue a sentence reduction pursuant to Rule 35 at this time."[19]

In the meantime, in the police corruption prosecution pending before Judge Blake, all but

two defendants entered pleas of guilty.  *See* CCB-17-106, ECF 156, 157, 195, 215, 257.  To

illustrate, Jemell Rayam pleaded guilty on October 10, 2017.  *See* ECF 196 (Rayam Plea

Agreement).  In Rayam's plea agreement, he admitted, *inter alia*, that as a BPD officer he

> robbed civilians he detained and in some cases arrested and stole money and drugs
> from them.  RAYAM did this beginning in at least 2009 or 2010 when he joined
> the GTTF.  At times, RAYAM shared the proceeds with co-defendants Momodu
> GONDO ("GONDO"), Wayne Jenkins ("JENKINS"), Daniel Hersl ("HERSL"),
> Marcus Taylor ("TAYLOR"), Sergeant A and others, and on other occasions, he
> kept all the proceeds for himself . . . .  RAYAM also sold, through associates of his,
> drugs that JENKINS gave him and split the proceeds of those sales.  JENKINS
> obtained the drugs by robbing detainees and arrestees.

*See* CCB-17-106, ECF 196, ¶¶ 8, 9.

Jenkins pleaded guilty on January 5, 2018, "to racketeering conspiracy, racketeering, two

counts of Hobbs Act Robbery, falsification of records in a federal investigation, and four counts

of deprivation of rights under color of law."  *See Id.*, ECF 254 (Jenkins Plea Agreement); CCB-

17-638, ECF 5 (Jenkins Plea Agreement).  Jenkins acknowledged, *inter alia*, that he and other

members of the BPD authored false incident and arrest reports, engaged in warrantless stops and

---

[19] The Court is aware that, in other instances involving misconduct by GTTF officers, the
government has agreed to vacate convictions.  *See, e.g.*, *United States v. Burley and Matthews*,
RDB-11-74, ECF 115.  And, the State has sought to set aside countless convictions involving the
tainted police officers, regarding them as "unjust."  *See, e.g.*, THE DAILY RECORD, Feb. 28, 2019,
at 8A ("[State's Attorney Marilyn] Mosby seeks tool to let courts vacate 'unjust' convictions");
THE DAILY RECORD, Sept. 6, 2019, at 1 ("Mosby seeks to vacate 800 convictions"); *see also* THE
DAILY RECORD, Nov. 20, 2019, at 1 (discussing adoption of a new rule by the Maryland Court of
Appeals, Rule 4-333, to allow prosecutors to seek to vacate tainted convictions, and referencing
"at least 790 convictions" that the State's Attorney for Baltimore City "believed should be vacated
because they significantly involved GTTF members").

seizures without probable cause, made false arrests, created phony charging documents, planted drugs on defendants, and stole money from them. *See*, *e.g.*, CCB-17-106, ECF 254 at 17.

Defendants Hersl and Taylor did not plead guilty. Instead, they proceeded to a jury trial beginning on January 23, 2018. *See* CCB-17-106, ECF 310. The RICO conspiracy charge (Count One) included conduct of the police officer defendants in which they arrested individuals and then stole money from them. Notably, the government did not use Paylor as one of those victims. Indeed, Paylor was never called as a witness at Hersl's corruption trial.

Herbert Tate and Jimmie Griffin were among those who testified for the government. According to Tate, Hersl and a group of officers arrested him on November 27, 2015, and Hersl stole money from Tate. ECF 98-17 ("Tate Testimony") at 23-25. Similarly, Griffin testified that, on or about November 5, 2014, Hersl stole money from him during an arrest. ECF 98-16 ("Griffin Testimony") at 8-10, 14.

On February 12, 2018, the jury convicted both Hersl and Taylor. In particular, Hersl was convicted of "Racketeering Conspiracy" (Count One); "Racketeering" (Count Two), including as to Griffin and Tate; and "Hobbs Act Robbery and Extortion" (Count Five). ECF 98-3 ("Verdict Form"); *see also Gondo*, CCB-17-106, ECF 342; ECF 343. On June 26, 2018, Judge Blake sentenced Hersl to three concurrent terms of 216 months' imprisonment and three years of supervised release. *See Gondo*, CCB-17-106, ECF 442 ("Hersl Judgment"). The convictions and sentences were upheld by the Fourth Circuit. *See United States v. Taylor and Hersl*, ___ F.3d ___, 2019 WL 5700359 (4th Cir. Nov. 5, 2019).

The government disputes Paylor's suggestion that Hersl and Romeo stole money from Jimmie Griffin, a witness at the Hersl trial. ECF 114 at 12 (citing ECF 98 at 12-13). It also challenges Paylor's suggestion that Hersl and Burns stole money from Herbert Tate, another

witness at the Hersl trial, or that they planted evidence on Tate. *Id.* The testimony of Griffin (ECF 114-18); Romeo (ECF 114-19); and Tate (ECF 114-20) did not establish that Burns or Romeo committed the robberies, although they were at the scenes at the relevant times.

In the unrelated RICO case of *United States v. Gerald Johnson et al.,* JKB-16-363, the government called Detective Romeo as a witness. ECF 114 at 14. Before doing so, the government disclosed information to defense counsel and to the court pertaining to Romeo, his involvement in Paylor's case, and other matters. *See* ECF 114-21 at 1-4; 22; 24-26; 28; 30-47; 51; 57-121; *see also* ECF 114-25 (excerpt of proceedings before Judge Bredar on 1/2/18). After a review of information presented by the government, Judge Bredar stated, in part, *id.* at 22: "I'm not persuaded anything in relation to the Paylor incident is admissible as impeachment of Officer Romeo in his testimony in this case, because I am not persuaded that Officer Romeo knew of misconduct by other police officers . . . . And then most of all, I'm not persuaded that [Romeo] himself engaged in officer misconduct . . . ."

To my knowledge, the other BPD officers involved in Paylor's arrest (Jordan Moore, Timothy Romeo, and John Burns) have not been charged with any criminal offenses. *See* ECF 139; ECF 144, with exhibits; *see also* ECF 114 at 14-16.

Additional facts are included in the Discussion

## II.    Discussion

### A.  Section 2255

Pursuant to 28 U.S.C. § 2255(a), Paylor may "move the court which imposed the sentence to vacate, set aside or correct the sentence" if he can show "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or

is otherwise subject to collateral attack . . . ."[20]  "[H]abeas corpus is, at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319 (1995).

The scope of a § 2255 collateral attack is far narrower than an appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, ___ U.S. ___, 136 S. Ct. 1737, 1758 (2016) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)).  Thus, any failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 petition unless the petitioner can demonstrate "cause and prejudice" or "actual innocence." *See Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339 (1994); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010); *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999).  In contrast, any "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." *Massaro v. United States*, 538 U.S. 500, 509 (2003).

Generally, the rule governing procedural default of claims brought under § 2255 precludes consideration of any contentions that "'could have been but were not pursued on direct appeal, [unless] the movant . . . show[s] cause and actual prejudice resulting from the errors of which he complains.'" *Pettiford*, 612 F.3d at 280 (quoting *Mikalajunas*, 186 F.3d at 492-93).  Under the "cause and prejudice" standard, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error. *Bousley*, 523 U.S. at 622;

---

[20] The government does not dispute the timeliness of the filing of the Petition.  *See* ECF 98-18 ("Agreed Waiver").

*see also Dretke*, 541 U.S. at 393; *Massaro*, 538 U.S. at 505; *Reed*, 512 U.S. at 354 (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Murray*, 477 U.S. at 485, 496; *Frady*, 456 U.S. at 167-68; *Mikalajunas*, 186 F.3d at 492-93.

In order to show cause for not raising the claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded their counsel's efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see Carrier*, 477 U.S. at 492 ("[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel"). Additionally, the alleged error cannot simply create a possibility of prejudice, but must be proven to work to the petitioner's "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original). Pursuant to the Supreme Court's ruling in *Carrier*, 477 U.S. at 494, prejudice does not support relief of a procedural default in the absence of a showing of cause. *See also Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

An actual innocence claim, "if proven, serves as a gateway" to overcome a procedural bar. *Finch v. McCoy*, 914 F.3d 292, 294 (4th Cir. 2019); *see Schlup*, 513 U.S. at 329. The "fundamental miscarriage of justice exception is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). However, the actual innocence exception "only applies in limited circumstances." *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014). Indeed, it must

be "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." *Carrier*, 477 U.S. at 496.

In order to show "actual innocence," the petitioner "must demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent." *Mikalajunas*, 186 F.3d at 494 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also Bousley*, 523 U.S. at 623. Notably, the petitioner must meet this burden by clear and convincing evidence. *Mikalajunas*, 186 F.3d at 494. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Jones*, 758 F.3d at 583; *see Bousley*, 523 U.S. at 623.

As the Fourth Circuit recently said, "A valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Finch v. McKoy*, 914 F.3d at 298 (quoting *Schlup*, 513 U.S. at 324). Moreover, a petitioner must "'demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.'" *Finch*, 914 F.3d at 298 (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)). It is an "exacting standard," based on a "'holistic judgment about all the evidence[.]'" *Finch*, 914 F.3d at 299 (quoting *House v. Bell*, 547 U.S. 518, 539 (2006)).

## B. Voluntariness

In his Petition, Paylor argues, *inter alia*, that his "guilty plea was involuntary in violation of his Fifth Amendment due process rights because it was induced by gross police misconduct." ECF 98 at 14. He maintains that at the time he pleaded guilty he knew "that the police had planted

evidence against him and lied," but "he also knew that he had no viable way to fight against those lies in front of a jury." *Id*. at 13. Therefore, he insists that the police misconduct "induced him to plead guilty." *Id*.

In response, the government asserts that the defendant's plea colloquy demonstrates the voluntariness of his plea. ECF 114 at 18. Further, it posits: "Paylor confessed his guilt repeatedly, to the Court, the probation office, and through his counsel. There is no reason, legal or otherwise, to ignore those confessions now." *Id*. at 25-26.

A defendant must know the direct consequences of his guilty plea in order for it to be knowing and voluntary. *Brady*, 397 U.S. at 755. The Supreme Court has explained that under Fed. R. Crim. P. 11, "the district court is required, as a precondition to acceptance of a guilty plea, to inform the defendant in person of the specified rights he or she may claim in a full criminal trial and then verify that the plea is voluntary by addressing the defendant." *Gonzalez v. United States,* 553 U.S. 242, 247 (2008). This "requirement is satisfied by a colloquy between the judge and the defendant, reviewing all the rights listed in Rule 11." *Id.*

In evaluating the validity of a guilty plea, "courts look to the totality of the circumstances surrounding [it], granting the defendant's solemn declaration of guilt a presumption of truthfulness." *Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir. 2003) (citation omitted). Indeed, "[a] defendant's solemn declarations in open court affirming [a plea] agreement . . . 'carry a strong presumption of verity.'" *United States v. White*, 366 F.3d 291, 295 (4th Cir. 2004) (quoting *Blackledge v. Allison*, 431 U.S. 63, 76 (1977)). And, "because they do carry such a presumption, they present 'a formidable barrier in any subsequent collateral proceedings.'" *White*, 366 F.3d at 295-96 (quoting *Blackledge*, 431 U.S. at 74).

Indeed, a court must be able to rely on a defendant's statements made under oath during a properly conducted Rule 11 plea colloquy. *United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003). Notably, "a more lenient approach . . . 'would eliminate the chief virtues of the plea system—speed, economy, and finality.'" *White*, 366 F.3d at 296 (citation omitted).

In *United States v. Lemaster*, 403 F.3d 216, 222 (4th Cir. 2005), the Fourth Circuit stated that, "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." Put another way, "allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'" *Id.* (quoting *Crawford v. United States*, 519 F.2d 347, 350 (4th Cir. 1975)).

As discussed earlier, at the outset of Paylor's rearraignment on April 21, 2015, Paylor took an oath to tell the truth. ECF 91 at 2. The Court explained the significance of that oath. *Id.* at 3. And, Paylor indicated that he understood. *Id.* Paylor also confirmed, under oath, that he had read and understood his Plea Agreement. ECF 91 at 7.

Paylor insists that his guilty plea was the product of coercion because, at that time, he could not prove the lies of the BPD officers or their blatant corruption, and no one would have believed Paylor's accusations. But, the facts also reflect that Paylor's decision to plead guilty was the product of careful consideration, with knowledge of allegations of misconduct by Hersl and other members of the BPD. Indeed, defense counsel pursued efforts to establish such misconduct. Ultimately, Paylor made a calculated decision to negotiate a favorable plea deal that substantially limited his period of incarceration.

At the guilty plea proceeding, the Court carefully reviewed with Paylor the nature of the charge and its elements (ECF 91 at 8-9), as well as the maximum penalties (*id.* at 9), the anticipated sentencing guidelines calculations (*id.* at 9-17), and the various rights that Paylor waived by pleading guilty. *Id.* at 20-22. In particular, Paylor was advised that, by pleading guilty, he "waive[d] any and all defenses to the charges." *Id.* at 30. Of relevance here, he was expressly informed that he waived his right to challenge the investigation or prosecution of the case. *Id.* at 30-32. Also of import, Paylor acknowledged that, by pleading guilty, he waived "any argument that something illegal happened in this case in terms of the investigation or prosecution . . . ." *Id.* at 32.

The government presented a summary of the stipulated statement of facts. *Id.* at 34-35. The facts reflected that on January 2, 2014, Paylor had a loaded firearm and he placed it under a seat cushion on his porch. ECF 76, ¶ 9. And, Paylor agreed, under oath, that the facts as outlined were accurate. ECF 91 at 35. The following colloquy is pertinent, *id.* at 35-36 (emphasis added):

> THE COURT: Mr. Paylor, is that an accurate summary of the facts in this case?
>
> PAYLOR: Yes, ma'am.
>
> THE COURT: Do you still wish to plead guilty?
>
> PAYLOR: Yes, ma'am.
>
> THE COURT: Are you pleading guilty freely and voluntarily?
>
> PAYLOR: Yes, ma'am.
>
> THE COURT: *Are you pleading guilty because you are guilty as charged?*
>
> PAYLOR: *Yes, ma'am.*

As indicated, Paylor entered his plea under Rule 11(c)(1)(C). *See* ECF 76, ¶¶ 13-21. The agreement called for a federal sentence of five years' incarceration. *Id.* ¶ 13. And, the plea was

conditioned on time-served sentences for the two violations of probation pending in State court, where Paylor faced back-up time of almost 15 years of incarceration.

Paylor was also advised of his waiver of the right to appeal, both as to the conviction and the sentence. ECF 91 at 20-21; *see also* ECF 76, ¶ 22. Notably, "even valid appeal waivers do not bar claims that a factual basis is insufficient to support a guilty plea." *United States v. McCoy*, 895 F.3d 358, 364 (4th Cir. 2018). In other words, "a challenge to a plea's factual basis survives an appellate waiver." *Id.* However, "'[a] stipulated recitation of facts alone is sufficient to support a plea.'" *Id.* at 365 (quoting *United states v. Ketchum*, 550 F.3d 363, 367 (4th Cir. 2008)). And, a defendant is "bound by his sworn statements." *McCoy*, 895 F.3d at 365; *see United States v. Bell*, 359 F. App'x 442, 444 (4th Cir. 2010). Paylor did not appeal; he knowingly and voluntarily waived his right to do so. *McCoy*, 895 F.3d at 363; *United States v. Brown*, 232 F.3d 399, 403-04 (4th Cir. 2000).

Despite Paylor's sworn statements, and the comprehensive Rule 11 colloquy, in which the Court specifically explained that Paylor was waiving any challenge to the prosecution of his case, Paylor argues that, based on police misconduct, his guilty plea must be set aside as involuntary. ECF 98 at 14. To "set aside a plea as involuntary," Paylor, "who was fully aware of the direct consequences of the plea[,] must show that (1) 'some egregiously impermissible conduct (say, threats, *blatant misrepresentations*, or untoward blandishments by government agents) antedated the entry of his plea' and (2) 'the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice.'" *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013) (emphasis in *Fisher*) (quoting *Ferrera v. United States*, 456 F.3d 278, 290 (1st Cir. 2006)).

*Fisher*, 711 F.3d at 466, on which Paylor relies, is critically important here. In that case, the defendant was convicted of being a felon in possession of a firearm. A Baltimore City Task

Force Officer with the Drug Enforcement Agency ("DEA") had investigated the case against Mr. Fisher. It was later established that the DEA officer lied in a sworn search warrant affidavit that led to the recovery of inculpatory evidence forming the basis of the charge to which Mr. Fisher pleaded guilty. After Mr. Fisher was convicted, the DEA officer entered a plea of guilty to fraud and theft in connection with his official duties. *Id*. at 462, 466. As a result, pursuant to 28 U.S.C. § 2255, Mr. Fisher moved to vacate his guilty plea, asserting that the officer's pre-plea criminal misconduct rendered Mr. Fisher's guilty plea involuntary under *Brady v. United States*, 397 U.S. 742, 755 (1970). *See Fisher*, 711 F.3d at 464. Mr. Fisher also claimed that the government failed to meet its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). *See Fisher*, 711 F.3d at 464.

Based on these "extraordinary" facts, the Fourth Circuit held, in a two-to-one decision, that Fisher's plea was involuntary, in violation of due process. *Id*. at 462. The Court explained that to set aside his plea as involuntary, Fisher had to clear two hurdles: "first [he] must show that impermissible government conduct occurred," *id*. at 465; second, he "must show that the misconduct induced him to plead guilty." *Id*. at 467.

The *Fisher* Court found egregious misconduct based on the "highly uncommon" facts of the case, "in which gross police misconduct [went] to the heart of the prosecution's case." *Id*. at 466. It observed that the search warrant that authorized the search of Fisher's house rested entirely on the DEA officer's false affidavit, in which the DEA officer swore that a confidential informant told him that Fisher was distributing narcotics from his residence. *Id*. But, a year after Fisher pleaded guilty, the DEA officer "admitted that the confidential informant he identified in his affidavit 'had no connection to [Fisher's] case.'" *Id*. And, the Court determined that Fisher had shown a reasonable probability that, had he known about the DEA officer's misconduct, he would not have pled guilty. *Id*. at 469. Thus, the Court stated: "Given the totality of the circumstances

of this case—a law enforcement officer intentionally lying in an affidavit that formed the sole basis for searching the defendant's home where evidence forming the basis of the charge to which he pled guilty was found—Defendant's plea was involuntary and violated his due process rights." *Id.* at 469.

In addition, the *Fisher* Court observed that setting aside Fisher's plea "is supported by the important interest of deterring police misconduct." *Id.* at 469. It reasoned that if a defendant cannot challenge "subsequently discovered police misconduct," then "officers may be more likely to engage in such conduct, as well as more likely to conceal it to help elicit guilty pleas." *Id.* And it acknowledged that "allowing [a] defendant's guilty plea to stand when a police officer intentionally lies in a search warrant affidavit undermines public confidence in our judicial system." *Id.* at 470.

Paylor argues that both aspects of the *Fisher* test are satisfied. As to the first, component— impermissible government conduct—he contends that "there is no shortage of egregious, impermissible police misconduct here." ECF 98 at 16. In Paylor's words, "since at least 2014, Hersl has been involved in a steady spree of fraudulent behavior, including but not limited to, lying in search warrant affidavits, charging documents, and arrest reports; planting evidence against suspects; robbing individuals Hersl then (falsely) charged with other crimes; extortion; and fraud." *Id.* To illustrate, asserts Paylor, "the facts relating to Hersl's racketeering conviction for robbing and planting evidence against Tate are eerily similar to Hersl's bad acts in Mr. Paylor's case." *Id.* at 17.

Further, Paylor avers that "[t]he case for granting relief here is even stronger than in *Fisher*," ECF 125 at 12, and that "allowing his conviction to stand would be an injustice far more intolerable than would have been the case for Mr. Fisher." *Id.* at 13. He reasons, *id.* at 13-14:

"The police misconduct is not merely misattributing who led the police to the defendant; instead, the police invented this crime out of whole cloth to steal Mr. Paylor's money." He also asserts: "The police then covered it all up with a single false report, authored and signed by only two of the four officers (Hersl and Burns)." *Id*. at 14.

As to the second prong of the *Fisher* test—materiality—Paylor asserts: "Hersl's misconduct was material to [his] decision to plead guilty." ECF 98 at 17. He argues that if he had "known about Hersl's extensive criminal conduct" and he "would have had an entirely different view of the government's case against him" and "would have insisted on going to trial." *Id*. In addition, Paylor argues that if his counsel "had this new evidence against Hersl—evidence that [Hurson] tried but was unsuccessful in securing—[Hurson's] entire approach to the case would have been different." *Id*. Specifically, Hurson "would have fought hard for an outright dismissal of the case. If that did not work, he would have litigated the motion to suppress the evidence in the case." *Id*. And, if that was unsuccessful, Hurson "would have advised Mr. Paylor that a key consideration in deciding whether to plead guilty or go to trial would have been the role that Hersl's credibility played." *Id*. (citing ECF 98-10, ¶ 6).

Moreover, Paylor maintains his innocence, which is "an important factor" that courts may consider in assessing the validity of a plea. *See, e.g., Fisher*, 711 F.3d at 467 (noting that a claim of innocence is "by no means a dispositive" factor, but it is "perhaps an important factor in this assessment"); *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000) (a court assessing the validity of a defendant's plea "may consider such factors as whether there is evidence of factual guilt"). He avows: "The credible evidence all demonstrates that Mr. Paylor is innocent. That's why he was put before a grand jury and offered a sentence reduction to time-served." ECF 125 at 15.

Further, Paylor argues that the government's position that "Paylor should get no relief because he pleaded guilty and he is in fact guilty" is a position that is "diametrically opposed to what the government told judges in this very Court, and diametrically opposed to evidence the government presented to" the grand jury. ECF 125 at 1. According to Paylor, it "would be a miscarriage of justice" to allow his "conviction to stand. . . ." *Id.* at 2.

In opposition, the government contends that, in contrast to the facts in *Fisher*, "Paylor cannot point to evidence that there was any misconduct *in this case*." ECF 114 at 22 (emphasis added). Rather, the government observes that Paylor "points to evidence" that Hersl "had engaged in criminal conduct in *other* cases, such as those involving Jimmie Griffin and Herbert Tate." *Id.* (emphasis in original). Moreover, "Paylor does not claim" that the incidents involving Griffin or Tate are "in any way connected to his specific case, or that it has any bearing on his actual guilt or innocence." *Id.* at 23. For example, the Griffin incident is "a classic example of impeachment material that could have been used to attack Hersl's credibility at trial." *Id.* And, the government points out that the incident involving Tate occurred on November 27, 2015, *i.e.*, *after* "Paylor's guilty plea, "and is therefore irrelevant to the *Fisher* analysis." *Id.*

As the government sees it, in *Fisher* the police officer admitted to his misconduct as to Mr. Fisher, and that unlawful conduct went "to the heart of the prosecution's case" against Mr. Fisher. *Fisher*, 711 F.3d at 466. But, there is no such misconduct or admission of misconduct in Paylor's case. Rather, "Paylor's claims are based solely on his own self-serving accusations." ECF 114 at 25. In this regard, the government notes that Paylor's accusations are inconsistent with the accounts of the three other officers involved in Paylor's case. *Id.*[21] To that end, the government

---

[21] Paylor contends that none of the officers saw Paylor with a weapon on the day of his arrest. ECF 98 at 5. The government acknowledges only that Detective Burns did not see Paylor

insists that it "did not need Hersl as a witness" because other officers saw him with the gun, and the government informed defense counsel, prior to Paylor's guilty plea, that it did not intend to call Hersl as a witness at trial. ECF 114 at 23. Because "Hersl was not a necessary witness," the government maintains that it could have proceeded to trial without Hersl. *Id.* at 24.

In addition, *prior* to defendant's guilty plea, he had been provided with the IAD complaint concerning Jimmie Griffin. Because the Griffin case is unrelated to Paylor's case, the incident involving Griffin would constitute impeachment evidence, and it was timely disclosed to Paylor. *See United States v. Ruiz*, 536 U.S. 622, 625 (2002) ("[I]mpeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary . . . ."). Significantly, according to the government, this is the only instance of misconduct by Hersl that *predated* Paylor's guilty plea, and Paylor knew about it. *Id.* at 24-25.

In the government's view, Paylor "does not present any new evidence of police misconduct in this case." ECF 114 at 26. Indeed, as the government observes, Paylor acknowledges in his Petition that "he knew at the time he pled guilty that the police had planted evidence against him and lied." *Id.* (citing ECF 98 at 13). According to the government, "This admission is fatal" because it establishes that "the alleged misconduct could not have been material to Paylor's decision to plead guilty," given that "he knew about the misconduct at the time." ECF 114 at 26. And, perhaps most significant, the government maintains that Paylor's "accusations" are repeatedly contradicted by his own admissions, including his statements under oath at the Rule 11 proceeding, during the presentence investigation, and in connection with sentencing. *Id.* at 24.

_____

remove the firearm from his waistband, but claims that Burns heard another officer shout "gun." ECF 114 at 23 n.7.

As to Paylor's arrest, he alleges "that police officers framed and robbed him and then covered it up with a false police report that omitted the real facts . . . ." ECF 125 at 15. But, in contrast to *Fisher*, where the officer admitted to misconduct in Mr. Fisher's case, there is no admission of misconduct here. In any event, theft of money does not prove that the gun was planted.

In my view, Paylor does not meet the criteria set forth in *Fisher*. In this case there is no extrinsic, independent evidence that Hersl engaged in misconduct that tainted Paylor's prosecution. Significantly, *Fisher* "involved misconduct relating to the evidence underlying the charges to which [Fisher] pled guilty." *United States v. Cohen*, WDQ-14-0310, 2015 WL 5331697, at *6 (D. Md. Sept. 10, 2015) (summarizing *Fisher*). As noted, the DEA officer in *Fisher* lied in the *only* affidavit supporting the application for a search warrant, which led to the discovery of the *only* evidence against the defendant in the case itself. *See* 711 F.3d at 466. And, the defendant in *Fisher* could point to extrinsic evidence of the government's misconduct, *i.e.*, the officer's admission that he falsified the affidavit. *Id.* at 465. No such admission has been made here, nor is there any such evidence that Paylor was framed, other than his own assertions to that effect. *See* ECF 114 at 22. Indeed, Paylor's case involved three other police officers who have not been charged with criminal misconduct, at least some of whom claim to have seen Paylor with the firearm.

To be sure, there is evidence that Hersl engaged in misconduct in *other* cases. *Id.*; *see* ECF 98 at 2, 12-13, 16-17. But, to the government's knowledge, it appears that only one incident of misconduct by Hersl occurred before Paylor's arrest. Such misconduct would provide "a classic example of impeachment material" as to Hersl. ECF 114 at 23. Yet, that misconduct was disclosed to Paylor before he pleaded guilty.

Several courts have found that *Fisher* does not apply where the information allegedly withheld from the defendant is impeachment evidence with little or no connection to the defendant's own case. *See, e.g., Coats v. United States*, RDB-09-333, 2018 WL 1570241, at *5-*6 (D. Md. Mar. 30, 2018) (declining to apply *Fisher* where "[m]ultiple officers were consistently involved in the observations and investigations that led to [the petitioner's] conviction"); *Carmon v. United States*, 4:12-cr-99-FL-1, 2015 WL 5838634, at *3 (E.D.N.C. Oct. 7, 2015) (distinguishing *Fisher* and denying petitioner's claim for relief based on police misconduct where "petitioner ma[de] no allegation as to any connection between such criminal conduct and the prosecution of [petitioner's] case"); *Richardson v. United States*, 4:11-cr-110-FL, 2015 WL 4366198, at *4 (E.D.N.C. July 16, 2015) ("Unlike in *Fisher*, petitioner has not alleged that the alleged criminal conduct by [the officer] related specifically to the police investigation that underpinned the government's evidence in this case. In this manner, petitioner has not alleged exculpatory evidence so extraordinary as to undermine the knowing and voluntary nature of his plea."); *Lewis v. United States*, 4:12-cr-00068-FL-2, 2015 WL 2401514, at *9 (E.D.N.C. May 20, 2015) (distinguishing *Fisher* where criminal charges against an officer involved in the petitioner's arrest "d[id] not permit an inference of a connection to this case" and therefore constituted impeachment evidence that, pursuant to *Ruiz*, the government was not required to disclose prior to petitioner's guilty plea).

To be sure, the allegations of police misconduct by members of the BPD are extremely disturbing. But, the allegation that Paylor was framed, and his claim of theft of money from his home, do not undermine the facts as to Paylor's unlawful possession of the loaded gun, which he admitted, *under oath*.

### C.    *Brady* Violation

In the alternative, Paylor contends that his guilty plea should be vacated because the government violated his due process rights under *Brady v. Maryland* by failing to disclose its investigation into Hersl's corruption.  ECF 98 at 20.  Paylor claims: "In discovery, the government never disclosed evidence of Hersl's or other officers' corruption."  And, when the Court ordered the government to do so, "the government provided a partial disclosure of IAD files" but "[t]his partial disclosure did not satisfy *Brady*."  *Id*. at 22.

The government recounts the investigation of the GTTF.  *See* ECF 114 at 11.  It notes that "the broader investigation into the GTTF . . . did not begin until November 2015, roughly seven months after Paylor pleaded guilty."  *Id.*  at 27.  And, it claims that it only learned of Hersl's involvement in May 2016, more than a year after Paylor pleaded guilty. *Id.* at 11-12, 27.  The evidence as to Hersl was uncovered during a wiretap of the phone of former BPD Dectective Momodou Gondo.  *Id.*  Moreover, the government insists that "no *Brady evidence*—whether characterized as exculpatory or impeachment evidence—was withheld by the government in this case."  *Id.* at 27.  Rather, it contends that the IAD files "were the *sole* evidence of officer misconduct known to the government at the time Paylor pleaded guilty."  *Id*. (emphasis in original).

In *Brady*, 373 U.S. at 87, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Notably, "a *Brady* violation contains three elements: the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial."  *Nicolas v. Attorney General of Md.*, 820 F.3d 124, 129 (4th Cir. 2016); *see also United States v. Taylor and Hersl*, ___ F.3d ___, 2019 WL 5700359, at *14 (4th Cir. Nov. 5, 2019); *Monroe v. Angelone*,

323 F.3d 286, 299 (4th Cir. 2003). And, there is "no distinction between exculpatory and impeachment evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Both information that undermines the prosecution's case and information that supports the defendant's case constitute *Brady* material that must be disclosed." *Nicolas*, 820 F.3d at 129; *accord United States v. Cannady*, 719 F. App'x 237, 240 (4th Cir. 2018).

Under *Brady*, a defendant is "entitled to the disclosure of evidence that is 'both favorable to the accused and material to guilt or punishment.'" *United States v. Abdallah*, 911 F.3d 201, 207 (4th Cir. 2018) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)). Of relevance here, evidence is favorable "not only when it tends substantively to negate guilt but also when it tends to impeach the credibility of a key witness for the prosecution." *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995).

As the Fourth Circuit recently said, to demonstrate a *Brady* violation, in violation of due process, "'the proponent must show that the undisclosed evidence was 1) favorable to him either because it is exculpatory, *or because it is impeaching*; 2) material to the defense, i.e., prejudice must have ensued; and 3) that the prosecution had materials and failed to disclose them.'" *United States v. Taylor and Hersl*, ___ F.3d ___, 2019 WL 5700359, at *14 (4th Cir. Nov. 5, 2019) (quoting *United States v. Wolf*, 860 F.3d 175, 189-90 (4th Cir. 2017) (cleaned up); *see also Giglio*, 405 U.S. at 153-54. Therefore, courts "make no distinction between exculpatory and impeachment evidence." *Nicola*s, 820 F.3d at 129 (citing *Bagley*, 473 U.S. at 676). Further, evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

According to the government, the case of *United States v. Ruiz*, 536 U.S. 622 (2002), governs here. ECF 114 at 21. There, the Supreme Court made clear that "the Constitution does

not require the government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Id*. at 633. The *Ruiz* Court explained that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary . . . .*" *Id*. at 629 (emphasis in original). Therefore, under *Ruiz*, the government contends that it "was under no obligation to disclose impeachment material prior to Paylor's guilty plea." ECF 114 at 20.

The *Brady* requirement extends to police investigations, not just to prosecutors. *Kyles*, 514 U.S. at 437-38; *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010); *see United States v. Moussaoui*, 591 F.3d 263, 285-87 (4th Cir. 2010) ("The *Brady* right . . . is a *trial* right. It requires a prosecutor to disclose evidence favorable to the defense if the evidence is material to either guilt or punishment . . . . When a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted.") (emphasis in original); *see United States v. Richards*, 314 F. App'x 522, 525 (4th Cir. 2008) ("The failure to disclose *Brady* evidence prior to a guilty plea does not establish a constitutional violation because impeachment information is a safeguard for a fair trial, not a plea."); *Jones v. Cooper*, 311 F.3d 306, 315 n.5 (4th Cir. 2002) ("To the extent appellant contends that he would not have pled guilty had he been provided the information held by the jailor, this claim is foreclosed by [*Ruiz*].").

In any event, the government "disclosed to the Court *in camera* all available IAD materials pertaining to Hersl and his colleagues." ECF 114 at 20. Notably, as the government points out, these "files included not only a sustained IAD complaint against Hersl for making a false statement, but also a then-pending complaint relating to the incident involving Jimmie Griffin, which Paylor cites repeatedly in his [Petition]." *Id*. (citing ECF 98 at 12-13). Significantly, "the robbery of Griffin, which occurred in November 2014, is the only incident of corrupt behavior by

Hersl that Paylor alleges pre-dated his guilty plea." ECF 114 at 20. Thus, Paylor "received information pertaining to the very episode that he now contends would have altered his calculus as to whether or not to plead guilty." *Id*. at 21.

Petitioner contends that "Hersl's pattern and practice of falsifying documents (including search evidence receipts, warrant affidavits, police reports, charging documents and time/attendance records), robbing and extorting people, and stealing money from them is 'favorable' to Mr. Paylor." ECF 98 at 20. And, he contends that disclosure of such information "would have likely led to the dismissal of all charges against Mr. Paylor after a pre-trial hearing." *Id*. at 21 (citing *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.")).

Paylor also asserts that the "government suppressed evidence of the investigation into Hersl" because "it appears that at least BPD leadership was aware of Hersl's misconduct before Mr. Paylor's guilty plea." ECF 98 at 22. In his view, to comply with *Brady*, "the BPD should have disclosed that to the U.S. Attorney's office; and the U.S. Attorney's Office, in turn, should have turned it over to Mr. Paylor." *Id*. at 22-23; *see also Kyles*, 514 U.S. at 437 (observing that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").

In support, Paylor points to a public statement made by former BPD Commissioner Kevin Davis on March 3, 2017, stating that he had been aware of the GTTF investigation "since it was initiated in 2015." *See* ECF 98 at 22 (citing Christine Boynton, *Police Commissioner: Indictments of '7 dirty cops' result of 'rock solid investigation*,' FOX 45 NEWS (March 3, 2017),

https://foxbaltimore.com/news/local/police-commissioner-indictments-of-7-dirty-cops-result-of-rock-solid-investigation).  From this statement, Paylor argues that before he pleaded guilty on April 21, 2015, the government had additional information about Hersl's misconduct beyond what was included in the IAD files.

However, according to the same news article cited by Paylor, the GTTF investigation commenced "in 2015, shortly after [Kevin Davis] was named Commissioner."  *See* Boynton, *supra*.  And, Davis was not confirmed as BPD Commissioner until October 19, 2015—several months after Paylor's guilty plea on April 21, 2015, and his sentencing on July 23, 2015.  Indeed, the government points out that this timeline is "consistent with wiretap affidavits documenting that the [GTTF] investigation began in November 2015 . . . ."  ECF 114 at 27.

Paylor also avers that "the government's failure to disclose evidence of Hersl's corruption was material."  ECF 98 at 23.  He argues that "a disclosure of Hersl's corrupt practices would have undoubtedly undermined confidence in the validity of the arrest and seizure of evidence, and in turn, shattered the government's only vehicle for securing a conviction against [him]."  *Id.* (citations omitted).

Paylor's arguments are unavailing.  As discussed, prior to Paylor's guilty plea, the government produced all IAD files for every officer involved in Paylor's arrest to the Court for *in camera* review.  *See Abdallah*, 911 F.2d at 218 ("[T]he defendant is 'entitled . . . to have the information he has sufficiently identified submitted to the trial court for *in camera* inspection and a properly reviewable judicial determination made whether any portions meet the [*Brady*] requirements for compulsory disclosure.'") (quoting *Love*, 57 F.3d at 1313) (alteration in *Abdallah*).  I spent several hours reviewing the IAD materials to determine whether any constituted *Brady* material.  ECF 63 at 1.  With respect to Hersl, I reviewed 30 files and ordered the disclosure

of four files, in their entirety, and the partial disclosure of a fifth file. *Id.* at 2; *see also United States v. Trevino*, 89 F.3d 187, 190 (1996) ("The trial court's ultimate conclusion as to whether the information is subject to disclosure-whether the evidence is both material and favorable-may be disturbed on appeal only if it is clearly erroneous.").

Paylor has failed to demonstrate that, prior to his guilty plea, the government withheld favorable and material evidence of Hersl's corruption beyond what was in the IAD files. There is no indication that the investigation into the GTTF began before Paylor entered his guilty plea or before he was sentenced. Thus, I conclude that the government did not commit a *Brady* violation.

### III.    Conclusion

In Paylor's jail calls at the outset of the underlying criminal case, he disputed that he had the gun. The government seemed to credit his account, calling him as a witness before the grand jury and then making a motion under Rule 35. *See* ECF 127-3. But, it never relied on that information in the prosecution of Hersl. Paylor was not named as a victim in the charges lodged against Hersl or the other GTTF officers. Nor did the government call him as a witness at the trial of Hersl.

What Judge Niemeyer said for the Court in *United States v. Taylor and Hersl* rings true here. "This is a particularly sad case. The community places a noble trust in police officers to define and enforce, in the first instance, the delicate line between the chaos of lawlessness and the order of the rule of law. And when police officers breach that trust and misuse their authority . . . a measure of despair infuses in the community . . . ." Nonetheless, Hersl's conduct does not exonerate Paylor; he is not entitled to relief under 28 U.S.C. § 2255. Therefore, for the reasons set forth above, I shall deny the Petition. ECF 98.

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the Court is required to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability is a "jurisdictional prerequisite" to an appeal from the court's Order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(B)(2). A certificate of appealability will not issue unless the petitioner can demonstrate both "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (internal quotation marks omitted).

In this case, I am satisfied that others might read *Fisher* as controlling in favor of Paylor. Therefore, a certificate of appealability shall issue.

An Order follows, consistent with this Memorandum Opinion.


Date: November 22, 2019                                          _____/s/_____
                                                                Ellen Lipton Hollander
                                                                United States District Judge